## UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| P180, INC.,<br><br>                                              Plaintiff,<br><br>—*against*—<br><br>JASWINDER PAL SINGH, CHRISTINE HUNSICKER, GEORGE GOLDENBERG, SCOTT CALLON, CHIRAG JAIN AND DOES 1–50<br><br>                                              Defendants. | CIV. NO. 25-cv-4432<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff alleges, upon personal knowledge as to its own conduct, records, and information received by it, and upon information and belief where otherwise stated to be upon information and belief, as follows:

### INTRODUCTION

1.      This case is a tale of lies, betrayal, and cover up.

2.      Veteran apparel CEO Brendan Hoffman formed Plaintiff P180 after meeting with Christine Hunsicker, who was then the CEO and Co-Founder of a company named CaaStle, Inc. Hunsicker explained that CaaStle offered technology to enable regular shipments of clothing to consumers to buy or to rent and that it had been extraordinarily successful in using that technology to build a subscriber base of hundreds of thousands of consumers.  According to Hunsicker, the technology included an efficient reverse logistics shipping platform, yield optimization technology, and an e-commerce ecosystem of hundreds of thousands of subscribers.

3.      That meeting led Hoffman to a eureka realization:  Apparel retailers could reclaim—and perhaps even multiply—their valuation by increasing their marginal gains on

discounted merchandise.  For years, valuation of apparel companies had declined to be just pennies per dollar of revenue.  Hunsicker promised e-commerce scale—specifically, technology and logistics that would enable regular clothing shipments to customers on a massive level—that would allow apparel companies to increase their margin on what otherwise would be discounted merchandise.

4.      Hoffman believed that this technology could turn everything in the industry around 180 degrees.  So he nicknamed his planned company Project 180—later shortened to P180.  Marrying Hoffman's expertise in apparel and industry relationships with Hunsicker's self-proclaimed technological and e-commerce prowess, Hoffman believed, could enable an integrated approach that combined experience with brand ownership and the great accomplishments of CaaStle.  So, Hoffman incorporated P180.  Hoffman would have 75% of the initial shares; Hunsicker would lead the board; and CaaStle have 25% of the initial shares.

5.      Thus, at the time (nearly two years ago), working with Hunsicker, along with CaaStle, seemed like a natural fit.  She presented CaaStle as a revolutionary technology and logistics company managing an ecosystem of hundreds of thousands of subscribers for multiple brands with hundreds of millions of dollars in revenue and a valuation of over $1.4 billion. Moreover, CaaStle had a prominent board of directors.

6.      What Hoffman did not know—but which eventually has become clear—is that Hunsicker is a world-class fraudster ranking alongside the likes of Bernie Madoff and Elizabeth Holmes.  She lied to the world to make it appear that CaaStle was a success, lied specifically to Hoffman about CaaStle, and hid CaaStle's financial data from Hoffman.  She presented herself as a skillful and successful entrepreneur who built a robust e-commerce business, raised

hundreds of millions of dollars for it, and commanded a board of notable leaders in corporate governance.

7.    Hunsicker, though, did not act alone.  She had co-conspirators—the other Defendants here--with whom she created her house of cards.  Hunsicker and her co-conspirators repeatedly stated or implied that CaaStle had a large scale, a huge subscriber base, and spectacular financials.

8.    In fact, contrary to Hunsicker and her co-conspirators' repeated claims of hundreds of thousands of subscribers and hundreds of millions of dollars in revenue, CaaStle itself had just a fraction of those subscribers, barely had any revenue, had supposedly spent hundreds of millions of dollars it received from investors, and had no viable business.  The whole thing was a sham perpetuated by a pattern of persistent lying, obfuscation, and, eventually, cover-up.

9.    The conspiracy included defrauding P180.  With Hunsicker as the ringleader of a conspiracy to defraud P180 (hereinafter, the "Hunsicker Enterprise"), the Hunsicker Enterprise consisted of her long-time collaborators and confidants Jaswinder Pal Singh, George Goldenberg, and Chirag Jain, as well as, more recently, Scott Callon and unknown others.  At various points in time, Singh, Goldenberg, Jain, and Callon served on CaaStle's board of directors and/or as executives of the company.  Based on public reporting and on information and belief, some portion of the Hunsicker Enterprise appears to have operated for years.  At least Hunsicker and, on information and belief, Goldenberg and Jain, faked financial information and fabricated subscriber data.  Since at least 2023, when CaaStle's independent auditor quit after learning that Hunsicker used its logo in connection with falsified numbers, the Hunsicker Enterprise has also been engaged in covering its tracks.  At that point, Singh and Callon knew, or

in the exercise of reasonable diligence should have known, about the fraudulent scheme, yet disregarded the information and continued to participate in the Hunsicker Enterprise anyway. And, at the latest, by December 2024, Hunsicker, Singh, Goldenberg, Jain, and Callon were actively participating in the Hunsicker Enterprise, including, without limitation, by concealing CaaStle's true financial state and its fraudulent activities.

10.    P180 was just another mark for the Hunsicker Enterprise.  The Hunsicker Enterprise sought to defraud P180 from the inside out.  Central to this scheme was a coordinated pattern of wire fraud and bank fraud.  Multiple times over the course of a year, the Hunsicker Enterprise fraudulently induced P180 to obtain assets and induced P180 to take self-dealing loans so that they, the Hunsicker Enterprise, could later leverage P180's assets for themselves or for their own benefit—including by way of example to hide, continue, or mitigate their fraud at CaaStle.  As one example, Singh both publicly and privately indicated the intent to force P180 to merge with CaaStle.

11.    The Hunsicker Enterprise also caused P180's money to be fraudulently transferred out of P180's bank account, both to CaaStle (where, presumably, the Hunsicker Enterprise used the transactions to fake accounts receivable or cashflow) and to personal bank accounts.  The Hunsicker Enterprise trumped up loan documents, executed fraudulent loans, engineered false repayments, and fraudulently transferred money to personal accounts—all through the interstate banking system.

12.    In addition to this abuse of the interstate financial system, members of the Hunsicker Enterprise also served on P180's board and committed flagrant breaches of fiduciary duties.

13.     These racketeering activities were accompanied by blatant conversion, clear common-law fraud, and efforts to aid and abet the same.

14.     By no later than early December 2024, CaaStle's leadership—including Defendants—was fully aware of the fraudulent activities occurring at CaaStle.  At that point, Defendants knew or should have known that given the long-running fraud, there was no viable path forward for CaaStle as a going concern.  In addition, CaaStle was facing allegations of unauthorized trademark use.

15.     However, from December 2024 through March 2025, in the face of cascading liabilities, rather than go public, come clean, and wind down business, the Hunsicker Enterprise kept quiet, failing to tell CaaStle investors and failing to tell Hoffman, including in his role as a board member of P180, the truth about CaaStle.  Worse, the Hunsicker Enterprise continued to make statements they knew to be false regarding CaaStle's subscribers, revenue, scale, and financial health.

16.     The egregiousness and intentionality of these actions is underscored by the fact that Callon is an expert on corporate governance.  As he is described by Forbes, "Callon became the only non-Japanese to serve on a government committee that drafted Japan's Corporate Governance Code, which was enacted in 2015."  Yet, since at least December 2024, he actively participated in failing to disclose, and thereby covering up, the fraud at CaaStle as part of the Hunsicker Enterprise, up to and including allowing Hunsicker to continue to provide updates to investors and communicate on behalf of the company months into 2025.

17.     Further underscoring the nature of the fraudulent scheme, another director—John Hennessey, the current chairman of Alphabet and former long-time president of Stanford University—left the CaaStle board, on information and belief, upon learning of the Hunsicker

5

Enterprise's fraudulent activities.  The Defendants, members of the Hunsicker Enterprise, however, banded together in an attempt to paper over and continue the fraud.

18.    Indeed, throughout the beginning of 2025, the Hunsicker Enterprise continued to control CaaStle and even adopted a new strategy:  induce P180 into transactions (including purchasing a controlling share of Vince), with the apparent intent to create the illusion of forward momentum for CaaStle and ultimately to force a merger or transfer of assets that would effectively bury their fraud within P180's success.  This was not a legitimate business strategy but rather was a calculated move to shift legal and financial exposure from a company with no viable business and long history of misrepresentations into another (solvent) company that, despite having been damaged, still retained independent assets.  They did so through multiple acts of wire fraud, bank fraud, and knowing breaches of fiduciary duty.

19.    All the while, Hunsicker and the co-conspirators kept silent about the CaaStle fraud until late March 2025, perhaps because, as disclosed in CaaStle's letter to shareholders that identifies an investigation by law enforcement authorities into CaaStle, it was obvious that the CaaStle fraud would inevitably become public.  At that time, CaaStle wrote to its investors, saying Hunsicker had "misstated financial statements and falsified audit opinions, as well as capitalization information that understated the number of company shares outstanding."

20.    Not surprisingly, CaaStle's disclosures to its investors were picked up by numerous media outlets.

21.    For P180's part, as soon as Hoffman learned this news, he moved quickly to untangle the fraudsters from P180, including replacing the self-dealing board members with P180 investors and terminating Hunsicker's access to P180 email.

22. While the media has rightly focused on Hunsicker's flagrant fraud at CaaStle, the full story of the Hunsicker Enterprise's fraudulent and racketeering activities has yet to be told. This suit seeks to bring the full conspiracy to light and seeks to obtain a measure of justice from Hunsicker and the co-conspirators.

## JURISDICTION AND VENUE

23. This Court has subject matter jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331.

24. This Court has subject matter jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367, as those claims form the same case or controversy as Plaintiff's federal claims.

25. This Court has personal jurisdiction over all Defendants.  The Court has specific personal jurisdiction over all Defendants because the conspiracy was executed in substantial part in New York, predicate acts and other fraudulent activities were directed at and harmed New York-headquartered P180, using New York-headquartered CaaStle, and Defendants acted in furtherance of the conspiracy in New York.  Defendants also regularly solicit and/or conduct business in New York, engaged in a persistent course of conduct related to the allegations herein in New York, and should have expected the fraud to have consequences in New York.

26. The Court further has personal jurisdiction pursuant to 18 U.S.C. §§ 1965(b) and (d), as the ends of justice require that any conspirators residing in other districts be summoned here for complete and full adjudication of the matter.  It is necessary to attain recovery that all conspirators be brought before a single court to answer for their racketeering activity.

27. Venue is appropriate in this District pursuant to 28 U.S.C. § 1331(b)(2) and (3), as a substantial part of the events or omissions giving rise to the claims occurred in the District and all Defendants are subject to personal jurisdiction in this Court.  Regarding the claims for breach

of fiduciary duty, P180's charter provides that suits against officers for breaches of fiduciary duties must be brought in the Court of Chancery in Delaware, "[u]nless the Corporation consents in writing to the selection of an alternative forum." The Corporation, by resolution dated April 30, 2025, consented to venue this case in this district.

## PARTIES AND RELEVANT NON-PARTIES

28.     P180, Inc., is a Delaware corporation with its principal place of business in New York, New York.

29.     Jaswinder Pal Singh is an individual who, on information and belief, resides in New York. At pertinent times he variously served as a director of CaaStle and was a co-founder of CaaStle.

30.     Christine Hunsicker is an individual, on information and belief, residing in New Jersey. At pertinent times she variously served as a director of P180, as CEO of P180, as a director of CaaStle, and as CEO of CaaStle.

31.     George Goldenberg is an individual who, on information and belief, resides in Los Altos, California. At pertinent times he variously served as a director of P180 and a director of CaaStle, longtime COO of CaaStle, and current interim CEO of CaaStle.

32.     Scott Callon is an individual, who, on information and belief, resides in Saratoga, California. At pertinent times he served as a director of CaaStle.

33.     Chirag Jain is an individual, who, on information and belief, is domiciled in India but presently resides in California. At pertinent times, he served as an executive of CaaStle.

34.     The identity of Does 1–50 are not presently known but the complaint will be amended as necessary to add them when appropriate.

35.     Non-Party CaaStle, Inc., is a Delaware corporation with its principal place of business in New York, New York.

8

## GENERAL ALLEGATIONS

36.    P180, Inc., was incorporated on February 21, 2024, in Delaware by Brendan Hoffman.  At that time, Hoffman had 75% of initially-offered shares, and CaaStle Inc. had 25% of initially-offered shares.

37.    Hoffman is a veteran of the apparel industry.  He has significant experience as an executive at apparel and footwear brands, including Vince and Wolverine Worldwide.  After leaving Wolverine in 2023, Hoffman was looking for his next project.  As described above, meeting Hunsicker led to a "Money Ball" moment for Hoffman.  He realized that apparel brands and stores were losing significant value by focusing on sell-through of full-price items while leaving discounted items as an afterthought.  Shifting focus, he thought, could drive meaningful profitability back to apparel brands and stores and regain historical levels of valuations.  It would be a 180-degree turnaround for the business, reversing the erosion that has occurred across the apparel industry.  Thus, "Project 180"—later shortened to P180—was born.

38.    In 2023 and 2024, working with Hunsicker seemed like a good idea.  According to Hunsicker, she had raised nearly $500 million for CaaStle based on its claimed innovative technology, its large ecosystem of subscribers, and its logistics and distribution expertise in supporting a rental business.  While Hoffman was an industry veteran with the knowledge, know-how, and experience in apparel, Hunsicker would lead the strategy of integrating the large e-commerce ecosystem into the business and raise the necessary funds.

39.    At the time, the now-well-publicized fraudulent activities of Hunsicker were not public and not known by Hoffman.  Hunsicker regularly denied Hoffman access to information regarding CaaStle's financial status or subscriber base on the pretense that Hoffman was not a large enough stakeholder in CaaStle to have that information.

40.     What Hoffman and P180 did not know was that Hunsicker headed an association of co-conspirators to conduct, cover up, and perpetuate unlawful business practices, since at least December 2024, and likely much longer.  As detailed below, the Hunsicker Enterprise perpetrated multiple instances of wire fraud and bank fraud.

### The Hunsicker Enterprise

41.     Hunsicker, Singh, Goldenberg, and Callon, and other unknown conspirators sought to fraudulently gain control of P180 and its assets for the benefit of the Hunsicker Enterprise.  The group had apparently worked together at various endeavors for years—including at and through other companies and ventures—and coordinated their activities across entities. The Hunsicker Enterprise's coherence was facilitated by the long relationship between the co-conspirators Hunsicker, Singh, Callon, and others, forged at elite universities such as Princeton and Stanford and other institutions.

42.     Hunsicker is the lynchpin of the association but is not solely responsible for its operation or management.  Hunsicker, Singh, Goldenberg, Jain, and Callon have all acted for and on behalf of the Hunsicker Enterprise through these longstanding relationships for the purpose of perpetuating unlawful business practices.  Others may be involved as well.  At least since December 2024, one primary goal of the Hunsicker Enterprise has been to cover up its other unlawful business practices at CaaStle and use racketeering business practices to obtain control over some or all of P180's assets.

43.     The central scheme of the Hunsicker Enterprise in regards to P180 was to obtain and control some or all of the money and assets of P180 for their personal benefit, to use P180's money and assets to perpetrate their fraudulent scheme at CaaStle, to conceal the scheme at

CaaStle, and, ultimately, to gain complete control of P180 to further their personal benefit and fraudulent schemes by, for instance, forcing P180 to merge with CaaStle.

44.    Emphasizing how the Hunsicker Enterprise operated independently of both P180 and CaaStle, its members blurred the lines of their involvement in both entities.  They also used their positions in both entities to perpetuate their racketeering activities of wire fraud and bank fraud.  For instance, even at times when Singh claims he had no official role at CaaStle, Defendants allowed him to use a CaaStle email address, holding him out as acting on CaaStle's behalf.  In fact, Singh and Hunsicker collaborated across multiple years, including at least and in addition as evidenced by Singh's periodic presence at CaaStle's offices in New York and their meeting in November 2024 in the lead up to Hunsicker's "confession."  As further example, after Hunsicker's fraud was revealed, she remained at CaaStle and continued communicating on behalf of the company months into 2025—even though she was supposed to have reduced her role.  The "reduced role" was a scam, as she actually served to further the Hunsicker Enterprise's control of P180, including a loan transaction where both sides of the transaction were controlled by the Hunsicker Enterprise (e.g., at least Singh, Jain, and Hunsicker).  She kept her office at CaaStle, and nothing about this "reduced role" was communicated to the organization.  And despite that supposed "reduced role," the Hunsicker Enterprise members who served on CaaStle's board allowed Hunsicker to continue to raise capital and communicate on behalf of CaaStle, including regarding CaaStle's scale and capabilities even though they knew such representations to be false.

45.    The Hunsicker Enterprise even tried to change CaaStle's business model on a dime, by switching from a "software as a service" business to an asset-heavy business as it continued its fraudulent scheme to obtain P180's assets.

46.     Members of the Hunsicker Enterprise engaged in a variety of activities to further this fraudulent scheme, including actions chargeable as wire fraud and bank fraud.  At least Hunsicker, Singh, Goldenberg, and Jain participated in the management and coordination of the Hunsicker Enterprise through individual acts of chargeable conduct as discussed below.  All Defendants conspired together for the benefit of the Hunsicker Enterprise.

### Wire Fraud

47.     Wire fraud is chargeable under 18 U.S.C. § 1343 if a defendant engages in a scheme to obtain money or property by fraud using interstate communications services, including email or phone calls.  Half-truths or fraudulent omissions are also chargeable.

48.     Members of the Hunsicker Enterprise engaged in multiple instances of wire fraud chargeable under Section 1343 in furtherance of their conspiracy to defraud P180 of its money and assets.  These lies were, in substance, principally the same ones that they told other stakeholders—the fictional subscriber and revenue numbers and holding a fraudulent business out as a real, successful one. The relevant conduct includes, but is not limited to:

> a.  In meetings on March 19 and April 10, 2024, with a company called elysewalker, which is high-end women's apparel brand, regarding a potential strategic opportunity, in which representatives of elysewalker, Hoffman, and members of the Hunsicker Enterprise all attended including Hunsicker and at least Goldenberg by video conference link, meeting attendees made statements about the robustness of CaaStle's overall business, e-commerce ecosystem, logistical capabilities, and ability to execute.  But that was false.  CaaStle had no viable business, exponentially fewer subscribers than stated, and lacked scale.  Those

statements that were not made by Hunsicker and Goldenberg were made in their presence, which they failed to correct when made.  Some were made by individuals whose statements were based on false information they had received from Hunsicker and Goldenberg.  Further, Hunsicker and Goldenberg, through their words, gestures, body language, and actions, implied capabilities and scale which CaaStle did not have and which they knew could not be delivered. In reliance on that information, P180 moved forward to secure a strategic relationship with elysewalker without knowing that the Hunsicker Enterprise intended to exert control over and raid the value in these assets for its own purposes.  The Hunsicker Enterprise then used P180's successes with elysewalker to continue their fraudulent business activities at CaaStle, including by using bank transfers discussed below to make CaaStle appear as if it had inbound accounts receivable or revenue.

b. On August 1, 2024, at a meeting with the apparel brand Altuzarra and, in which representatives of Altuzarra, Hoffman, and members of the Hunsicker Enterprise attended, held by video conference link, meeting attendees made statements regarding CaaStle's robust e-commerce ecosystem and capabilities.  But that was false.  CaaStle had no viable business, exponentially fewer subscribers than stated, and lacked scale. Indeed, CaaStle's business was multiple times smaller in terms of revenue and customers than Altuzarra itself.  Those statements that were not made by Hunsicker and Goldenberg were made in their presence which they

failed to correct when made.  Some were made by individuals whose statements were based on false information they had received from Hunsicker and Goldenberg.  Further, Hunsicker and Goldenberg, through their words and actions, implied capabilities and scale which CaaStle did not have and which they knew could not be delivered.  In reliance on that information, P180 moved forward in obtaining an interest in and providing an alleged loan related to Altuzarra without knowing that the Hunsicker Enterprise intended to exert control over and raid the value in these assets for its own purposes.  The Hunsicker Enterprise then sought to use P180's alleged debt to obtain control of P180's assets, including the interest in Altuzarra.

c.  On September 10 and 11, 2024, at a meeting in Mountainview, California, in which Hoffman and members of the Hunsicker Enterprise attended, including by via video conference link, Goldenberg knowingly articulated false information regarding value-add of CaaStle's capabilities, ecosystem, and scale which he knew to be untrue.  But that was false.  CaaStle had no viable business, exponentially fewer subscribers than stated, and lacked scale.  In reliance on that information, P180 moved forward in obtaining interest in and alleged debt related to Altuzarra without knowing that the Hunsicker Enterprise intended to exert control over and raid the value in these assets for its own purposes.  The Hunsicker Enterprise then sought to use P180's debt to obtain control of P180's assets, including the interest in Altuzarra.

d. In a meeting on January 10, 2025, with Vince regarding a potential transaction, in which representatives of Vince and members of the Hunsicker Enterprise attended, and which at least Hunsicker attended via video conference link, Hunsicker made statements regarding CaaStle's capacities, technology, and scale which were known to be false, and, on information and belief, which she had already confessed to be false a month previously. CaaStle had no viable business, exponentially fewer subscribers than stated, and lacked scale. Indeed, CaaStle's business was multiple times smaller in terms of revenue and customers than Vince itself. Other members of the Hunsicker Enterprise did not correct those statements, despite the fact that they knew, as of the disclosure in December 2025 that CaaSle was no longer a going concern and its scale was nonexistent.

e. In meetings on February 4 and February 24, 2025, with Vince regarding the recent transaction, in which representatives of Vince, Hoffman, and members of the Hunsicker Enterprise attended, and at which at least Goldenberg attended via video conference link, statements were made regarding CaaStle's robust e-commerce ecosystem, capabilities, and ability to execute. Those statements that were not made by Hunsicker or Goldenberg were made in their presence which they failed to correct when made. Some were made by individuals whose statements were based on false information they had received from Hunsicker and Goldenberg. Further, Hunsicker and Goldenberg, through their words and actions,

15

implied capabilities and scale which CaaStle did not have and which they knew could not be delivered.  These knowingly false or misleading statements or omissions were made in the course of the Hunsicker Enterprise's fraudulent scheme to use P180 to acquire assets, including any interest in Vince.

49.    Many other instances of wire fraud were committed.  The Hunsicker Enterprise ensured that outsiders did not have complete information regarding CaaStle's true number of subscribers, the size of its operation, and its revenue.  Instead, multiple times throughout 2024 and 2025, they made statements or took actions, on information and belief over phone lines or video conference, to give the impression that CaaStle was a large, successful company with extensive operations.  The goal was to create an image for CaaStle that would head off any questions regarding actual performance, operations, subscribers, or revenue.  In other words, if CaaStle were so successful, why would anyone need these details.  When others expressed beliefs regarding CaaStle's scale, subscribers, and revenue, members of the Hunsicker Enterprise remained silent and therefore concealed the truth, leading to half-truths and implied truth of these (ultimately false) facts.

50.    The overarching scheme of this wire fraud was clear: to obtain and deploy P180's money and assets in furtherance of the Hunsicker Enterprise's unlawful business activities, to eventually obtain control over (through merger or otherwise) those assets, and to induce P180 to obtain further assets.  Later, false statements or omissions were made to cover up and perpetuate the Hunsicker Enterprises' unlawful activities in 2025.

51.    Further, the Hunsicker Enterprise worked together to prevent the disclosure of its fraudulent actions at CaaStle from at least December 2024, when the conspirators' fraudulent

activities became known to CaaStle's leadership and board, through March 2025. In doing so, Defendants committed numerous other instances of wire fraud through statements or omissions. Demonstrative examples include:

a. On information and belief and based on public reporting, the conspirators' falsification of records was disclosed to the entire CaaStle board in or around late November or early December 2024. Yet on or around December 16, 2024, Singh had a 50-minute phone conversation with Jean-Paul St. Germain, a shareholder of P180 and CaaStle and eventual board member of P180, including regarding the proposed Vince transaction, CaaStle's cash position, and its strong network of subscribers (echoing Hunsicker). Singh did not disclose the falsification of records at CaaStle, even though the primary purpose of the Vince transaction and other transactions was to generate value by deploying CaaStle's platform, technology, and customer network. On information and belief, Singh's activities were part of a concerted strategy by the Hunsicker Enterprise in control of CaaStle, including Callon, to cover up Hunsicker's fraud.

b. Leading up to and at the time of the Vince transaction, Singh, Goldenberg, and Hunsicker had inarguably known for more than a month that CaaStle could not fulfil its promises. They knew that the transaction was proceeding on the assumption that P180 could deploy CaaStle's proprietary technology and customer network to derive profit above the standard retail margins. At the time, Singh, Goldenberg, and Hunsicker knew about the falsified business records at CaaStle, knew that CaaStle

had no ecosystem of subscribers, and thus knew that the transaction had little value as CaaStle could not provide the services to Vince as contemplated. Despite Hunsicker's and Goldenberg's respective positions on the P180 board, they did not disclose CaaStle's fraud to P180, independent directors, or P180's investors. Hunsicker and Goldenberg pushed P180 to move forward with the Vince transaction without informing Hoffman or P180 of the true situation at CaaStle and without recusing themselves from the transaction, even though they were on both sides of the deal. Specifically, Hunsicker, Goldenberg, and Singh induced P180 to enter into an agreement to purchase a controlling interest in Vince Holding Company and pay off a significant portion of Vince's debt. But when the transaction date came, P180 was about $5,000,000 short. Hunsicker and Goldenberg pushed P180 to move forward with the purchase of Vince without informing Hoffman or P180 of the true situation at CaaStle and without recusing themselves from the transaction, even though they were on both sides of the deal. Thus, the Hunsicker Enterprise members, who were also directors of CaaStle, conspired to approve this fraudulent loan despite liquidity issues at CaaStle.

c.   Similarly, Plaintiff engaged in confidential talks with an e-commerce business in early 2025. On two separate video conference calls, Hunsicker and Goldenberg either made false statements regarding CaaStle's technological capabilities, finances, and scale—which were undisputably known to be false after the disclosures at CaaStle—or failed to correct

18

materially false statements made by others who were not aware of the fraud at CaaStle. Although no deal occurred, these acts of wire fraud were part of the same scheme to continue the fraud on P180.

52.     Further, the Hunsicker Conspirators engaged in a cover-up of their racketeering activities since at least December 2024. During that time, Plaintiff is informed and believes that members of the Hunsicker Enterprise conspired to have Hunsicker continue to lead and be involved in CaaStle's affairs. The Hunsicker Enterprise then conspired to prevent the public—and in particular P180 and Hoffman—from learning the truth about CaaStle. They also conspired to place Hunsicker at the head of P180 and plotted to change CaaStle's business from software to brand ownership. These activities show how the Hunsicker Enterprise coordinated its activities in an attempt to perpetuate its fraud for months while concealing material information, loading P180 up on debt, and positioning themselves to obtain P180's assets.

53.     On information and belief, Hunsicker, Singh, Goldenberg, Callon, and perhaps others, also conspired to prevent disclosure of the fraud at CaaStle for a long time before December 2024 and committed further chargeable acts of wire fraud in furtherance of that conspiracy. Further, Hunsicker, Singh, Goldenberg, Callon, and other unknown conspirators knew that they could not keep their fraud secret indefinitely once the specifics were disclosed to the CaaStle board, which consisted of falsifying corporate documents, pitch decks, fundraising information, income statements, subscription numbers, customer numbers, partnership agreements, and other financial statements and information.

54.     Callon's international reputation for corporate governance expertise, as mentioned above, lent credibility to the endeavor, helping to keep the truth from coming out until months after Hunsicker "confessed."

55.     Indeed, during a phone call on March 30, 2025, with Jean-Paul St. Germain, shortly after CaaStle's public admission of fraud, Singh revealed the Hunsicker Enterprise's coordinated scheme.  He stated that he knew that CaaStle's SaaS business "did not work."  On information and belief, he and other board members including Goldenberg and Callon, knew that from December 2024.  Singh also commented that he believed to maximize the success of the January 2025 investment depended on merging with CaaStle's "remaining business."   The statements expose the Hunsicker Enterprise's intent, known to Singh, Callon, Hunsicker, and Goldenberg, since at least December 2024, to conceal CaaStle's insolvency and fraud, to induce P180's acquisition of assets and to pursue a merger to misappropriate P180's valuable apparel assets.

56.     As a director of P180 and in various roles as a board member at CaaStle, Goldenberg was aware of the falsification of records disclosed at CaaStle.  He was also aware that the primary purpose of the Vince transaction was to generate value by deploying CaaStle's platform, technology, and customer network.  Yet he did not disclose the falsification of records to P180 or the board of P180 (including Hoffman).

57.     Hunsicker was aware of the falsification of records disclosed at CaaStle.  She was also aware that the primary purpose of the Vince transaction was to generate value by deploying CaaStle's platform, technology, and customer network and she, also, failed to disclose the falsification of records to P180, its shareholders, or the uninterested directors of P180 (including Hoffman).

**Bank Fraud**

58.    Bank fraud is chargeable under 18 U.S.C. § 1344 if a defendant executes a scheme to obtain money under the custody or control of a financial institutions and anticipates using false or fraudulent pretenses, representations, or promises.

59.    Members of the Hunsicker Enterprise engaged in multiple instances of bank fraud chargeable under Section 1344 in furtherance of their conspiracy to defraud P180.  The relevant conduct includes:

a.  On or about June 26, 2025, Hunsicker and, on information and belief Goldenberg and Jain, conspired to transfer $1,400,000 from P180's bank account at Chase Bank without right to do so.  On information and belief, Defendants sought to use this transfer to hide the Hunsicker Enterprise's fraud at CaaStle.  Indicative of Defendants' fraudulent intent, this transfer occurred within a day of funding into P180 by an investor.

b.  On or about June 26, 2024, in a separate transaction, Hunsicker and, on information and belief Goldenberg and Jain, conspired to transfer $500,000 from P180's bank account at Chase Bank without the right to do so.  On information and belief, Defendants sought to use this transfer to hide the Hunsicker Enterprise's fraud at CaaStle.  Indicative of Defendants' fraudulent intent, this transfer occurred within a day of funding into P180 by an investor.

c.  On or about July 22, 2024, Hunsicker and, on information and belief Goldenberg and Jain, conspired to transfer $950,000 from P180's bank account at Chase Bank without right to do so.  On information and belief,

Defendants sought to use this transfer to hide the Hunsicker Enterprise's fraud at CaaStle.

d.    On or about July 22, 2024, in a separate transaction, Hunsicker and, on information and belief Goldenberg and Jain, conspired to transfer $450,000 from P180's bank account at Chase Bank without right to do so. On information and belief, Defendants sought to use this transfer to hide the Hunsicker Enterprise's fraud at CaaStle.

e.    On or about January 30, 2025, Hunsicker and, on information and belief, Goldenberg, Jain, and Singh conspired to, and did, transfer $1,000,000 from P180's bank account at Chase Bank to Hunsicker's personal account. As Defendants had no right to do so, the transfer was made through material misstatements and/or omissions regarding the lawfulness of that transfer.

f.    In a second theft, on or about the same day January 30, 2025, Hunsicker and, on information and belief, Goldenberg, Jain, and Singh, conspired to, and did, transfer $300,000 from P180's bank account at Chase Bank to Hunsicker's personal account. As Defendants had no right to do so, the transfer was made through material misstatements and/or omissions regarding the lawfulness of that transfer.

60.    Plaintiff anticipates that many more instances of unauthorized or fraudulently-induced transfers, including for personal enrichment, will be unearthed in discovery, but these six are readily apparent.

**COUNT I**
**VIOLATION OF THE RACKETEERING INFLUENCED AND CORRUPT**
**ORGANIZATIONS ACT (RICO) 18 USC § 1964(C)**
**(ALL DEFENDANTS)**

61.     Plaintiff incorporates by reference all foregoing and following paragraphs as if set out at length herein.

62.     On information and belief based upon publicly-available documents, Hunsicker, Singh, Goldenberg, and Callon have long been associated.  Two or more of them have been involved in multiple ventures across the last twenty years.  On information and belief, Hunsicker is the lynchpin of the association, but is not solely responsible for its operation and management, and others may be involved as well, including on information and belief other CaaStle board members.  Hunsicker, Singh, Goldenberg, and Callon have all acted as the Hunsicker Enterprise through these relationships and the longevity of these relationships for the purpose of perpetuating unlawful business practices, including defrauding P180 and its investors.

63.     Defendants have participated in a conspiracy spanning multiple entities, including but not limited to the board of CaaStle, Inc.  Defendants' conspiratorial enterprise is not limited to participation with CaaStle or another entity, but includes racketeering actions independent of CaaStle, including self-dealing actions taken to defraud P180.  The Hunsicker Enterprise consists of Hunsicker, Singh, Goldenberg, Jain, Callon, and other unknown conspirators, each of whom has committed predicate acts of racketeering as distinct individuals in support of the enterprise.

64.     As discussed in detail above, Hunsicker, Singh, Goldenberg, Callon, and other unknown conspirators have committed multiple offenses of interstate wire fraud chargeable under 18 U.S.C. § 1343 as part of a scheme to defraud P180 and gain control of its money and assets.

65.     As discussed in detail above, Hunsicker, Singh, Goldenberg, Callon, and other unknown conspirators have committed multiple offenses of interstate bank fraud chargeable under 18 U.S.C. § 1344 as part of a scheme to defraud P180 and gain control of its money and assets.

66.     Defendants repeatedly committed these offenses as part of concerted efforts to perpetuate and avoid disclosure of their fraud elsewhere and to use P180 for their own personal financial gain.  This pattern repeated itself over and over again, including through multiple instances of wire fraud and bank fraud perpetrated by multiple co-conspirators.

67.     P180 suffered great harm because of Defendants' racketeering activity.  CaaStle maintains that P180 is indebted to it based on multiple fraudulent transactions that would not have occurred but for Defendants' fraudulent activities, including payments related to the strategic relationship with elysewalker, the Altuzarra transaction, and Vince transaction. Defendants' racketeering activity induced indebtedness of $5,350,000 for the Vince transaction alone.  The Defendants' racketeering activities and fraud have also caused Plaintiff to lose value, income, and profits, which were predicated on P180's ability to deploy CaaStle's (non-existent) distribution capabilities and network of subscribers.

68.     P180 seeks trebling of damages and attorneys' fees to the fullest extent permitted by the Racketeering Influenced and Corrupt Organizations Act.

**COUNT II**
**CONSPIRACY TO VIOLATE THE RACKETEERING INFLUENCED AND CORRUPT**
**ORGANIZATIONS ACT (RICO) 18 USC § 1964(D)**
**(ALL DEFENDANTS)**

69.     Plaintiff incorporates by reference all foregoing and following paragraphs as if set out at length herein.

70.     Hunsicker, Singh, Goldenberg, and Callon conspired, aided, and abetted each other, as the Hunsicker Enterprise, in the commission of multiple offenses in violation of RICO as part of a scheme to defraud P180 and its investors.

71.     Members of the conspiracy have committed multiple acts of wire fraud under 18 U.S.C. § 1343 as overt, predicate acts of racketeering to further the conspiracy of the Hunsicker Enterprise, as described above.  Further, members of the conspiracy have committed multiple acts of bank fraud under 18 U.S.C. § 1343 as overt, predicate acts of racketeering to further the conspiracy of the Hunsicker Enterprise, as described above.

72.     As members of the Hunsicker Enterprise, Defendants knew of and adopted the goal of furthering the conspiracy to defraud P180.  As conspirators, the Hunsicker Enterprise worked together to prevent the disclosure of its fraudulent actions from at least December 2024, when the conspirators' fraudulent activities became widely known within CaaStle, through March 2025.  By way of non-limiting examples, Defendants did so by agreeing to prevent the disclosure of the fraud at CaaStle, continuing to fake financial and subscriber information, and approving or inducing fraudulent bank transactions.

73.     P180 suffered great harm because of Defendants' racketeering activity.  CaaStle maintains that P180 is indebted to it based on multiple fraudulent transactions that would not have occurred but for Defendants' fraudulent activities, including payments related to the strategic relationship with elysewalker, the Altuzarra transaction, and Vince transaction. Defendants' racketeering activity induced indebtedness of $5,350,000 for the Vince transaction alone.  The Defendants' racketeering activities and fraud have also caused Plaintiff to lose value, income, and profits, which were predicated on P180's ability to deploy CaaStle's (non-existent) distribution capabilities and network of subscribers.

74.     P180 seeks trebling of damages and attorneys' fees to the fullest extent permitted by the Racketeering Influenced and Corrupt Organizations Act.

## COUNT III
## CONVERSION (AS TO HUNSICKER, GOLDENBERG, JAIN, SINGH, AND DOES 1–50)

75.     Plaintiff incorporates by reference all foregoing and following paragraphs as if set out at length herein.

76.     On or about January 30, 2025, Hunsicker, Goldenberg, Jain, and Singh caused two separate transfers totaling $1,300,000 to be made from P180 to Hunsicker's personal account without cause, reason, or explanation.

77.     That $1,300,000 is P180's property.

78.     Plaintiff is entitled to recover the entire $1,300,000.

79.     Hunsicker, Goldenberg, Jain, and Singh exercised control and dominion over that property intentionally and without authority, including by wiring it to Hunsicker and alienating it from P180.

80.     Defendants' conduct was malicious, fraudulent, or demonstrated a reckless disregard for P180.

81.     Defendants had no right to exercise control and dominion over the $1,300,000.

82.     Defendants have deprived Plaintiff of its rights to the $1,300,000.

83.     Plaintiff has suffered damages in an amount to be proven at trial.

## COUNT IV
## UNJUST ENRICHMENT (AS TO HUNSICKER AND DOES 1–50)

84.     Plaintiff incorporates by reference all foregoing and following paragraphs as if set out at length herein.

85.     Hunsicker has enriched herself by $1,300,000 without justification at P180's expense.  Hunsicker cannot be allowed to enrich herself at P180's expense.

86.     It is against equity and good conscience to permit Defendants to reap the unjust enrichment created by their conduct.

87.     Defendants' conduct was malicious, fraudulent, or demonstrated a reckless disregard for P180.

88.     Principles of equity require restitution of P180's $1,300,000.

**COUNT V**
**BREACH OF FIDUCIARY DUTY**
**(AS TO HUNSICKER AND GOLDENBERG)**

89.     Plaintiff incorporates by reference all foregoing and following paragraphs as if set out at length herein.

90.     Hunsicker and Goldenberg were, for relevant times between formation of P180 and the end of March 2025, directors of P180.

91.     As directors of P180, Hunsicker and Goldenberg owed fiduciary duties to P180. These fiduciary duties included, whether statutory or common law and without limitation, the duty of care to perform their duties in good faith for the benefit of P180, the duty of loyalty, the duty of candor, the duty to disclose material facts impacting a transactions, the duty of honesty, and the duty to avoid self-dealing.

92.     Hunsicker breached these duties, including but not limited to by the following actions.

   a.  Hunsicker knowingly caused misrepresentations regarding CaaStle's distribution capabilities and subscriber network and did not correct the known falsehoods when others repeated her statements.

b.  Hunsicker conspired to force P180 to engage in transactions, including for the purchase of various assets, which were not in the interest of P180 because the success of these transactions was undermined by the fraud at CaaStle, but instead sought those transactions to hide her fraud and/or execute further fraud.

c.  Hunsicker knew of the financial fraud at CaaStle and the falsity of the representations regarding its distribution capabilities and subscriber network and did not timely disclose that information to any independent, non-conflicted director on P180's board.

d.  Hunsicker transferred or caused to be transferred $1,300,000 to her personal bank account without authorization in two separate transactions.

93.    Goldenberg breached these duties, including but not limited to by the following actions.

a.  Goldenberg conspired to force P180 to engage in transactions, including purchase of various assets, which were not in the interest of P180 and despite knowing that the success of the Vince transaction was undermined by the fraud at CaaStle and instead sought those transactions to hide his fraud and/or execute further fraud.

b.  Goldenberg knew of the financial fraud at CaaStle and the falsity of the representations regarding its distribution capabilities and subscriber network and did not timely disclose that information or correct others who stated that CaaStle was a viable, thriving company with good technology.

94.     Had Hunsicker and Goldenberg performed their fiduciary duties, P180 would never have entered into the transactions it did on the terms that it did so because those cost of those transactions only made sense if the acquired brands could access the purported distribution and customer network of CaaStle.

95.     As a direct and proximate result of Hunsicker and Goldenberg's breaches of their fiduciary duties, P180 has sustained and will continue to sustain significant damages as alleged herein in an amount to be proven at trial.

96.     Defendants' conduct was malicious, fraudulent, or demonstrated a reckless disregard for P180.

97.     As a result of the misconduct alleged herein, Hunsicker and Goldenberg are liable to P180.

## COUNT VI
## FRAUD –
## FRAUDULENT INDUCEMENT, FRAUDULENT CONCEALMENT, AND CONSTRUCTIVE FRAUD
## (AS TO HUNSICKER, GOLDENBERG, SINGH, AND DOES 1–50)

98.     Plaintiff incorporates by reference all foregoing and following paragraphs as if set out at length herein.

99.     Hunsicker, Goldenberg, and Singh made material misrepresentations or omissions as discussed above and remained silent while under a duty to speak regarding CaaStle's capabilities.

100.    Those representations were not true, the omissions implied the truth of false statements, and they failed to correct false statements while under a duty to speak.

101.    Hunsicker, Goldenberg, and Singh knew or had reason to know the falsity of these statements.

29

102.    These facts were material to P180's decisions to obtain assets and incur indebtedness.

103.    P180 reasonably relied upon these statements in obtaining a loan for the Vince transaction and accepting money from CaaStle (which it now claims is a loan) related to the strategic relationship with elysewalker and the Altuzarra transaction.  Had P180 known that CaaStle had neither the distribution capabilities nor the customer network it purported to have, P180 never would have entered into those transactions or incurred that indebtedness on the terms as presented.

104.    Defendants' conduct was malicious, fraudulent, or demonstrated a reckless disregard for P180.

105.    As a direct and proximate result of Defendants' fraudulent activities, P180 has sustained and will continue to sustain significant damages as alleged herein in an amount to be proven at trial.

## COUNT VII
## AIDING AND ABETTING FRAUD
## (AS TO ALL DEFENDANTS)

106.    Plaintiff incorporates by reference all foregoing and following paragraphs as if set out at length herein.

107.    There was an underlying fraud on P180 perpetrated by Hunsinger, Singh, and Goldenberg as described above.

108.    Defendants knew about this fraud at least as of December 2024.

109.    Defendants provided substantial assistance in perpetuating the fraud by, among other things, failing to report the fraud publicly, approving a loan of over $5,000,000 to induce the purchase of Vince despite knowing of CaaStle's fraud.

30

110.    Defendant Callon's presence on the board, and membership in the Hunsicker Enterprise, was instrumental—as it created a false assurance that the corporation was being governed correctly and legitimately.

111.    As a direct and proximate result of Defendants' aiding and abetting, P180 has sustained and will continue to sustain significant damages as alleged herein in an amount to be proven at trial.

## COUNT VIII
## AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
## (AS TO ALL DEFENDANTS)

112.    Plaintiff incorporates by reference all foregoing and following paragraphs as if set out at length herein.

113.    Hunsicker and Goldenberg breached their fiduciary duties.

114.    Defendants knew about these fiduciary duties and knew or should have known that the actions of the Hunsicker Enterprise would cause the breach of these fiduciary duties at least as of December 2024.

115.    Defendants provided substantial assistance in breaching the fiduciary duties by, among other things, approving the fraudulent loan to P180 and inducing the purchase of a controlling interest in Vince.

116.    As a direct and proximate result of Defendants' aiding and abetting, P180 has sustained and will continue to sustain significant damages as alleged herein in an amount to be proven at trial.

## COUNT IX
## CIVIL CONSPIRACY
## (AS TO ALL DEFENDANTS)

117.    Plaintiff incorporates by reference all foregoing and following paragraphs as if set out at length herein.

118.    Defendants conspired to exploit and steal the value of P180's equity, capital and investments on information and belief under the leadership of Hunsicker.

119.    In furtherance of this conspiracy, Hunsicker converted $1,300,000 from P180, Hunsicker, Jain, and Goldenberg breached their fiduciary duties, and Hunsicker and Goldenberg conducted multiple instances of fraudulent, including self-dealing, conduct.  Hunsicker, Singh, Goldenberg, Jain, and Callon knew of and actively sought to further this conspiracy.

120.    P180 was harmed through the conversion, breach of fiduciary duties, and fraud as described and discussed above.

121.    All Defendants are liable for this harm as members of the conspiracy.

122.    As a direct and proximate result of Defendants' participation in the conspiracy, P180 has sustained and will continue to sustain significant damages as alleged herein in an amount to be proven at trial.

## COUNT X
## NEGLIGENT MISREPRESENTATION
## (AS TO HUNSICKER, GOLDENBERG, SINGH, AND DOES 1–50)

123.    Plaintiff incorporates by reference all foregoing and following paragraphs as if set out at length herein.

124.    In the alternative, if Defendants' statements and actions were not fraudulent, they were negligent and caused harm to P180.

125.    Hunsicker, Goldenberg, and Singh made statements of facts to P180 related to CaaStle's capabilities, financial stability,  number of subscribers, their intentions regarding multiple transactions, and as further set forth above.

126.    These statements were false.

127.    Defendants knew or should have known of the falsity of these statements.

128.    P180 reasonably relied upon these statements.

129.    Plaintiff's reliance on these statements were to its detriment, including in obtaining assets and indebtedness as well as consummating transactions, and caused injury to Plaintiff.

130.    Had P180 been told accurate information about CaaStle's limited distribution capabilities and customer network, P180 would never have proceeded with the loans and transactions on the terms presented.

131.    Defendants' conduct was malicious, fraudulent, or demonstrated a reckless disregard for P180.

132.    As a direct and proximate result of Defendants' negligent misrepresentations, P180 has sustained and will continue to sustain significant damages as alleged herein in an amount to be proven at trial.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38 and the Seventh Amendment to the U.S. Constitution, Plaintiff demands a jury trial on all claims herein properly tried to a jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgement in its favor and against Defendants as follows:

A.  As to all Counts, award P180 damages in an amount to be proven at trial;

B.  As to Counts I and II, award treble damages to the extent available by law;

C.  As to Counts III, IV, V, VI, and X, award punitive damages in an amount to be proven at trial and as provided to the extent available by law;

D.  As to all Counts, award P180 its reasonable attorneys' fees and costs to the extent available by law; and,

E.  As to all Counts, grant P180 such other and further relief, whether at law or in equity, that this Court deems just and proper.

Date:  New York, New York
       May 27, 2025

STEPTOE LLP

By:  /s/ Joseph M. Sanderson
     Joseph M. Sanderson
     1114 Avenue of the Americas
     New York, New York 10036
     (212) 506-3900
     josanderson@steptoe.com

     -and-

     Thomas Watson (pro hac vice forthcoming)
     Conor Tucker (pro hac vice forthcoming)
     Kaitlyn Sever (pro hac vice forthcoming)
     633 West Fifth Street, Suite 1900
     Los Angeles, California 90071
     (213) 439-9400
     twatson@steptoe.com
     ctucker@steptoe.com
     *Counsel for Plaintiffs*