## UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF NEW YORK

P180, INC.,

　　　　　　　　　　　　　　　　Plaintiff,

—*against*—

JASWINDER PAL SINGH, CHRISTINE
HUNSICKER, GEORGE GOLDENBERG,
SCOTT CALLON, CHIRAG JAIN, DAYNA
CORLITO, AND DOES 1–50

　　　　　　　　　　　　　　　　Defendants.

CIV. NO. 25-cv-4432

**<u>JURY TRIAL DEMANDED</u>**

## AMENDED COMPLAINT

Plaintiff alleges, upon personal knowledge as to its own conduct, records, and information received by it, and upon information and belief otherwise, as follows:

### INTRODUCTION

1.　　This is a case about a sprawling fraud driven by a fake-it-'til-you make it mentality, led by erstwhile tech entrepreneur and soon-to-be federal inmate Christine Hunsicker, and principally centered around depicting CaaStle as a massively profitable, cash-rich, in-demand, rapidly growing "unicorn", with a valuation of more than $1 billion and tens of millions in the bank, that delivered subscription clothing boxes using high tech software to hundreds of thousands of subscribers, but, which, in reality, was a small, failing, cash-burning startup that had just hundreds of customers and a couple hundred thousand dollars in the bank.  Like Elizabeth Holmes and Bernie Madoff before her, Hunsicker was a slick, well-connected confidence artist.  Hunsicker was the face of the fraud, but, like Holmes and Madoff, Hunsicker could not have done it without the help of others.

2.     This case is also about greed and how it drove Hunsicker's inner circle not only to look the other way but also to agree to keep the fraud quiet, to facilitate it, to deceive others in order to cover up the fraud.  The big lies by Hunsicker, every decision by her coterie to keep a known liar in front of customers, business partners, and investors to reassure them that there was no reason for alarm, and every decision by them to allow her to make statements about CaaStle's performance that information readily available to them showed were obviously false—all this was necessary for the fraud to succeed at the massive scale that it did.  Hunsicker was even able to boast that she had a Princeton University professor—Jaswinder Pal Singh—as co-founder, and a board that included the Chairman of the Board of Alphabet, Google's parent, and former, long-time president of Stanford University—John Hennessy, and a corporate governance expert—Scott Callon.  Who would doubt a company?

3.     And this case is about how that greed led Hunsicker's coterie to lie and to suppress the fraud even once they knew that outsiders had figured out the fraud:  to use company money to try to buy silence from those who found out; to pay themselves off to the tune of millions of dollars; to give Hunsicker a secret slap on the wrist for hundreds of millions of dollars of fraud without telling even CaaStle employees, let alone the investors, business partners, and customers that she was still lying to; and to try to bury the fraud through forcing a merger with a separate, independent company—Plaintiff P180—all to try to perpetuate the appearance of a company with real assets, to prevent a bankruptcy that would bring independent scrutiny of their actions, and to delay or even to prevent disclosure of the CaaStle fraud.

4.     Plaintiff P180—a company co-founded by longtime apparel executive Brendan Hoffman with the goal of investing in premier apparel brands and utilizing CaaStle's technology around yield-optimization to make the businesses more profitable—had been founded after

Hunsicker lied to Hoffman about CaaStle's capabilities and business.  Through those lies, CaaStle received a minority stake and a board seat, principally in exchange for favorable licensing terms for CaaStle's supposedly groundbreaking subscription service technology, which Hunsicker promised would dramatically improve the profitability of the brands P180 invested in and would grow revenue, just as she said it had at CaaStle.  Hunsicker unilaterally placed CaaStle executive Georgiy "George" Goldenberg on the P180 Board, too.  They were a Trojan Horse, tricking their way inside to work against P180's interests to try to cover up their fraud at CaaStle.  With this, they hoped to force P180 into a position where it would be deeply indebted to CaaStle through loans they negotiated without disclosing the material facts they knew about CaaStle's fraud, to loot P180's bank accounts for their own benefit, and, eventually, to force P180 into a merger with CaaStle on unfavorable terms for P180.  That, they hoped, would allow them to point to a business with actual assets and—even more importantly—stave off the independent scrutiny that a Chapter 7 bankruptcy or other collapse of CaaStle would bring.

5.  When concealing CaaStle's fraud finally became untenable—an investor loudly raised the fact that it had been given faked financials—Hennessy quickly resigned from the Board.  And then Hunsicker supposedly "confessed" to the fraud and resigned from the Board.  But she conditioned her resignation on a demand that her longtime confederate (and, according to Hunsicker's ex-husband, admitted former romantic partner), CaaStle co-founder and Princeton University Professor J.P.  Singh be added to the Board.  Remarkably, despite the obvious need for *independent* scrutiny from a board member not tied to Hunsicker, the only remaining board member, corporate governance guru Scott Callon agreed to Hunsicker's demand and added Singh, and soon thereafter Singh and Callon added Goldenberg to the Board.  Somehow, the

3

effect of Hunsicker's resignation was thus that *more* people tied to her were now on the Board supposedly investigating her—and their own roles in facilitating her—than before.

6.      Yet, rather than investigate and quickly disclose the fraud at CaaStle, Singh hired his Princeton college roommate's law firm to investigate Hunsicker.  The Board, all of whom had been deeply involved at CaaStle for years and thus faced substantial risks of liability for their own roles in facilitating Hunsicker, defined the law firm's scope of work and thus ensured that the law firm's investigation would not dig too deep beyond Hunsicker.  Nor did they disclose the fraud promptly so that the people Hunsicker had lied to would no longer rely on her lies.  And astoundingly, despite the "confession", CaaStle's Board kept Hunsicker on as CEO, allowed her to continue to raise money for CaaStle, and encouraged her to continue her parallel role at P180 without her or anyone else disclosing to P180 that she had confessed to a quarter-billion-dollar fraud.

7.      In total, more than three months passed without revealing the fraud, critical months during which board minutes that have since come to light reveal the CaaStle Board had openly discussed and approved the plan to the bury CaaStle's fraud through forcing a merger with P180, a company that had actual assets and a real business.  And CaaStle officers and employees, including CaaStle's corrupt finance department led by *de facto* CFO Chirag Jain and Controller Dayna Corlito that had previously supplied Hunsicker with fake numbers and lied to auditors about the reason why prior auditors had resigned, executed unauthorized multi-million-dollar transfers from and to P180's bank accounts, to which they had access under a shared services arrangement.  In short, Hunsicker's enablers among CaaStle's directors and officers had resolved to swindle their way out of the predicament they were in because of Hunsicker's own swindling to save themselves from scrutiny—all to P180's detriment.

8.      Meanwhile, P180's co-founder Hoffman and outside investors, still in the dark about the fraud, ultimately resisted Defendants' efforts to force it into a merger with CaaStle, but they had nevertheless engaged in multi-million dollar transactions based on Defendants' lies, had millions of dollars transferred from P180's bank accounts without authorization, and burned millions of dollars based on the assumption that what Defendants told P180 about CaaStle's software platform was true.  So Defendants' plan to bail themselves out by seizing control over P180 failed too.

9.      Eventually, the house of cards fell.  Enough had gotten out that the U.S. Attorney's Office for the Southern District of New York investigated Hunsicker.  It ultimately charged Hunsicker.  She has pleaded guilty to a $300 million fraud and is awaiting sentencing.

10.      The gig was well and truly up.  CaaStle was hundreds of millions of dollars in the red due to both trade debts and enormous liabilities to defrauded investors.  In March 2025, the Board finally told its investors what had happened, but even then, the Board continued to lie and even to continue to drive P180 into an unfavorable merger to try to bury the fraud rather than face the scrutiny a collapse would bring.  Singh pretended to have been at arm's length from CaaStle for years to try to distance himself from the fraud and Hunsicker, and they kept resisting taking the requisite legal steps to address the company's insolvency.  Eventually—more than six months after Christine's supposed "confession"—CaaStle filed for a Chapter 7 bankruptcy to liquidate the flaming wreckage that was left behind.

11.      P180 therefore brings this action to hold those who tricked it and looted millions of dollars from its bank accounts responsible for the harm they caused to it—to ensure that not just Hunsicker but all of those whose greed led them to become complicit in her fraud face the

consequences, and that P180 is made whole for the losses it suffered due to their lies, cover-ups, looting, and betrayal of P180 and its investors' trust amid their attempts to seize control of P180.

**JURISDICTION AND VENUE**

12. This Court has subject matter jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331.

13. This Court has subject matter jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367, as those claims form the same case or controversy as Plaintiff's federal claims.

14. This Court has personal jurisdiction over all Defendants. The Court has specific personal jurisdiction over all Defendants because the conspiracy was executed in substantial part in New York, predicate acts and other fraudulent activities were directed at and harmed New York-headquartered P180, using New York-headquartered CaaStle, and Defendants acted in furtherance of the conspiracy in New York. Defendants also regularly solicited and/or conducted business in New York, engaged in a persistent course of conduct related to the allegations herein in New York, and should have expected the fraud to have consequences in New York.

15. The Court further has personal jurisdiction pursuant to 18 U.S.C. §§ 1965(b) and (d), as the ends of justice require that any conspirators residing in other districts be summoned here for complete and full adjudication of the matter. It is necessary to attain recovery that all conspirators be brought before a single court to answer for their racketeering activity.

16. Venue is appropriate in this District pursuant to 28 U.S.C. § 1331(b)(2) and (3), as a substantial part of the events or omissions giving rise to the claims occurred in the District and all Defendants are subject to personal jurisdiction in this Court. Regarding the claims for breach of fiduciary duty, P180's charter provides that suits against officers for breaches of fiduciary duties must be brought in the Court of Chancery in Delaware, "[u]nless the Corporation consents

6

in writing to the selection of an alternative forum." The Corporation, by resolution dated April 30, 2025, consented to venue this case in this district.

## PARTIES AND RELEVANT NON-PARTIES

17. Plaintiff P180, Inc., is a Delaware corporation with its principal place of business in New York, New York. P180's co-founder and current Chairman is veteran apparel industry executive Brendan Hoffman.

18. Non-Party CaaStle, Inc., is a Delaware corporation with its principal place of business in New York, New York. CaaStle is the successor to Gwynnie Bee, which, in 2018, rebranded itself as CaaStle. In 2025, CaaStle, Inc., filed for Chapter 7 bankruptcy in the United States Bankruptcy Court for the District of Delaware, Case No. 25-11187-BLS, and the Bankruptcy Court appointed George L. Miller as Chapter 7 Trustee for the bankruptcy estate of CaaStle (the "Trustee").

19. Defendant Jaswinder Pal Singh is an individual who, on information and belief, resides in New York. Singh is Professor of Computer Science, Technology, and Societal Change at Princton University and a co-director of the Princeton Center for the Decentralization of Power Through Blockchain Technology. He was a co-founder of CaaStle, and, at pertinent times, he served as a director of CaaStle.

20. Defendant Christine Hunsicker is an individual, on information and belief, who resides in New Jersey. She was a co-founder of CaaStle, and, at pertinent times, she variously served as a director of CaaStle, and as CEO of CaaStle, and as a director, officer, and briefly interim CEO of P180.

21. Defendant Georgiy Goldenberg, also known as George Goldenberg, is an individual who, on information and belief, resides in California. At pertinent times, he variously

served as a director of CaaStle, COO of CaaStle, and interim CEO of CaaStle.  At pertinent times, he was also a director and officer or agent of P180.

22.     Defendant Scott Callon is an individual, who, on information and belief, resides in Japan.  At pertinent times, he served as a director of CaaStle.

23.     Defendant Chirag Jain is an individual, who, on information and belief, now resides in India.  At pertinent times, he served as an executive of CaaStle managing its finances and accounting, Corporate Secretary, Head of Finance, and de facto CFO.  He also ran CaaStle's Indian subsidiary, which, upon information and belief, received very large payments from CaaStle that may have been at least in part diverted to him and other co-conspirators.

24.     Defendant Dayna Corlito is an individual who, upon information and belief, resides in New York.  At pertinent times, she served as CaaStle's Financial Controller.

25.     The identities of Does 1–50 are not presently known but the complaint will be amended as necessary to add them when appropriate.

26.     Non-party John L. Hennessy is the chairman of Alphabet, Inc., a former president of Stanford University, and a veritable legend of Silicon Valley.  At pertinent times, he served as a director of CaaStle.

<b>FACTS COMMON TO ALL COUNTS</b>

**A.     Hunsicker Builds a Team.**

27.     Hunsicker, Singh, and Goldenberg have worked closely together for nearly two decades.

28.     At that time, Hunsicker was Chief Operating Officer of a company called Right Media where Singh was also working.  Right Media was an early pioneer of digital advertising exchanges.

29.  Hunsicker's ex-husband has stated that the relationship between Hunsicker and Singh was not merely a professional one.  He has stated that both Singh and Hunsicker had an intimate relationship in or about 2006, while at Right Media.  When he confronted his then-wife Hunsicker and Singh, they both admitted to the relationship.  Thus, in addition to their business relationship, there may have been other reasons for their loyalty to one another.

30.  Yahoo! eventually bought Right Media for $850 million.

31.  Goldenberg worked for Yahoo! as a software engineer.  He and Hunsicker began working together when Yahoo! acquired Right Media.

**B.    Hunsicker and Singh Found Gwynnie Bee.**

32.  In 2011, Hunsicker and Singh co-founded a subscription-based clothing rental service—akin to monthly boxes—named Gwynnie Bee.  With "yield optimization technology" that used rental services as the tool, it specialized in offering plus-sized women (who are often poorly served by main street fashion brands) a closet of brands to rent and return, with options to buy favorites.

33.  Gwynnie Bee offered various plans (unlimited, unlimited-style, and lower-tier, one-item-at-a-time, etc.), all purportedly backed by high-tech software and inventory management techniques that enabled the company to manage the subscriptions and optimize inventory.  This purportedly distinguished Gwynnie Bee from the dime-a-dozen eCommerce startups of the time; it was, in other words, what made it work as a *software* company—with the generous valuation multiples that attracted from investors at the time due to the idea that it could scale and bring rapidly-growing revenue with minimal marginal costs—rather than a clothing store.

34.  Goldenberg came on to oversee the technology.

35.     Before the end of 2012, Chirag Jain had joined the team.  He served as Senior Vice President and Corporate Secretary and, beginning in 2015, "Head of Finance"—even though, prior to joining Gwynnie Bee, he had never served in any finance role in any company.

36.     In 2014, Scott Callon joined the Board.  He has long held himself out as having corporate governance expertise.  His presence on the Board lent credibility to the endeavor.  As he is described by Forbes, "Callon became the only non-Japanese to serve on a government committee that drafted Japan's Corporate Governance Code, which was enacted in 2015."

37.     As CEO, Hunsicker became the telegenic, confident face of Gwynnie Bee, she presented herself as a success and tech darling—being part of a nearly-billion dollar exit from Right Media, posting pictures with the Clintons, hosting a *Project Runway* spinoff TV show, and interviewing with media outlets from CNBC to Forbes.

38.     But Gwynnie Bee was not a success.  Interviews with former employees published by Bloomberg suggest that, inside Gwynnie Bee, "[e]veryone feels like the company is doing very poorly."

**C.      As Gwynnie Bee Struggles, Its Leaders Choose to Rebrand—and Commit a Snowballing Fraud.**

39.     By 2018, Gwynnie Bee's leadership—Hunsicker, Singh, Goldenberg, Callon, and Jain—knew that its business model had not succeeded and decided to try to remake the company.

40.     Like Theranos's Elizabeth Holmes and Sunny Balwani before them, Gwynnie Bee's leadership embarked on a scheme to make it *seem* like they had succeeded, perhaps hoping either that reality would catch up to the hype or that they could cash out without getting caught.

41.     It started with a full rebrand.

42.     The company re-named itself CaaStle to position itself more squarely as a high-tech company.  "CaaStle" stood for "clothing-as-a-service"—a play on "software-as-a-service," or SaaS.

43.     Hunsicker wanted to make sure that, in investors' and business partners' eyes at least, CaaStle was a success.  A clothing brand looking for a partner to outsource its subscription service to is betting its customers' trust that its partner is not a fly-by-night operation that will leave them high and dry.  And it is investing an enormous amount of its own money and employee time into specializing processes to integrate its partner, work that will not transfer straightforwardly to competitors.  Any platform needed a company backing it with financial strength and implemented with advantageous technology and logistics.  It is engineering specifically for, and thus becoming dependent on, the company it chooses.  Partners cannot afford to establish a relationship with a commercial partner or technology vendor that is financially week, or does not have proven technology and logistics, or is too small to show real staying power, that has uncertain access to capital, that shows poor growth prospects so as to be likely eclipsed by competitors and abandoned by its investors is not likely to be attractive to a brand.  A brand, after all, is not merely investing in what it pays its subscription vendor; it is investing in its customers' trust and in specialization.

44.     Hunsicker and CaaStle could not, in reality, do what Hunsicker promised.  But, as we will see, she was not going to let a little thing like reality get in her way.

45.     To bolster its tech credentials, CaaStle—remarkably—attracted John Hennessy, the chairman of Alphabet, Inc., a former president of Stanford University, and a veritable legend of Silicon Valley, to join the Board.  Hennessy provided critical pedigree to CaaStle.  Hunsicker and others used Hennessy's name and reputation to deflect any questioning of CaaStle's bona

11

fides.  Hunsicker would often say, although she could not share certain financials or other critical information, do not worry; Hennessy, the Chair of the Alphabet Board, is on the CaaStle Board.  Hennessy also had been Singh's advisor at Stanford.

46.    CaaStle also moved locations, to a midtown Manhattan office building.  Within a few years, amenities such as a rooftop terrace, a fitness center, and a golf simulator all opened, as befitted a trendy tech startup.

47.    And—in another parallel to Elizabeth Holmes—Hunsicker reinvented her image, too.  She buzzed her shoulder-length hair, replacing bangs with a pompadour and swapping out t-shirts for leopard-print blazers.

48.    At around this same time, Dayna Corlito joined as Financial Controller, and, among other things, worked with Jain as the primary contact for auditors.

**D.    Defendants Presented the Rebrand of CaaStle as Staggeringly Successful, Earning CaaStle the Coveted "Unicorn" Status.**

49.    From the outside, CaaStle had become a media favorite because of its savvy CEO and great technology.  CaaStle maintained that it was valued at $1.4 billion, with lifetime investments made in the company totaling over $500 million.  Hunsicker and other Defendants, including Singh and Goldenberg, touted innovative technology, partnerships with leading retailers, and over 700,000 subscribers.

50.    Business partners and clients heard a similar pitch.  CaaStle, it seemed, was a business partner worthy of their consideration.  The story was told carefully: using CaaStle's software improved brands' profitability and allowed business partners to invest more into growing their overall business.  And CaaStle seemed a credible business partner now too, the rare "unicorn" tech company that looked poised for growth and (just as importantly) more stable than its competitors and likely to be a reliable partner, one that they could depend upon and risk

spending their own capital to partner with. And any doubts were easily assuaged, among other things, given Hennessy's prominent involvement.

### E. Hunsicker Spearheads at Least Six Years of Pervasive Deception.

51. But it was all a lie. When reality did not support them, Defendants decided they would hide, rather than admit, the truth: as internal records now reveal, CaaStle had been a failed, money-burning business with no path to profitability, no real technological advantage, and no real subscriber base from 2019 onward.

52. As the rebrand into CaaStle took hold, and at least as early as February 2019 (and very likely before then), Hunsicker was already providing stakeholders, including both current and prospective investors and CaaStle's business partners and clients, with false statements, misleading claims, and fabricated documents regarding CaaStle and its software.

53. For example, in an update she and Singh shared with investors in July 2018, they claimed their "results have been quite amazing," with: "large increases in spend per consumer," the ability to "attract[] new consumers," and discussions with "CEOs of major retailors … about moving the majority of their businesses to our platform." On information and belief based upon filings by the Trustee regarding internal CaaStle documents—none of these statements are true. Furthermore, Hunsicker—and through adoption of these statements, Singh—claimed that "Gwynnie Bee … has helped us prove the model and optimize the operations and the unit economics"—despite the clear failure, as described above, of Gwynnie Bee.

54. For example, as an investigation by the U.S. Securities & Exchange Commission would later find, when the CaaStle finance department sent Hunsicker an income statement showing $47 million in annual losses with just $23 million in revenue for 2018, Hunsicker created a new income statement that claimed $72 million in revenue and only $24 million in losses.

55.    As Hunsicker later admitted in connection with her guilty plea to criminal securities fraud, Hunsicker "intentionally altered the [fiscal year] 2021 and 2020 audit to inflate CaaStle's [fiscal year] 2021 revenue by more than $100 million" and "falsely report[ed] that CaaStle's net revenue had nearly doubled to $230 million from [fiscal year] 2021 to [fiscal year] 2022 when, in truth, [revenue] did not exceed $20 million."  As she further admitted, "she had digitally altered [a screenshot] to show that CaaStle had over $50 million in available cash in its bank accounts when, in fact, CaaStle had less than $1 million in available cash at the time."

56.    Likewise, Hunsicker admitted that CaaStle's independent audit firm "had never completed the audit for [fiscal year] 2022 and 2021."  Yet Hunsicker "falsified and transmitted . . . what purported to be a final audit of CaaStle for [fiscal year] 2022 and 2021."

57.    Hunsicker provided investors with an array of false documents, including falsely inflated income statements, fake audited financial statements, and fictitious bank account records.  In one instance, she provided an investor with a "fictitious" income statement that "reported an operating profit of nearly $24 million in the second quarter of 2023" when "in truth, CaaStle's operating profit for the second quarter of 2023 was less than $30,000."

58.    This is just a sampling of Hunsicker's fraud; it was absolutely pervasive and infected virtually every number or metric she presented to any stakeholder, be it an investor or a commercial partner or client, for at least six years.

### F.  Hunsicker's Co-Conspirators Look the Other Way and Perpetuate Her Lies.

59.    None of this would be possible if not for those who surrounded Hunsicker—people who had access to the truth, had seen Hunsicker lie, and who made the deliberate choice that it was better for their wallets to cover up—and spread—the lies rather than risk discovery. Defendants continued to place Hunsicker in positions where she would inevitably tell even more

lies, to give her the raw materials for her fraud, and indeed to actively share numbers and assertions that they knew or could readily have verified were lies. It was a conspiracy of silence in part, but also of affirmative lies and active concealment.

60. Each defendant personally played an active role in the fraud, both before 2024 and afterward. And, as alleged below, each of them played a central role in the cover-up as well.

### 1. Singh

61. Singh was Hunsicker's co-founder, longtime confidant, close friend, advisor, mentor, and, according to Hunsicker's ex-husband as alleged above, at one point her paramour.

62. Singh's experience with software and managing data perfectly placed him to give technical credibility to the endeavor. He built or supervised the building of CaaStle's software and the sophisticated data-handling that made it supposedly valuable and thus had clear visibility into what CaaStle was actually doing.

63. From Gwynnie Bee's founding until approximately 2018, Singh was, as co-founder, just as equally the face of the company as Hunsicker. Upon information and belief, before 2018, he frequently participated in meetings with investors, business partners, and clients at which Hunsicker shared information that presented Gwynnie Bee and later CaaStle as a fabulous success with booming subscriber numbers.

64. Singh later claimed he had stepped away from the company, with the stated justification of prioritizing his academic career at Princeton and his involvement with other startups. According to statements Singh later made to CaaStle investors on a conference call in March 2025, he was "away" from 2017, "not involved with the company," and only "rejoined" in 2024.

65.    However, he in fact stayed closely involved with Hunsicker and her confederates. For example:

    a.  Singh continued to pitch investors on CaaStle, including texting a prospective investor in October 2019 to tout information he had about CaaStle's "momentum and growth."

    b.  In August of 2019 he texted regarding CaaStle: "We spoke with CEO of HBC about it, since [S]aks is in talks with us." He used "we" to refer to the actions, internal plans, and goals of CaaStle.

    c.  In November of 2019, he asked for an introduction to a senior member of Walmart's e-commerce team for the purpose of expanding CaaStle's partnerships.

    d.  Singh continued to forward updates from Hunsicker that he knew contained false statements about business successes to prospective investors, including in November 2019.  These included texts such as: "We just closed one of Walmart's brands as a customer"—again clearly indicating his knowledge of the inner workings of CaaStle and the scheme. He also directed Hunsicker to send investor updates as well.

    e.  He even continued to partner with Hunsicker in pitching investors in CaaStle.  In December of 2019, he texted the following to an investor: "[Y]ou should add to CaaStle if I can get you in.  Great things happening." and "I can probably keep it in the last round/valuation.  Money can come later if needed."

f.   Singh participated in strategic meetings with Hunsicker in February 2020, asking a potential investor to "come to the office" (meaning CaaStle's office at 5 Penn Plaza).

g.   Singh told an investor in CaaStle in April 2020 that the company's retail partners were seeing "profit and money" leading CaaStle to be "[s]igning and renewing deals."

h.   Again in June of 2020, he texted "We are signing a number of new clients."

i.   And in July of 2020, using his @caastle.com email address, he indicated he was directed by Hunsicker to contact an investor.

66.   In reality, then, even if he lacked any official title, he never left the small group of confederates with whom Hunsicker had surrounded herself.  He actively involved himself in the company, including meeting potential clients, raising funds, opining on capital structure, and discussed company valuations.  Defendants allowed him to use a CaaStle email address, holding him out as acting on CaaStle's behalf.  This all shows Singh's proximity to the inner workings of the cadre at the center of this conspiracy, even when he had no formal role at CaaStle proper.

67.   Further, as co-founder, Singh had access to complete information about CaaStle's business.  He could check if the information he was telling others was actually true and either did not check or did not care enough about whether what he was telling others was actually true to check information readily available to him.  With access to the true numbers, Singh knew, or at the very least acted with reckless disregard to the fact, that the financial and subscriber figures he touted to others were false.

17

68.     Singh, upon information and belief, maintained involvement with CaaStle throughout its existence—and with Hunsicker—despite his less publicly-prominent role after 2018 and continued to have wide-ranging access to its systems.

69.      Singh, having been involved in numerous investor and partner meetings, had seen Hunsicker lie on numerous occasions.  But, rather than blow the whistle, he continued to recruit prospective investors and business partners or validate Hunsicker to those who asked about her, he continued to lend his credibility to her claims about the company, and he continued his loyalty to her.

70.     Singh's close personal (and indeed, at times apparently intimate) relationship with Hunsicker further gave him access to the truth and a strong personal interest in protecting Hunsicker.

71.     As will be discussed below, he was also integral to cover-up efforts and cashed out his own shares when the fraud looked like it might imminently come to light.

### 2.     Goldenberg

72.     Hunsicker had brought Goldenberg along to her new venture, which promised him extraordinary wealth and prestige.

73.     As COO, Goldenberg had access to everything—all the true financial data, all the true sales data, all the performance data.  And he checked it constantly.  That, after all, was his job.  If he did not know the true revenue, the true subscriber numbers, the true expenses, the true number of sales pitches and contracts signed, then what was he doing all day?

74.     As part of CaaStle's C-Suite, Goldenberg would have been in meetings with business partners and clients and at least some investor meetings too, and thus would have witnessed Hunsicker presenting numbers he knew were inconsistent with the real data.  He was involved with producing financials for due diligence responses during potential deals or raises,

18

so he would have had visibility if Hunsicker modified the contents of the financials and likely would have had access to data rooms.

75.     Goldenberg's access to the true, alarming numbers also manifested itself in his actions.  For example, he put extremely strict cost controls in place.  Any expenditure over $1,000 needed to be personally approved by him.  That sort of C-suite micromanagement is the kind of strict budgeting one expects at a company that is tight on cash, even as Hunsicker was telling everyone who would listen that CaaStle was flush with cash.  These actions reflect his contemporary awareness of the balance the co-conspirators needed to strike between bringing money in and paying money out.  Despite outward statements of millions in the bank, the bank accounts contained fractions of that.  Since a bounced ACH would risk revealing that all was not as it seemed, Goldenberg's tight expenditure controls would make sure that Defendants could lie with impunity.

76.     Goldenberg knew that Hunsicker was lying, that the true numbers were abysmal, that the sort of spending on growth and sales that one would expect from a company as successful as CaaStle claimed to be would in fact lead to bounced payments and revelation of the fraud.  So he micromanaged expenditures to make sure that it would last until Hunsicker could sucker another round of investors and business partners in with her lies.

77.     Goldenberg had also repeatedly been in meetings with business partners where Hunsicker shared metrics that he cannot but have realized were false given his pervasive access to the true data.  Goldenberg—a software engineer by training—also had an intimate knowledge of the technical side of the business, and would therefore would have known, and certainly had ready access to data showing, the true dearth of subscribers and other business metrics showing the company's lack of success.  Because of this, he also clearly would have known that

Hunsicker's vaunted statistics—whether about finances or performance—were false. Additionally, Goldenberg, at business meetings with vendors and outside partners, intentionally reiterated Hunsicker's false statements regarding success, disseminated falsified documents, and remained silent and/or failed to correct false statements by Hunsicker made in his presence.

78.     Goldenberg, as Jain's direct manager, also knew about the resignation of CaaStle's auditor in 2023 when it learned of the falsification of financial data (as further discussed below), perhaps the most obvious sign imaginable that there was fraud at CaaStle. Even after Hunsicker confessed her fraud—both to the CaaStle Board in December and to Goldenberg specifically in January—Goldenberg still pitched to a friend and investor in January.

79.     With the full knowledge that Hunsicker was lying, Goldenberg actively facilitated her conduct and—as discussed below—took active steps to conceal it too, and he sought to cash out on his fraud based on insider information when the gig was up.

### 3.     Jain and Corlito

80.     Jain ran CaaStle's India subsidiary, to which tens of millions of dollars flowed, purportedly for inventory and staff salaries, although what exactly happened to all that money remains obscure.

81.     Despite lacking an accounting background, he was appointed as "Head of Finance" for CaaStle, a de facto CFO but reporting directly to Hunsicker.

82.     A company of CaaStle's size lacking a true CFO with dual reporting to the Board is bizarre and surely would have tipped off CaaStle's Board that something strange was going on; upon information and belief, the reason they did not insist on a true CFO, with an accounting background and reporting directly to the Board in addition to the CEO, was because they already knew Hunsicker was lying and that any new CFO with integrity and awareness of an accountant's professional duties would immediately blow the whistle.  Instead, they made the

20

same fake-it-'til-you-make-it gamble: that given enough time and ill-gained resources, CaaStle would make its business work eventually, and perhaps then it could clean up its act in preparation for an exit.

83.    Because Jain handled the money, he knew that there was not as much of it as Hunsicker said in documents he saw.  He had access to the ledgers and the true revenue figures and financial statements and reporting; that was his job.

84.    Corlito, meanwhile, was Financial Controller at CaaStle and similarly had pervasive access to the ledgers, revenue figures, and financial statements and reporting; that was her job too.

85.    Upon information and belief, Jain was also personally involved in Hunsicker's alterations of audits and other financial data; as Head of Finance, his knowledge was necessary to make sure that the fake books being presented to investors, business partners, and clients during due diligence seemed plausible and internally consistent enough to avoid setting off any red flags.

86.    Jain's and Corlito's reactions to actual knowledge of forgery, moreover, strongly suggests that they had been in on it for quite some time.

87.    For example, several of CaaStle's agreements with its investors required it to undergo regular audits.

88.    Jain, as Head of Finance and de facto CFO, was involved in communicating with auditors and providing them access to financial data.

89.    So was Corlito, as financial controller.

90.     In October 2023, CaaStle's auditor, BDO, resigned because it became aware of indications of fraud and that Hunsicker used its logo in connection with falsified numbers, including falsified financial statements in communications with investors.

91.     Jain and Corlito worked hand in hand with Hunsicker, to prevent BDO from going to the investors, retail partners, or other stakeholders directly with this information.  This activity included both Jain and Corlito responding "No" to a question from a new auditor about whether "there have been any recent frauds"—despite knowing that BDO had, in fact, resigned due to a very recent fraud.  Similarly, Jain came up with the plan to falsely tell people that the switch from BDO occurred as a "cost saving" measure and directed Corlito to tell that to others, which she did, knowing that her statements were false.

92.     Jain and Corlito became instrumental to the cover-up, telling employees, investors, and other stakeholders that the auditors had been changed as a cost-saving measure, which they knew was a lie and told anyway because they were committed to covering up the wider fraud to keep their chances of wealth from being early employees at a "unicorn" startup alive.

**4.     Callon**

93.     Callon, meanwhile, provided crucial external validation for the fraud as the "independent" board member and as an authority on corporate governance.

94.     In that role, Callon had the absolute right under Delaware law to inspect any of CaaStle's records and knew that basic competence as a director required him to be adequately informed and to ensure that there were reporting mechanisms other than to the CEO.

95.     Upon information and belief, he was informed of BDO's resignation as auditor in October 2023, a circumstance that anyone—and especially a corporate governance expert— would recognize indicates a high likelihood of fraud.

22

96.    Upon information and belief, he knew how unusual it was for a company the size that CaaStle purportedly was to not have a CFO with dual reporting to the Board, as opposed to a "Head of Finance" reporting only to the CEO.

97.    And, as alleged below, Callon was an eager participant in the cover-up efforts as the fraud threatened to come to light.

98.    He too played an essential enabling role, his very presence lending legitimacy to the business and encouraging contractual counterparties and investors alike to trust, preventing them from doing the sort of diligence they would do for a company that lacked such trusted validators on its board.

99.    And, as discussed below, when the conspiracy had its back to the wall in December 2024, with disclosure imminent, he was integral to the decision to keep the fraud quiet and enable further fraud by keeping Hunsicker involved in all aspects of the business despite clear knowledge of the fraud.  This was part of a larger pattern of enablement by Callon, which included Callon providing a $5 million personal loan to Hunsicker from one of his other companies, paid back by CaaStle funds.

G.    **The Success of the Conspiracy Required Hunsicker and Her Confederates to Work Together.**

100.    Hunsicker was able to lie for as long, and as brazenly, as she did precisely because of the affirmative cooperation, silence, and active participation in the fraud by Singh, Goldenberg, Jain, Callon, and Corlito as well as related cover-up efforts every time the fraud threatened to come to light.  Each individual Defendant knew that Hunsicker's statements were false, or was aware that she routinely lied and exaggerated (even if they did not know the specifics of every single lie), did not care whether what she was saying was misleading or not, and kept silent, actively facilitated Hunsicker's lies, and covered them up, presumably because

23

they stood to gain millions of dollars on their CaaStle stock from Hunsicker's lies and to lose out if the truth came out and CaaStle crashed and burned.

101. All individual Defendants had access to and knowledge of CaaStle's true financials, technological data, and subscriber information, yet never disclosed Hunsicker's falsifications of the same or corrected statements that she made, whether to investors or to business partners.

102. At least Singh, Goldenberg, Corlito, and Jain would have known that Hunsicker was disclosing and stating false revenue numbers, accountant balances, and audit results because of their positions as at CaaStle with review and management authority over finances and accounting, yet they never disclosed Hunsicker's falsification of the same or corrected statements she made

**H. As Auditors and Investors Start to Smell a Rat, Hunsicker and Her Confederates Engage in Snowballing Efforts to Cover-Up the Fraud.**

103. Starting in late 2023, the fraud almost came to light a number of times.

104. In October 2023, CaaStle's independent auditor, BDO, "questioned Ms. Hunsicker about her transmission of a false audit" to an investor.

105. As Hunsicker admitted in her recent guilty plea: "During a call with the Audit Firm, Ms. Hunsicker falsely claimed that she had created the fake audit in connection with a lecture that she gave at Princeton University, and that sending the audit to [the investor] had been a one-time error, unrelated to the solicitation of any investment."

106. "In fact, there was no such lecture, and Ms. Hunsicker had provided two fabricated audits to [the investor] while soliciting an investment from" that investor.

107. Moreover, "[a] few hours before the call with the Audit Firm, Ms. Hunsicker had conducted internet searches for 'fraud' and 'created an audit firm fake.'" Shortly thereafter, the

investor "contacted Ms. Hunsicker about the same fake audit, and Ms. Hunsicker repaid" the investor the value of its "investment in CaaStle."

108.    According to Hunsicker's guilty plea, at least one investor appears to have become aware of the fraud in October 2023 and threatened to blow the whistle. The result, of course, would be catastrophic for the scheme, so Defendants sprung into action to prevent it.

109.    Hunsicker took another page out of the Theranos playbook—using lawyers and non-disclosure agreements to keep the fraud under wraps whenever anyone came too close to revealing the truth. She contacted her longtime outside transactional counsel, Lori Hoberman, a sole practitioner who had received significant business from CaaStle and who hoped to obtain more, to create a "settlement agreement."

110.    The "settlement agreement" purported to redeem the investor's shares in CaaStle at their full value (despite CaaStle and the investor alike knowing that the truth would render those shares worthless) in exchange for a "gag order," confidentiality and non-disparagement terms that would impose a massive deterrent on revealing the truth of the fraud.

111.    In this way, Hunsicker paid off the investor using money obtained by fraud to conceal and further carry on that same fraud.

112.    As the Bankruptcy Trustee has recently alleged, CaaStle's records indicate that Jain and Corlito both knew about the report and worked to cover it up. They facilitated the buy-back of shares and they also prevented the spread of the information. As just one example, when the independent auditor terminated the contract, in part because of the fake audit report, Jain and Corlito agreed to keep it quiet and lie about the reason BDO left by saying that it was just a natural transition. Jain and Corlito even directly lied to the new auditor when asked whether

25

there had been any prior fraud at the company, responding "No" despite knowing that there had been.

113.    Goldenberg, with control of the finances, would certainly have known of such a large redemption of shares and upon information and belief would have had to not only approve it, but assist Jain and Corlito in ensuring that CaaStle's bank accounts retained enough cash assets to permit the redemption.

114.    No one with access to the actual financials of CaaStle, including each of the individual Defendants by virtue of their jobs or their access to Hunsicker, could have possibly concluded that large share buybacks were in the interest of the company.  In reality, by this time, as alleged in a complaint filed by the Trustee in CaaStle's Chapter 7 bankruptcy proceeding based on his review of CaaStle's records, CaaStle was not only not profitable during these years, but quite the contrary: it had staggering net losses.  The fiscal year ending 2023 showed net losses in excess of $80 million, and the fiscal year ending 2024 showed net losses in excess of $71 million.  The same records and allegations show that CaaStle's unrestricted cash was a fraction of its debt during these same years:  $1 million of unrestricted cash as of September 30, 2023, with $13 million in liabilities and $4.3 million in total cash as of September 30, 2024, with total liabilities exceeding $21 million.

115.    However, none of this was known publicly.  Instead, Defendants continued through their silence, active concealment, and repetition or sharing of Hunsicker's lies despite their ready access to the truth, to continue to defraud investors, business partners, and clients alike.

116.    This pattern of lying, covering up, buying out, and contractually silencing potential whistleblowers continued unchecked.

**I.      P180 Is Founded Based on Brendan Hoffman's Revelation About How to Improve Profitability in the Apparel Industry—a Revelation Predicated on CaaStle's Purported Business Success.**

117.    Enter Brendan Hoffman.  Hoffman is a veteran of the apparel industry.  He is a long-time C-suite executive for apparel and footwear brands, including as CEO of Vince Holding Corp., Inc. ("Vince"), a global luxury apparel and accessories brand as well as a public company.

118.    Unlike the Defendants, Hoffman had never been in Hunsicker's orbit.  Instead, Hoffman first met Hunsicker in approximately 2018, after an introduction by executives at Sun Capital, just as Gwynnie Bee was re-branding as CaaStle.  At the time, Hoffman was CEO of Vince.

119.    In 2023, as Hoffman left Wolverine and was looking for his next project, Hunsicker and Hoffman set up a meeting.  Hunsicker told Hoffman about CaaStle's outstanding successes in yield optimization and inventory monetization, two critical measurements of success in the apparel industry.  She pitched CaaStle as a "clothing-as-a-service" business that enabled clothing brands to rent their clothing inventory to consumers.  She described CaaStle as a success with rapid business growth and promoted the business as the "leading B2B technology company driving the next evolution of inventory monetization for apparel and beyond."

120.    Hunsicker explained that CaaStle offered technology to enable regular shipments of clothing to consumers to buy or to rent and that it had been extraordinarily successful in using that technology to build a robust subscriber base.  Hunsicker said that CaaStle had a value of more than $1.4 billion based on its innovative technology, its large ecosystem of hundreds of thousands of subscribers for multiple brands with hundreds of millions of dollars in revenue, and its logistics and distribution expertise in supporting a rental business.

121.    According to Hunsicker, the technology included an efficient reverse logistics shipping platform, back-end logistics, distribution centers handling cleaning, storage, shipping,

and returns, yield optimization technology, and an e-commerce ecosystem of hundreds of thousands of subscribers.

122.    Hunsicker's description of CaaStle's promised e-commerce scale—specifically, technology and logistics that would enable regular clothing shipments to customers on a massive level—would allow apparel companies to increase their margin on what otherwise would be discounted merchandise.

123.    The meeting with Hunsicker prompted a "Money Ball" moment for Hoffman. Hoffman realized that apparel brands and stores were losing significant value by focusing on sell-through of full-price items while leaving discounted items as an afterthought. Shifting focus, he thought, could drive meaningful profitability back to apparel brands and stores and regain historical levels of valuations. This business plan might incorporate rentals, but it was not the main goal. Apparel retailers could reclaim—and perhaps even multiply—their valuation by increasing their marginal gains on discounted merchandise. For years, valuation of apparel companies had declined to be just pennies per dollar of revenue; they were viewed as thin-margin, capital-intensive, brick-and-mortar-heavy businesses that struggled to attract investment in an era of software.

124.    So Hoffman set about turning this idea—apparel brands that were tech-enabled and thus able to maximize profits through channels that other brands were neglecting—into a reality more executable to retailers.

125.    At the time, working with CaaStle seemed like a great idea. Hunsicker created cloaks of credibility around the business with highly credible outside board members and well-known investors on board at CaaStle. Hoffman trusted that these board members and backers would have done their diligence, so their involvement gave further weight to Hunsicker's claims.

28

He knew and trusted Hunsicker; her description of CaaStle had helped create the idea for P180's tech-enabled business. All of this solidified Hoffman's belief in CaaStle, even while she was hiding specific financials. Hunsicker told Hoffman that she would not give out more specific numbers except to large investors who had information rights. According to Hunsicker, she was not raising additional funds for CaaStle except for secondary offerings because CaaStle did not need money—in other words, it was profitable, so it could fund itself from its operations rather than investor cash. Given how many highly credible investors CaaStle had and its illustrious outside directors, Hunsicker's statements sounded reasonable to Hoffman; even if he had not been shown the underlying data behind Hunsicker's claims of fabulous financial success, he believed that the investors and board members Hunsicker touted would not have gotten involved without seeing the detailed financials.

126. Hoffman brought deep industry knowledge and experience in apparel and retail, and Hunsicker would lead the strategy of integrating a large e-commerce ecosystem into the more brick and mortar apparel businesses and raise the necessary funds. Marrying his industry expertise and relationships to Hunsicker's self-proclaimed technological and e-commerce prowess, Hoffman believed, could enable an integrated approach that combined experience with brand ownership and the great technological accomplishments of CaaStle.

127. Hoffman believed that this combination of industry experience, technology, and approach could turn everything in the apparel industry on its head—180 degrees. So he nicknamed his planned company Project 180—later shortened to P180.

128. As a result, beginning around September 2023, Hoffman embarked on his new business venture, and, on February 21, 2024, Hoffman incorporated P180, Inc., as a Delaware Corporation.

129.    At incorporation, Hoffman owned 75% of P180, and, in exchange for access to CaaStle's supposedly groundbreaking technology, infrastructure, and subscriber base, plus Hunsicker's enviable Rolodex of investors who were interested in the apparel industry, Hoffman issued 25% of the initial common stock to CaaStle and agreed to appoint Hunsicker as P180's other director.

130.    P180's business plans and investor decks during this time underlined the centrality of CaaStle to the business thesis at this time:  P180 would acquire or invest in brands, and CaaStle's technology and back-end platform would enable P180 to run them better and more profitably than their prior owners ever could.

131.    Hunsicker also talked Hoffman into appointing her and Goldenberg to P180's Board, providing it with the credibility of having the founder of a supposed unicorn on the Board and underscoring how P180 could expect to have the ongoing support of this billion-plus-dollar company and favorable access to its technology in the long term.  Indeed, she had her and CaaStle's outside lawyer draft a Shareholders' Agreement on behalf of and for P180 that purported to *require* P180 shareholders to vote to elect the three of them to the Board of P180.

132.    Of course, neither Hunsicker nor Goldenberg disclosed during any of the negotiations over the licensing arrangements between P180 and CaaStle or Shareholders' Agreement and the Board appointments that CaaStle's finances and subscriber metrics were all fake and CaaStle was already using its new investors' money to buy the silence of old investors. Hoffman was denied access to detailed information regarding CaaStle's financial status or subscriber base on the pretext that he was not a large enough stakeholder in CaaStle to have that information, while reassuring him that CaaStle's finances and business were strong.  And Hunsicker regularly denied Hoffman other access, even for seemingly routine information.  For

example, Hunsicker and Goldenberg did not give Hoffman access to the CaaStle Wi-Fi and connected features like printers, despite that Hoffman worked from the office, forcing him to use the guest network. Similarly, Goldenberg (who would eventually be a board member and de facto COO of P180) kept tight control of financial information, including requiring all expenditures of $1000 or more to be personally approved by himself.

133. And needless to say, neither P180 nor Hoffman—either in his capacity as holder of 75% of common stock or his capacity as director and officer of P180—nor any of P180's other investors would have agreed to any of these terms if Hunsicker and Goldenberg had disclosed the truth in connection with the agreements or the Board appointments. P180's business model was simple: It would acquire clothing brands (or stakes in clothing brands) and then increase marginal gains on discounted merchandise from those brands to increase profitability by using CaaStle's purported technology, scale shown by the purported subscriber base, and tapping into a supposedly large creator-network. Hunsicker (and other Defendants at and through CaaStle) purported to supply the subscriber base and technological approach, as well as her Rolodex of CaaStle investors. Thus, Hoffman based P180's business plan on representations and promises made by Hunsicker and other Defendants at CaaStle.

134. To that end, in the spring of 2024, P180 entered into a strategic partnership with elysewalker, a high-end women's apparel brand, as a test of the business idea. What Hoffman did not know was that the deception Hunsicker and Goldenberg would deploy during this strategic partnership. In meetings on March 19 and April 10, 2024, with elysewalker regarding a potential strategic opportunity—attended by representatives of elysewalker, Hoffman, and Defendants, which included Hunsicker and at least Goldenberg by video conference link—

31

meeting attendees made statements about the robustness of CaaStle's overall business, e-commerce ecosystem, logistical capabilities, and ability to execute.

135. But that was false. CaaStle had no viable business, exponentially fewer subscribers than stated, and lacked scale. Those statements that were not made by Hunsicker and Goldenberg were made in their presence, which they failed to correct when made. Some were made by individuals whose statements were based on false information they had received from Hunsicker and Goldenberg. Further, Hunsicker and Goldenberg, through their words and actions, implied capabilities and scale that CaaStle did not have and that they knew could not be delivered.

136. In reliance on that information, P180 moved forward to secure a strategic relationship with elysewalker without knowing that the Defendants intended fraud. The Defendants then used P180's successes with elysewalker to continue their fraudulent business activities at CaaStle, including by using bank transfers discussed below to make CaaStle appear as if it had inbound accounts receivable or revenue.

137. In the fall of 2024, P180 acquired a minority interest in Altuzarra, a luxury women's ready-to-wear and accessories brand. What Hoffman did not know was the deception Hunsicker and Goldenberg would deploy during this strategic partnership. On August 1, 2024, at a meeting with the apparel brand Altuzarra and, in which representatives of Altuzarra, Hoffman, and Defendants including at least Hunsicker and Goldenberg attended, held by video conference link, meeting attendees made statements regarding CaaStle's robust e-commerce ecosystem and capabilities.

138. But that was false. CaaStle had no viable business, exponentially fewer subscribers than stated, and lacked scale. Indeed, CaaStle's business was multiple times smaller

32

in terms of revenue and customers than Altuzarra itself.  Those statements that were not made by Hunsicker and Goldenberg were made in their presence, which they failed to correct when made. Some were made by individuals whose statements were based on false information they had received from Hunsicker and Goldenberg.

139.    Further, Hunsicker and Goldenberg, through their words and actions, implied capabilities and scale that CaaStle did not have and that they knew could not be delivered.

140.    In reliance on that information, P180 moved forward in obtaining an interest in and providing an alleged loan related to Altuzarra without knowing that Defendants intended for CaaStle to exert control over and raid the value in these assets for its own purposes.

141.    They then sought to use what P180 purportedly owed CaaStle to try to coerce P180 into a merger on unfavorable terms, which would allow CaaStle to bury its fraud in a combined business that had real assets and avoid the independent scrutiny that a high-profile collapse would bring.

142.    Then, in the winter of 2024–2025, P180 sought to acquire a controlling share of Vince, through a purchase of shares of stock from Sun Capital.

143.    Acquiring a controlling share of a public company would be a far more significant move for P180 than its prior work with elysewalker and Altuzarra and would require P180 to raise additional capital from investors to accomplish the acquisition.

144.    Moreover, P180 raised that money based on a business plan premised on its expected ability to monetize and to scale Vince's use of CaaStle's rental platform.

145.    What P180 did not know, though, because it was not disclosed to Hoffman—the only loyal director at the time—was the depth of deception that Defendants were willing to engage in regarding the Vince transaction.  These include the following:

   a. On September 10 and 11, 2024, at a meeting in Mountainview, California regarding Vince and Altuzarra, in which Hoffman and Defendants, including at least Goldenberg, attended, including by via video conference link, Goldenberg knowingly articulated false information regarding value-add of CaaStle's capabilities, ecosystem, and scale that he knew to be untrue.  But that was false.  CaaStle had no viable business, exponentially fewer subscribers than stated, and lacked scale.  In reliance on that information, P180 moved forward in obtaining an interest in and alleged debt related to Altuzarra without knowing that the Defendants intended to exert control over and raid the value in these assets for its own purposes.  The Defendants then sought to use P180's debt to obtain control of P180's assets, including the interest in Altuzarra.

   b. In a meeting on January 10, 2025, with Vince regarding a potential transaction, in which representatives of Vince and Defendants, including at least Hunsicker, attended, and which at least Hunsicker attended via video conference link, Hunsicker made statements regarding CaaStle's capacities, technology, and scale that were known to be false, and, on information and belief, which she had already confessed to be false a month previously.  CaaStle had no viable business, exponentially fewer subscribers than stated, and lacked scale.  Indeed, CaaStle's business was

34

multiple times smaller in terms of revenue and customers than Vince itself. Other Defendants present did not correct those statements, despite the fact that they knew, that CaaSle was no longer a going concern and its scale was nonexistent.

c. In meetings on February 4 and February 24, 2025, with Vince regarding the recent transaction, in which representatives of Vince, Hoffman and Defendants including at least Hunsicker and Goldenberg attended, and at which at least Goldenberg attended via video conference link, statements were made regarding CaaStle's robust e-commerce ecosystem, capabilities, and ability to execute. Those statements that were not made by Hunsicker or Goldenberg were made in their presence, which they failed to correct when made. Some were made by individuals whose statements were based on false information they had received from Hunsicker and Goldenberg. Further, Hunsicker and Goldenberg, through their words and actions, implied capabilities and scale that CaaStle did not have and that they knew could not be delivered. These knowingly false or misleading statements or omissions were made in the course of the Defendants' fraudulent scheme to use P180 to acquire assets, including any interest in Vince.

d. Leading up to and at the time of the Vince transaction, Singh, Goldenberg, Callon, and Hunsicker inarguably knew that CaaStle was a fraud and could not fulfill its promises. They knew that the transaction was proceeding on the assumption that P180 could deploy CaaStle's

35

proprietary technology and customer network to derive profit above the standard retail margins.  At the time, Singh, Goldenberg, Callon, and Hunsicker knew about the falsified business records at CaaStle, knew that CaaStle had no ecosystem of subscribers, and thus knew that the transaction had little value as CaaStle could not provide the services to Vince as contemplated.  Despite Hunsicker's and Goldenberg's respective positions on the P180 Board, they did not disclose CaaStle's fraud to P180, Hoffman, or P180's investors.  Hunsicker and Goldenberg pushed P180 to move forward with the Vince transaction without informing Hoffman or P180 of the true situation at CaaStle and without recusing themselves from the transaction, even though they were on both sides of the deal.  Specifically, Hunsicker, Goldenberg, Callon, and Singh induced P180 to enter into an agreement to purchase a controlling interest in Vince Holding Company and pay off a significant portion of Vince's debt.  But when the transaction date came, P180 required about $5,000,000 more in capital to close the transaction.  Hunsicker and Goldenberg pushed P180 to move forward with the purchase of Vince without informing Hoffman or P180 of the true situation at CaaStle and without recusing themselves from the transaction, even though they were on both sides of the deal. Thus, the Defendants, who were also directors of CaaStle, conspired to approve a fraudulent purported loan on terms unduly favorable to CaaStle and without disclosing highly material information about the fraud at CaaStle or CaaStle's teetering on the brink of collapse because of it, facts

36

highly material to the decision to proceed with the transaction and the financing.

146.    Plaintiff also engaged in confidential talks with another e-commerce business in early 2025.  On two separate video conference calls, Hunsicker and Goldenberg either made false statements regarding CaaStle's technological capabilities, finances, subscribers, and scale—which were undisputably known to be false after the disclosures at CaaStle—or failed to correct materially false statements made by others who were not aware of the fraud at CaaStle. Although no deal occurred, these acts of fraud were part of the same scheme to continue the fraud on P180.

147.    Through their disloyalty, Hunsicker and Goldenberg were acting with the explicit approval of Singh and Callon, who had each signed off on the plan to deceive P180 into a merger on terms that anyone who knew the truth would know were deeply unfavorable to try to gain control of P180's assets and use the combined assets to bury the fact that CaaStle had been a massive fraud, as well as to try to avoid the outside scrutiny that a high-profile collapse or bankruptcy would bring.

148.    As CaaStle was a shareholder, as Defendants Hunsicker and Goldenberg were P180 Directors in addition to their roles at CaaStle, and as Hunsicker and Goldenberg's disloyal actions were part of a preconceived plan with the approval and assistance of Singh and Callon, Defendants here had full knowledge of P180's raising capital, its strategic partnership with elysewalker, its minority interest in Altuzarra, and its plan to acquire a majority of Vince, a public company.  Yet, despite their fiduciary duties to P180 and/or their knowledge that Hunsicker and Goldenberg owed fiduciary duties to P180, they made no disclosures (or agreed with Hunsicker and Goldenberg that they would make no disclosures) whatsoever of CaaStle's

37

true finances, its true lack of technological capacity, its true lack of subscribers, or its impending collapse and prosecutorial scrutiny due to the fraud.

149. While Defendants were defrauding P180 and its business partners, they were also looting P180's bank accounts. These acts included:

    a. On or about June 26, 2024, Hunsicker and, on information and belief Goldenberg, Corlito, and Jain, conspired to transfer $1,400,000 from P180's bank account at Chase Bank without right to do so. On information and belief, Defendants sought to use this transfer to hide the Defendants' fraud at CaaStle. Indicative of Defendants' fraudulent intent, this transfer occurred within a day of funding into P180 by an investor.

    b. On or about June 26, 2024, in a separate transaction, Hunsicker and, on information and belief Goldenberg, Corlito, and Jain, conspired to transfer $500,000 from P180's bank account at Chase Bank without the right to do so. On information and belief, Defendants sought to use this transfer to hide the Defendants' fraudulent business activities at CaaStle. Indicative of Defendants' fraudulent intent, this transfer occurred within a day of funding into P180 by an investor.

    c. On or about July 22, 2024, Hunsicker and, on information and belief Goldenberg, Corlito, and Jain, conspired to transfer $950,000 from P180's bank account at Chase Bank without right to do so. On information and belief, Defendants sought to use this transfer to hide the Defendants' fraudulent business activities at CaaStle.

d.  On or about July 22, 2024, in a separate transaction, Hunsicker and, on information and belief Goldenberg, Corlito, and Jain, conspired to transfer $450,000 from P180's bank account at Chase Bank without right to do so. On information and belief, Defendants sought to use this transfer to hide the Defendants' fraudulent business activities at CaaStle.

**J.    The Fraud Threatens to Come to Light, and Defendants Close Ranks.**

150.    As P180 executed its business plan throughout the fall and winter of 2024, the fraud at CaaStle threatened to become public.

151.    As Hunsicker has admitted in connection with her guilty plea, in September 2024, after providing an investor with a fake screenshot showing CaaStle had $200 million in cash on hand when, in fact, it had less than $200,000 in cash on hand, Hunsicker "falsely claimed that the CaaStle Board of Directors … would not allow her to share the information and permitted [the investor] to redeem its investments in CaaStle."  Thus, Hunsicker paid off the investor using money obtained by fraud to conceal and further carry on that same fraud.

152.    Once again, the redemption would have required the knowing assent and, likely, the active participation of Callon (as a board member), Goldenberg (who kept careful and close tabs on the bank accounts), Jain (as Head of Finance), and Corlito (as Financial Controller).

153.    For instance, as COO and with approval authority over expenditures, Goldenberg would have needed to approve each of the redemptions.

154.    Given the true financial state of the company, Goldenberg would certainly have known that the redemptions had no legitimate business purpose and vastly overvalued the stock.

155.    Jain and Corlito would have been involved, as they were in October 2023, in moving the money, addressing or minimizing any concerns raised by other employees, and ensuring that the bank accounts could handle the redemptions.

156.    Callon, as a board member, knew about the redemptions and the true financial state of the company, and thus knew that the redemptions had no legitimate business purpose.

157.    With so little cash on hand and with the fiscal year showing losses exceeding $70,000,000, redemption of an investment would have been a red flag.  But for the Defendants, it was merely business as usual.

158.    As Hunsicker has admitted in connection with her guilty plea, in October 2024, after providing fake draft audited financial statements to an investor, the investor "learned that the Audit Firm had not prepared the audit and confronted Ms. Hunsicker during a meeting at the CaaStle office in Manhattan" where she "feigned ignorance" and later "conducted an internet search for 'faking an audit,'" searches that demonstrate her knowledge of what she had done. Hunsicker then "offered to buy" that investor's "total investment in CaaStle."

159.    Again, Hunsicker had her lawyer paper that redemption with another "gag order" agreement.

160.    And again, the redemption would have required the knowing assent and, likely, the active participation of Callon, Goldenberg, Jain, and Corlito, given their involvement in CaaStle's operations and finance side, knew about and facilitated these redemption payments.

161.    CaaStle's Board at the time also rubber-stamped them, either aware or not caring why multiple investors were suddenly being bought out with scarce cash.

162.    This report and confrontation should have ended the fraud.  It did not.  Instead, it triggered a sophisticated effort to cover up that fraud which could only have been accomplished with the knowing involvement and participation of at least Goldenberg, Jain, Corlito, and Callon.

**K.    Key Conspirators Cash Out.**

163.    With immense pressure bearing down on the conspirators in September and October of 2024, they chose this moment to cash out.

164.    Singh went first.  CaaStle's records show that in October 2024 (at the same time an investor confronted Hunsicker over the fake statements), Singh redeemed 2,790,000 shares for $6,000,000 in cash.

165.    Of course, no valuation of CaaStle could have supported any such value for his shares given that the company was losing millions of dollars per year and—just the month before, had only $200,000 cash on hand.

166.    The timing strongly suggests that Singh had inside knowledge of the fraud.

167.    Further, the amount of the redemption confirms Singh's knowledge of the fraud. Singh redeemed shares for a little more than $2.15 per share.  Upon information and belief, based upon investment documents circulated for CaaStle in 2024, at or around the time of these redemptions, outstanding shares in CaaStle should have commanded a much higher price per share—if statements made by Hunsicker and others regarding the company's technology and financials, including its valuation, were accurate.  Such a fire-sale price confirms Singh's knowledge that the company was on fire.

168.    Lest there be any doubt of his complicity, leading up to this looting the company under the guise of a redemption, he was increasingly seen with Hunsicker, including at the CaaStle offices and in business meetings despite professing not to have an official role at the company.

169.    Hunsicker, in her plea, admits that she "used CaaStle funds obtained through fraud on investors to repurchase, on behalf of CaaStle, $6 million in CaaStle shares from *Ms. Hunsicker's close associate and former co-founder at CaaStle*." (emphasis added).  Records filed in connection with CaaStle's bankruptcy also show this payoff.

170.    There is only one other co-founder, Singh.

41

171.    In other words, Hunsicker herself has confirmed what is obvious:  She used the cash from her fraud to pay off others, keeping them loyal and cooperative.  There was no reason for her to do so if she was not getting something in return.

172.    At around this time, Singh's presence also became more visible at CaaStle—even though he ostensibly lacked any official title at CaaStle.

173.    Hoffman saw Singh become more involved, and Singh started to attend meetings. Many meetings were confidential between Hunsicker and Singh, although some included investors regarding CaaStle's business planning and P180's deals.  Singh's involvement at this time took place despite his not having a publicly-known role at CaaStle or P180.

174.    At one point, Hoffman was in a meeting with Singh in Hunsicker's office to work on a new deck for investors and brands, in addition to other times Hoffman observed Singh in Hunsicker's office.

175.    Indeed, on information and belief, Singh's increased presence in the Fall of 2024 occurred because at least Hunsicker and Singh were discussing how to weather the coming storm.

176.    Goldenberg went next.  Exactly four Fridays later, Goldenberg redeemed 1,395,350 shares for $3,000,000 in cash.

177.    Again, perhaps Goldenberg saw that the fraud was about to break through and wanted to cash out at least some of his ill-gotten gains.  Perhaps he knew that his silence was valuable and sold it for a hefty price.  Perhaps both.  Either way, it is clear evidence of inside knowledge of the fraud.

178.    The fact of the redemption as well as the amount demonstrates Goldenberg's knowledge of the fraud.  Goldenberg redeemed shares for a little more than $2.15 per share.  As

stated above, but for the fraud, outstanding shares should have commanded a much higher price per share.

179.    More damning, upon information and belief based upon allegations made by CaaStle's Bankruptcy Trustee, Goldenberg purportedly acquired "1 million shares of common stock" in November 2024—the same month that he redeemed them—"for no consideration." "There is no indication that he paid for the shares originally, nor that he received the redemption pursuant to any approved redemption policy or liquidation program."

180.    The fact that both Singh and Goldenberg sold their shares at prices well under the prices at which the company was selling shares to the investor community and not in line with the company's publicized valuation—in fact, at small fractions of those prices—demonstrates that they knew the company was in grave financial jeopardy.  They both also received almost exactly the same value for their shares—suggesting coordination and collusion over and above the fire-sale pricing.  Yet they did nothing to disclose this to investors or CaaStle's business partners and clients.

181.    Goldenberg testified in the Chapter 7 Bankruptcy Proceeding that the "basis" for him to buy back his shares was that his mother was "diagnosed with cancer" and he wanted to make sure that he had money to support her in case "medical bills" piled up.  Of course, unless Goldenberg knew that his shares risked decreasing in value, there is no reason why he would have needed to sell them just in case he needed the money at that time.

182.    Moreover, Goldenberg's claim to need $3 million due to his mother's health is not the only claim to need money for such a reason in this case.  Hunsicker has admitted, as part of her guilty plea, to "falsely claiming" that "shareholders needed money for a 'family health

43

emergency.'"  She then admitted to "us[ing] the investors' money to raise new capital for CaaStle while concealing from the investors that CaaStle itself needed cash."

183.    On information and belief, Goldenberg's statement is not true.

184.    Singh and Goldenberg's withdrawals were made by insiders and from a company that was losing tens of millions of dollars each year and that, just a month or so before, had had only $200,000 in its bank account.  They both cashed out exactly as they feared CaaStle's true finances would become more widely known.  The withdrawals and the timing show that they both had knowledge of the fraudulent scheme.

185.    On information and belief based upon allegations made by CaaStle's Bankruptcy Trustee, upon review of internal records, these stock redemptions were directly and knowingly facilitated by Jain, Corlito, and outside counsel Lori Hoberman despite their fraudulent bases.

**L.    The Dam Breaks—Yet Hunsicker's Confederates Continue the Cover-Up.**

186.    In the fall of 2024, the scheme started to fray.  As admitted by Defendant Hunsicker, in late 2024 an investment manager for a CaaStle investor uncovered the fraud.  That individual learned that CaaStle's listed auditor had been relieved of the account years earlier.  That investor then confronted Hunsicker regarding her fake financial information in October 2024.  The investor would not be bought off, and he reported Hunsicker's behavior to the Board.

187.    By late 2024, there were increasingly loud calls for investigation of fraud at CaaStle, including by an investor in CaaStle who had received a falsified audit report made.  Throughout the year, investors had been asking Hennessy and Hunsicker for information regarding their investments in CaaStle.

188.    On October 8, 2024, Hunsicker had lunch with investors, after which at least one investor asked for Hunsicker to send a "data room" with information to review.  On information and belief, on or before October 30, Hunsicker sent a falsified audit statement to at least one

investor, which purported to be from BDO.  On November 20, the investor asked Hunsicker to connect with BDO.

189.   After collaborating with Hunsicker across multiple years, Hunsicker and Singh met for drinks weeks after he redeemed $6 million in shares for fire-sale prices and in the lead up to Hunsicker's "confession" on or about November 13, 2024, shortly before an official P180 dinner with Altuzarra, to celebrate closing a deal.

190.   Based upon allegations contained in the Trustee's complaint regarding internal records of CaaStle's, on November 27, 2024, the investor "emailed Hennessy, and advised that on October 30, 2024, it reviewed an August 20, 2024 audit purportedly signed by BDO."

191.   According to that investor, "page 7 of the audit report was missing, and that Hunsicker's explanation was unsatisfactory."

192.   Following a prior pattern, "Hunsicker followed up with [the investor] and offered to repurchase its shares in CaaStle."

193.   Then, on December 3, 2024, the investor "participated in a call with Hennessy and Callon during which it was observed that the missing page of the audit report was incorrect by $13 million."

194.   Then, on December 6, 2024, Hennessy sent a letter to CaaStle's General Counsel "claiming that his four-year term on the Board terminated on April 12, 2021.  Hennessy asserted that his letter should be construed as a retroactive resignation, effective April 12, 2021."

195.   Yet Hunsicker provided a fictious explanation for this departure in December of 2024.

196.   She and Hoffman travelled to the Middle East to do business development and, on the way back, stopped over for a short time in India to visit Jain's finance operation.

197. On or about December 13, 2024, at the CaaStle India offices, Hunsicker told Hoffman that Hennessy was merely rotating off the CaaStle Board and Goldenberg would potentially take on more responsibility.

198. Shortly thereafter, Hunsicker also met with Jain for an extended period of time—1.5-2 hours.

199. After that meeting, she told Hoffman that she "did not feel well and had to lay down."

200. Given the recent developments, Plaintiff believes the two planned how to best continue the conspiracy's course of fraud. (Hunsicker later confessed to Hoffman that they did, in fact, discuss the fraud during this meeting.)

201. But with the investor threatening to go to authorities, the gig was well and truly up. At a December 2024 CaaStle Board meeting, Hunsicker made a show of "confessing" to the fraud.

202. Perhaps some of them were surprised by the full *extent* of the lies they had been enabling; perhaps Hunsicker had made some of them think that the lies were glossing over minor issues rather than the whole edifice being rotten. But they all knew long before that she was lying. They all had seen the ludicrously obvious red flags, like not having a CFO who would report partially to the Board, not having an audit committee, or that CaaStle's auditor resigned in 2023 without any replacement. The Board had failed to take normal corporate governance steps like creating an audit committee to oversee financial reporting, internal controls, and auditing processes, likely because the directors each knew that the company would crumble under basic scrutiny. Yet they all had ready access to the true financials and subscriber metrics had they only asked. At best, they had been turning a blind eye to the fraud that they were actively facilitating

in the hopes that Hunsicker could bootstrap the company into profitability so it would no longer be necessary to lie.

203.    In response, one would have thought that Scott Callon—the only other remaining Director aside from Hunsicker after Hennessy's resignation and a supposed expert in corporate governance—would have immediately taken steps to get rid of Hunsicker and her influence at the company, to determine what the true finances of the company were (such as by taking a quick look at bank statements and also noticing the lack of audited financials), and then tell investors about the fraud.  Or he could have hired counsel and liquidated the company, inside or outside of bankruptcy court.

204.    But that is not what happened.

205.    Callon supposedly suggested that Hunsicker resign from the Board, but Hunsicker said she would do so only on the condition that Singh replace her.  Callon agreed.

206.    Callon's agreeing to Singh's coming on the CaaStle Board is remarkable.  Why would he accept Hunsicker's demand?  Why would he choose Singh, who had just recently received $6 million buy-out for worthless stock?  Basic corporate governance dictates that it is critically important amid a fraud that an outsider with no skin in the game be brought in to supervise an investigation without fear or favor, not that someone with, at minimum, millions of dollars in liability be supervising an investigation that ought to include taking a close look at their own actions.

207.    But Callon did agree.  He accepted Hunsicker's demand, and Singh was now a director, although apparently even employees were not told of Hunsicker's supposed "reduced role" (lest they ask why).

47

208.     Indeed, Callon and Singh, according to the Trustee, "ignored the best interests of [CaaStle] and inexplicably permitted Hunsicker to remain as CaaStle's CEO for *more than three months*."

209.     In hindsight, Callon's willingness to appoint Singh is not surprising, and likely motivated by more than Hunsicker's supposed demand.  Callon knew that he himself faced a substantial risk of liability from the fraud and that it was important to his own pocketbook to keep the investigation led by insiders rather than having independent scrutiny.  Callon's involvement and willingness to acquiesce to Hunsicker at every turn is demonstrated by his and Singh's actions in the following months during which time they acted in lockstep.  They were ostensibly in charge—along with Goldenberg—over the following months during which they concealed the fraud at CaaStle and thereby continued it, to the detriment of P180 as well as many others.

210.     Singh, along with Callon, were now supposedly at the helm as the only two remaining directors.  But what one might *expect* from an innocent outsider would be to cause the company to come clean and, if not wind down or reorganize the company, then to explain to investors why it was still a valuable business proposition despite the fraud.  That's not what happened.

211.     Instead, Singh tried to cash out a second time.  The same day as the supposed "confession," according to the Trustee, "Singh attempted to cash out additional CaaStle stock by sending a Common Stock Redemption Agreement to Jain."

212.     Then, on January 6, 2025, Hunsicker supposedly confessed to Goldenberg about her fraud.  Of course, Goldenberg knew well before then that Hunsicker had been lying to investors, clients, and business partners and had been facilitating it for years; at most, he may

48

have been surprised at the sheer extent of the fraud he had been knowingly facilitating.  But the fact of the supposed confession demonstrates that Singh and Callon had not acted during the month or so during following Hunsicker's supposed confession to the Board to inform or question Goldenberg about it—despite the fact that he was the purported COO.

213.    Shortly thereafter, Singh and Callon, at that time the only CaaStle Board members, installed Goldenberg on the Board, thus ensuring only loyalists would control the investigation of her conduct.

214.    The appointment of another insider to the Board at a moment of corporate crisis—rather than an independent director who might scrutinize whether the rest of the Board were implicated in the wrongdoing—is yet another example of how Defendants sought first and foremost to protect themselves from liability and cover up the fraud and their role in it, showing consciousness of their guilt.

215.    By at least very early January 2025, and likely at some point in December 2024, Singh arranged—apparently through a partner at the prestigious law firm of Cravath, Swaine & Moore LLP, who according to the Daily Princetonian newspaper was Singh's Princeton college roommate for "all four years"—for CaaStle to hire Cravath to investigate Hunsicker.  In other words, Singh arranged for his college roommate's law firm to investigate a person with whom he had an intimate relationship as well as a business relationship of many years.

216.    Upon information and belief, Cravath reported to and its scope of work was defined by CaaStle's Board, consisting of Singh, Callon, and Goldenberg.  Each of these three knew that they faced millions of dollars in liability and had every incentive to avoid a full-fledged investigation.

217.    Tellingly, when there were vacancies on the Board to be filled, neither Singh nor Callon nor Goldenberg tried to add a truly independent, untainted director who could have led a credible investigation that would follow the evidence wherever it might lead.

218.    Thus, Cravath reported to a Board that consisted entirely of people who were themselves culpable as set out herein.

**M.    Callon and Singh Allow Hunsicker and Goldenberg to Continue to Operate Just as They Did Before.**

219.    Internally, Callon and Singh supposedly demoted Hunsicker to a "reduced role." But that was nothing but window dressing.  Hunsicker's cover story was that Goldenberg should take on more responsibilities, such as co-CEO, stating that she wanted to spend more time with building P180 and that she was frustrated with the administrative responsibilities at CaaStle.

220.    Hunsicker kept her office at CaaStle, and the Board communicated nothing about this "reduced role" to the organization, or to investors, or to retail partners.  Hoffman, P180's only non-conflicted director, did not learn about it, either.  To all the world, Hunsicker was still the face of CaaStle.

221.    Moreover, Callon and Singh allowed Hunsicker to continue to communicate and act on CaaStle's behalf, including to prospective brand partners and investors in the Middle East, to continue to raise capital and communicate on behalf of CaaStle, including regarding CaaStle's scale and capabilities even though they knew such representations to be false, and to continue her role as a board member at P180.  They also allowed Goldenberg to continue at CaaStle and to continue his role as a board member at P180.

**N.    As CaaStle Collapses, Defendants Suppress News of the Fraud for Months and Shift Focus to P180.**

222.    In a board meeting on January 3, 2025, Singh and Callon focused their attention on P180—not on addressing the fraud in CaaStle directly.  They did so to try to bury CaaStle's

50

fraud by using P180's real business to cover it up and potentially to use P180's financial assets and potential to attract new investors to a legitimate business to stanch the bleeding at CaaStle.

223.    Although likely developed sooner, this plan was memorialized in meeting minutes of a January 3, 2025, CaaStle board meeting.  That meeting was held telephonically at 8 am eastern time, and included Singh, Callon, and three lawyers from Cravath, one of whom acted as secretary.

224.    Singh presided as chairman.

225.    He recounted that he and Jain had had multiple meetings and discussions with Hunsicker in which they identified limited cash reserves and noted that the traditional parts of the business were struggling to scale and unlikely to prosper.

226.    The minutes reflect that "Mr. Singh reported that Ms. Hunsicker and Mr. Jain had been developing plans for a restructuring of the business to focus solely on the P180 business. The Board was in agreement as to this proposed streamlining and restructuring of the business. After discussion, the Board agreed that Ms. Hunsicker and Mr. Jain should finalize a restructuring proposal and present it to the Board."

227.    Thus, and as a variety of records have subsequently shown, the true plan was as follows:

> a.    CaaStle's business was money-losing and unsalvageable on its own.
>
> b.    Rather than admit the fraud and wind down the business, Defendants would undertake an elaborate plan resulting in a coerced merger with P180 to try to cover up the fraudulent tech business with a real business with real assets.

51

c.  The plan was simple:  Use loans to coerce compliance.  Defendants planned to load P180 with purported debts to Defendants and CaaStle and then use that as leverage to coerce a merger.

d.  Once this fraudulent coercion was complete, CaaStle would have real, tangible, and valuable assets from P180's real business that it could present to avoid having to disclose to investors, business partners, or anyone else outside the select few already in the know that its prior business had been a fraudulent sham.

e.  Importantly, this plan would keep Defendants firmly in control, avoiding a situation such as a Chapter 7 bankruptcy where an independent trustee would scrutinize their actions and where they would likely face liability. By merging CaaStle with a viable business, the foxes could remain firmly in control of the henhouse.

228.    Two additional components were critical to this plan: whitewashing the investigation of Hunsicker to hide the full extent of the fraud and keeping her in power.

229.    As for the investigation, Singh repeatedly claimed that the eventual report prepared by Cravath at the direction of Singh, Goldenberg, and Callon found that Hunsicker had "acted alone."  That the investigation may have focused on Hunsicker's wrongdoing is not surprising when counsel was hired by, and their scope of work defined by, a Board that consisted entirely of people who had everything to lose if the investigation actually tried to look beyond Hunsicker.  As described above, the Trustee's investigation of CaaStle documents has shown complicity since October 2023 by Jain and Corlito.  And, also as described above, Singh and Goldenberg had cashed out at fire sale prices to lock in their gains from the fraud.  Perhaps the

52

co-conspirators were effective at covering their tracks in the moment, but they could not once their documents came under control of the Trustee.

230. But, for the next few months, the story was that Cravath had not found anything suggesting anyone other than Hunsicker had done anything wrong. As for keeping Hunsicker in power, remarkably the meeting minutes explicitly reflect that, with outside counsel present and apparently completely aware of the history of fraud at the company, the Board decided that Hunsicker should remain involved as CEO because her involvement was necessary, among other things, to force a merger with P180.

231. In other words, then, a confessed fraudster had to remain as CEO because there was no other feasible way to pursue merger with P180 as an exit option.

232. Remarkably, and demonstrating the lengths Defendants went to attempt to bury their fraud, this shift was a substantial departure from CaaStle's business model—from a "software-as-a-service" business to an asset-heavy business.

233. Moreover, the deal between P180 and Vince would have been abandoned if P180 had known the truth, which would have damaged Defendants' availability to hide the CaaStle fraud by merging it with a company with a substantial, real business. Hunsicker's sudden departure would have prompted Hoffman and others at P180 to ask serious questions about why.

234. Thus, despite half a decade of admitted fraud (and likely more), they did not remove Hunsicker from her fundraising and management responsibilities at CaaStle.

235. Indeed, she continued to raise money through March of 2025, without her or anyone else involved in approving the raises disclosing that the business was imploding and had secretly been a fraudulent mess for half a decade or more.

236.    Instead, they would secretly try to manufacture the ability to coerce a merger with P180 too to further the plan.

237.    After all, Hunsicker and Goldenberg were already on P180's Board.

238.    Of course, none of them were acting consistent with their duties of loyalty to P180.  None of them were disclosing the material fact that Hunsicker was a fraudster and P180's key technology vendor was a massive sham that was collapsing under the weight of its own half-decade of fraud.

239.    CaaStle's entire board went along with all of this even though the fraud was now squarely before the Board, they knew that CaaStle's business had imploded (indeed, the January board minutes admit there was no business), knew that there was no way that Hoffman or P180's outside investors would approve a merger if they were told the truth, knew that Hunsicker and Goldenberg owed fiduciary duties of disclosure to P180, knew P180 too had been lied to in the past and was still operating under the influence of CaaStle's past lies and nondisclosures, and more.  Of course, their actions were wildly inconsistent with their fiduciary duties.

240.    Upon information and belief, they also knew that CaaStle's outside counsel, the same Lori Hoberman who had drafted the gag agreements to suppress the fraud and who had done work for Hunsicker personally, was advising P180 on its corporate documents and could be trusted to throw her duties to P180 under the bus in favor of her misplaced personal loyalty to Hunsicker.

241.    Yet Callon and Sing, along Goldenberg once he joined the CaaStle Board, actively voted to approve and continue the January 2025 plan to permit an admitted fraudster to lie to P180 in an effort to force it into an unfavorable merger.

**O.      Defendants Lie to Hoffman and P180 and Try to Bury CaaStle's Fraud Through a Merger with P180.**

242.    In parallel with their fraudulent conduct at CaaStle, the Defendants conspired to obtain control of P180's money and assets not only to perpetuate their fraud at CaaStle, but to conceal that fraud and, ultimately, hoped to exert control over P180 to further their own personal benefit.

243.    To that end, the Defendants conspired to hide their fraud by coercing a merger with P180.

244.    They made a concerted effort to gain control both of money coming into P180 and money flowing from P180 to CaaStle.  Just as they had previously used CaaStle as their own personal piggy bank, including questionable payments to Hunsicker, huge payments to CaaStle India that partly got diverted to Jain, and Singh and Goldenberg cashing out through "redemptions" on the eve of the fraud coming to light, they hoped to take control of P180's finances to loot it to benefit themselves and the scheme as a whole.

245.    The principal way that they hoped to achieve this was by using the positions that they had lied their way into to have CaaStle take control of P180's bank accounts and move money in whatever way Hunsicker directed, without authorization from disinterested directors. From the beginning, Jain and Corlito controlled P180's bank account and fund flow.

246.    Hunsicker installed herself as chair of P180's Board and put Goldenberg in a position as *de facto* COO.  This permitted Goldenberg to control P180's funds while ostensibly serving both as a director of P180 and as COO of CaaStle.

247.    As part of a shared services arrangement, Jain managed P180's accounting and Corlito executed the flow of funds from the bank account, with additional access by others at CaaStle's Indian subsidiary.

248. Hoffman has been told that the CaaStle Board was aware of this, which would have included Singh and Callon.

249. With Jain as head of accounting at CaaStle and Singh and Callon (in addition to Goldenberg) as directors of CaaStle, Defendants could dictate the flow of money to and through P180 and CaaStle, and onward to their personal bank accounts when they thought they could get away with it.

**P.      Defendants Make Unauthorized Transfers of Millions of Dollars from P180's Bank Accounts.**

250. The Defendants also caused P180's money to be fraudulently transferred out of P180's bank account, both to CaaStle (where, presumably, they used the transactions to fake accounts receivable or cashflow) and to personal bank accounts. By ways of illustrative example, in addition to the unauthorized transfers during the summer of 2024:

a. On or about January 30, 2025, Hunsicker and, on information and belief, Goldenberg, Jain, Corlito, and Singh conspired to, and did, transfer $1,000,000 from P180's bank account at Chase Bank to Hunsicker's personal account. As Defendants had no right to do so, the transfer was made through material misstatements and/or omissions regarding the lawfulness of that transfer.

b. In a second theft, on or about the same day January 30, 2025, Hunsicker and, on information and belief, Goldenberg, Jain, Corlito, and Singh, conspired to, and did, transfer $300,000 from P180's bank account at Chase Bank to Hunsicker's personal account. As Defendants had no right to do so, the transfer was made through material misstatements and/or omissions regarding the lawfulness of that transfer.

251.    Combined with the transfers in the summer of 2024, such coordinated looting would have required Jain, Corlito, Goldenberg, and Hunsicker—at least—to communicate closely about the quantity and location of P180's cash.

252.    So, by way of example, on information and belief, at least some of the $6,000,000 that Singh arranged to take from CaaStle in October 2024 came directly from money that Defendants had looted from P180 earlier in the summer.

253.    Similarly, at least some of the $3,000,000 that Goldenberg looted from CaaStle in November 2024, came directly from money that Defendants had looted from P180 that fall.

254.    Hoffman, however, knew nothing about the fraudulent scheme operated by Defendants, including Hunsicker.

### Q.    Duped by Defendants' Lies and Nondisclosures, P180 Spends Millions of Dollars in Reliance on Defendants' Fraud.

255.     As discussed above, a fundamental aspect of P180's business plan was the idea that it could make a profit where others could not from apparel companies by improving them with technology and logistics services that P180 had preferential access to through its licenses with CaaStle.

256.    Vince—a business that Hoffman knew in depth because he was its former CEO—turned out to be up for sale during the winter of 2024-2025.  Sun Capital, Vince's majority owner, was winding down their funds and looking to close their positions.

257.    P180 did the math.  With the efficiencies and additional revenue streams it could realize by deploying the benefits of its commercial arrangement and favorable licensing terms with CaaStle, P180 ultimately paid $25,000,000 for this controlling interest and pay down of the long-term note held by Sun Capital.

258.    Despite full knowledge and awareness of the importance of CaaStle's scale and financial performance to the value of the deal, and despite their positions as Directors and Officers of P180, Hunsicker and Goldenberg never disclosed to Hoffman, P180's only non-conflicted director, the truth about CaaStle's flawed technology, its miniscule subscriber network, its shaky financials, and the underlying fraud.  Instead, the Defendants set out on a concerted campaign to use the deal to gain control over P180 and try to force the two companies to merge into one so that they could continue to suppress CaaStle's fraud by having a real business to point to and so that they could avoid outside scrutiny if CaaStle collapsed.

**R.      Defendants Launder Their Ill-Gotten Gains Through Their "Loan-To-Own" Fraud.**

259.    Of course, P180 needed to finance the acquisitions.  Defendants used this as an opportunity to coerce P180 in order to bury Defendants' fraud and, the plan went, perpetuate the fraud through P180.  Singh and Callon provided the architecture for the plan.  The notes from a January 3, 2025, CaaStle board meeting show that they knew CaaStle's business model was no longer viable, documented the fraud, and chose to put Hunsicker—by everyone's account now a confessed fraudster—in control of both CaaStle and P180.  They did this despite knowing of the fraud at CaaStle and not disclosing it publicly or to Hoffman.

260.    Callon, with clear knowledge of the years' worth of fraud, permitted—and even encouraged—Hunsicker's control of and leadership at P180 precisely to permit this plan to take effect.

261.    Defendants then set about implementing their plan for P180.  Core to this plan was debt.  Goldenberg, at that point a director of both P180 and CaaStle and with full knowledge of the fraud at CaaStle, negotiated a purported "loan" from CaaStle to P180 for $5,000,000 and 10% interest over a matter of weeks.  He negotiated and signed the purported loan documents,

despite being a director of P180, without disclosing to Hoffman, who also signed the purported loan and who was the only loyal director of P180, the fraud at CaaStle or the true purpose of the transfer. (The true purpose became clear in the months afterward, as Singh and Goldenberg sought to use that purported loan to force P180 to merge with CaaStle under their control in order to bury their fraud.)

262. While negotiating both sides of the purported loan, Goldenberg never once disclosed any of his knowledge of the fraud at CaaStle to Hoffman (the only non-conflicted board member of P180), despite being under a clear duty to do so both as a fiduciary of P180 and based on the "special facts" duty of disclosure because he was participating on behalf of CaaStle in negotiating a transaction as to which he knew that P180 did not know material information in his peculiar knowledge and not readily discoverable by P180.

263. As a director of P180 and its de facto COO, and in various roles as a board member at CaaStle, Goldenberg was aware of the fraudulent activity at CaaStle. He was also aware that the primary purpose of the Vince transaction was to generate value by deploying CaaStle's platform, technology, and customer network. Yet he did not disclose the falsification of records to P180 or the Board of P180 (including Hoffman) and instead presented the transaction without disclosing these facts.

264. Hunsicker also sought leverage over P180. That January, she transferred $9.3 million into P180 to enable the Vince acquisition. She gave various, contradictory bases for doing so. To some, including Hoffman who wanted confirmation regarding planned repayment , she stated that she would "fundraise," herself, to repay any obligations. (Of course, she never did.) To at least one other, she agreed to represent that P180 had no insider debt, which would mean that the transfer was, at best, an equity investment or not to be repaid at all. At the same

59

time, Hunsicker was of course aware of her own fraud, which she had already "confessed" at CaaStle. She knew that the primary purpose of the Vince transaction was to generate additional value by deploying CaaStle's platform, technology, and customer network, but, which she knew could do no such thing since CaaStle was a failure. Nor did she disclose the falsification of records to P180, its shareholders, or the uninterested directors of P180 (including Hoffman). Finally, no documentation accompanied this transfer, nor did Hunsicker seek approval from Hoffman, the unconflicted director, or shareholders after a full disclosure of the fraud and her role in it.

265. Neither these transactions nor the transfers of funds discussed above were approved by an unconflicted, independent board with full disclosure of material facts by Hunsicker or Goldenberg. To the contrary, Hoffman would never have authorized any dealings with CaaStle, Hunsicker or Goldenberg whatsoever if he had known of the fraud at CaaStle.

266. Jain, running P180's accounting function, was also an officer or agent of P180 and owed it fiduciary duties of disclosure, including to disclose his knowledge of the fraud at CaaStle. Instead, he facilitated the fraudulent transfer of funds to and out of P180. As another jab to further weaken P180, Hunsicker, in late January, made two transfers totaling $1.3 million dollars from P180's bank account directly to her personal bank account without authority or right to do so. On information and belief Jain conducted this transaction with the assistance of Corlito and Goldenberg at the instruction of Hunsicker.

267. In the end, the Vince transaction closed at the end of January 2025 and P180 obtained control of Vince. The independent board of Vince appointed Hoffman as CEO (a position he still holds).

268.    Callon, meanwhile, used his connections and other businesses to prop up the conspiracy as long as he could.  The Trustee's complaint, based upon review of CaaStle's internal records, shows that a personal loan that Callon directed his company, Ichigo, to make to Hunsicker in 2023, had been repaid not with her money but with CaaStle money.  Callon then, in February of 2025, directed Ichigo to send funds back to CaaStle.  On information and belief, this provided operating funds so that the conspirators had more time to attempt to perfect their scheme to shift the fraud from CaaStle to P180.

269.    Of course, by February of 2025, Callon already possessed every fact necessary to understand that he had received misappropriated corporate funds.  He knew that Hunsicker had represented the $5 million Ichigo loan as a personal obligation.  He knew the repayment had come not from her personal account but from CaaStle's corporate treasury.  And he knew, from the January 3 board meeting, that CaaStle was operating with severely limited cash reserves.  The inference is inescapable: Callon understood that a cash-strapped company had used its dwindling corporate funds to retire its CEO's personal debt to him.  His response was not to raise the issue and seek to return the funds so that it could be distributed to victims.  His response was to put the funds back at the disposal of Hunsicker in an effort to perpetuate the fraud through continued business activity.

### S.    P180 Learns the Truth and Is Left to Clean Up the Wreckage from Defendants' Fraud and Cover-Up.

270.    Despite having continued to act for CaaStle and P180, by March 2025, it became no longer possible for Defendants to hide what had occurred.

271.    In March 2025, the Department of Justice seized Hunsicker's electronic devices. Hunsicker then got a new phone.

272.    Even then, Hunsicker lied.  Hunsicker told Hoffman that she had gotten a new phone based upon the advice of Scott Callon.

273.    But on March 23, 2025, while the Defendants' fraud was largely still a secret within CaaStle beyond Hunsicker's inner circle, the Defendants here, Hunsicker confessed to Hoffman.  She stated that she had been falsifying financial data since the beginning of 2019.  During that conversation, she confirmed that she and Jain had discussed the fraud while she met with Jain in India in December 2024.  Even then, unable to accept that she had done something wrong, she sought to deflect responsibility, blaming it, in part, on a head injury she said she had suffered in 2018.

274.    Immediately thereafter, Hunsicker and Goldenberg resigned from the Board of P180.  Two outside investors promptly joined the P180 Board to serve as independent directors, joining Hoffman on the P180 Board, and they promptly investigated what had occurred—a stark contrast to Callon's, Singh's, and Goldenberg's decisions a few months earlier to keep CaaStle's Board to insiders who would keep things quiet because of their own exposure.

275.    As the P180 Board sought swiftly to clean up the mess left by Hunsicker and Goldenberg's lies and disloyalty, one immediate order of business was to hold the wrongdoers accountable and force them to make good the damage they caused and deprive them of their dishonest gains.  P180 sued CaaStle in New York Supreme Court to cancel or avoid those purported debts.  And P180 brought this suit to recover damages from the Defendants.

**T.    The Fraud Becomes Public.**

276.    Curiously and astonishingly, despite having essentially no functioning business and hundreds of millions of dollars in liabilities to defrauded shareholders, clients, and business partners, the Defendants decided to keep the company operating, to burn through the company's remaining cash, and to keep investors and others, like P180, in the dark.

277.    Eventually, though, the truth came out.  At the end of March 2025, with Hoffman now informed and it becoming obvious that lawsuits would be forthcoming from P180 and investors Defendants had told or were about to tell about Hunsicker's confession, Singh finally sent a letter to CaaStle's investors disclosing some information about the fraud.  The next day, he had a call with CaaStle investors, as discussed below.

U.    **Defendants Continue to Attempt to Force P180 to Merge with CaaStle, but P180 Successfully Resists.**

278.    Remarkably, the public of disclosure of CaaStle's fraud was not the end of it. Defendants still tried to execute on their plan to coerce a merger P180 as they strove mightily to avoid the independent scrutiny they would face if CaaStle were unable to avoid bankruptcy.

279.    In March and April 2025, Singh, Goldenberg, and Jain conspired to maximize the purported debt owed by P180 to CaaStle and demanded payment of north of $14 million.  In March, they trumped up documents purporting to show various debts and payments owed to CaaStle by P180.  The "loan" which Goldenberg had negotiated in violation of his fiduciary duties came back front and center.  They demanded millions of dollars in payments for CaaStle's purported technology license.  And they demanded repayment of millions of dollars for operating expenses without any contractual entitlement.  The precise purpose of this scheme was to coerce P180 to cave and fold into Defendants' control, without the disclosure of the fraud, so that the Defendants could continue their fraud through P180.  They also conspired to drain the entirety of P180's bank accounts, through Jain and Goldenberg's access to those accounts, to less than $20,000—further upping the financial pressure on P180.

280.    Singh openly talked, including on at least one call with CaaStle stakeholders that took place later, of CaaStle's merging with P180 to continue the business.  The point, he said in

63

response to repeated questions regarding Hunsicker's continued activities was: "We wanted to get – we wanted to see if P180 could give us the money that—that we were owed."

281.    At the same time, he crowed about his purported distance from Hunsicker's fraud—saying that he had not been involved in the company for years and only came back in December.  Those statements misled people about the depth and breadth of the fraud at CaaStle, the fraud that he had participated in even without an official role, for over six years.

282.    Yet, on this call, Singh revealed the coordinated scheme.  He stated that he knew that CaaStle's SaaS business "did not work" and that he believed to maximize the success of the January 2025 investment depended on merging with CaaStle's "remaining business."  The statements expose the intent, known to Singh, Callon, Hunsicker, and Goldenberg, since at least December 2024, to conceal CaaStle's insolvency and fraud, to induce P180's acquisition of assets and to pursue a merger to misappropriate P180's valuable apparel assets.  They did that without *any* public disclosure, precisely to coerce action through misrepresentations and silence.

## V.    Having Failed to Seize Control of P180, CaaStle Ultimately Collapses and Files Bankruptcy.

283.    Singh would later tell CaaStle investors that he had had been "away" from CaaStle since sometime in 2017, a date which all-too-conveniently predates the period as to which Hunsicker had commenced her fraud.

284.    Despite his claim that he ceased having an official role at CaaStle at that time, as discussed above, he continued, through at least 2019 and 2020, to participate in strategic meetings and corroborate Hunsicker's falsehoods with his own statements.

285.    Indeed, as discussed above, his text messages show that well into 2020, he was attending CaaStle meetings, recruiting CaaStle investors, holding meetings with Hunsicker at CaaStle headquarters, and spoke to retailers about business opportunities.  Throughout, he raised

money for CaaStle, had control over valuation (and statements thereabout), and had knowledge of the true capital structure.

286. Singh was, in short, a fox guarding the proverbial hen house; he was investigating a fraud in which he was complicit and that he had enabled.

287. Singh presented himself, later, to CaaStle's investors as the man of integrity who had been on the outside and had returned only when called upon. That presentation was false in every particular. Singh had never really left.

288. In that conference call, Singh made abundantly clear that Defendants had intentionally put a known fraudster in control of the company without disclosing the fraud or her role in it. Pressing Singh about why the Board permitted Hunsicker to continue raising money, an investor asked "JP, JP, one thing, sorry, but why was she continuing to raise money and other people were raising money on her behalf up until I think like two weeks ago? And that was, like, she was still—she and other people on her behalf were raising money last—up until last month. You would have thought that would have stopped in December."

289. Singh responded weakly: "We put what we did was we initiated an investigation . . . we constrained her and her ability to do things at Castle with board resolutions—strong board resolutions and so on . . . but we looked at the—you know, the impact of how does the company survive, we believed in this new business model."

290. Singh immediately tried to constrain the issue to Hunsicker: "She acted alone. No other executives or anybody was involved in this, and so its not a systemic issue." But in truth it was a deeply systemic issue—one which Singh was intimately involved with. And Goldenberg, who was also part of that CaaStle investor-call, remained silent as Singh said this. He did not

disclose his role, or Singh's. And neither he nor Singh disclosed that they redeemed, between them, $9,000,000 in the lead-up to "disclosure."

291. Upon information and belief, Defendants were attempting two things, both of which were centered around their own self-interest.

292. First, they were trying to find a way to tell a story that made reorganization a possibility so that they could either avoid bankruptcy altogether or file for Chapter 11 as a debtor-in-possession. That way, they could keep control of the company and try to prevent the company from independently investigating their own conduct and suing them for their part in the fraud. To that end, Callon arranged for a purported "bridge loan" to be made by one of his other companies, Ichigo.

293. Second, they were attempting to run down the preference period clock and the look-back period for avoidance actions in order to make it harder for a trustee to claw back their ill-gotten gains, specifically including the substantial payments to Singh and Goldenberg.

294. Eventually, CaaStle could wait no longer; the company's cash was running out. It filed for Chapter 7 bankruptcy on June 20, 2025.

**W.      Hunsicker Is Indicted and Pleads Guilty to a $300 Million Fraud.**

295. On or about July 18, 2025, the United States Attorney for the Southern District of New York unsealed an indictment against Christine Hunsicker. The 15-page indictment included six counts, including securities fraud, bank fraud, and aggravated identity theft.

296. On or about March 4, 2026, Hunsicker pled guilty to fraud in the purchase and sale of CaaStle securities, admitting the forfeiture allegation with this charge and agreeing to forfeit $283,291,940 to the United States. Hunsicker further admitted that she knew at the time that what she was doing was illegal.

66

297.     In announcing the plea, the US Attorney reiterated that Hunsicker "fashioned a massive fraud scheme, built on forged documents, fabricated audits, and material misrepresentations to hundreds of venture capital investors."  As described in the US Attorney's press release, the plea recognizes that the "one count of securities fraud" involved "a scheme to defraud hundreds of investors in CaaStle."  The US Attorney further notes that even after CaaStle's Board purportedly removed Hunsicker in December 2024, she "continued her fraudulent activities and raised and attempted to raise new capital for CaaStle and P180."  Well into March 2025, she was "continuing to meet with the investor[s] about a fake audit without revealing its fraudulent nature, her removal from the Board, or the prohibition against her selling shares."

298.     Hunsicker is now awaiting sentencing.

## COUNT I
### VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (RICO) 18 USC § 1962(C) (AS TO ALL DEFENDANTS)

299.     Plaintiff incorporates by reference all foregoing and following paragraphs as if set out at length herein.

300.     The "Hunsicker Enterprise" was a group of individuals associated in fact centered around Christine Hunsicker and her various fraudulent business ventures, including her corruption of what was formerly Gwynnie Bee and later CaaStle and her efforts to take control of P180 (albeit ultimately rebuffed, after millions of dollars of damage, by the efforts of Hoffman and P180's outside investors).

301.     As alleged above, each of the Defendants worked together toward the common purpose of lying to maximize the wealth of the Hunsicker Enterprise and evade discovery of the fraud, as well as to distribute ill-gotten funds to members of the enterprise to secure their

67

ongoing loyalty and silence.  Defendants operated for their own profit at the expense of CaaStle and P180 and their respective outside investors, CaaStle's clients and business partners, and other stakeholders.  The Hunsicker Enterprise operated for years with a continuity of membership; at least Hunsicker, Goldenberg, and Singh were there throughout, with Jain joining the inner circle not much later and Callon and Corlito joining in for at least several years each.

302.    On information and belief based upon publicly-available documents, Hunsicker, Singh, Goldenberg, Jain, Corlito, and Callon have long been associated.  Two or more of them have been involved in multiple ventures across the last twenty years.  On information and belief, Hunsicker is the lynchpin of the association, but is not solely responsible for its operation and management, and others may be involved as well, including on information and belief other CaaStle board members.  Hunsicker, Singh, Goldenberg, Jain, Corlito, and Callon have all acted as the Hunsicker Enterprise through these relationships and the longevity of these relationships for the purpose of perpetuating unlawful business practices, including defrauding P180 and its investors.

303.    Defendants have participated in a conspiracy spanning multiple entities, including but not limited to CaaStle, Inc.  Defendants' conspiratorial enterprise is not limited to participation with CaaStle or another entity, but includes racketeering actions independent of CaaStle, including self-dealing actions taken to defraud P180.  The Hunsicker Enterprise consists of Hunsicker, Singh, Goldenberg, Jain, Corlito, Callon, and other unknown conspirators, each of whom has committed predicate acts of racketeering as distinct individuals in support of the enterprise.  The members of the Hunsicker Enterprise also used their positions in both entities to perpetuate these predicate acts:  Hunsicker was the chair and, for a few weeks, CEO, of P180's Board and CEO of CaaStle; Goldenberg controlled P180 funds and served as a director of P180,

68

while also serving as the COO of CaaStle; and Jain, Corlito, Singh, and Callon knew, based on their positions at CaaStle or intimate involvement with the conspirators, that they were distributing and concealing Hunsicker's lies.  Singh's role included his claiming "outsider" status, which allowed him to provide credence to valuations and activities and, eventually, to swoop in once the internal fraud was revealed to take control of the company at a critical time as an apparent outsider.

304.   As discussed in detail above, Hunsicker, Singh, Goldenberg, Callon, and other unknown conspirators have committed multiple offenses of interstate wire fraud chargeable under 18 U.S.C. § 1343 as part of a scheme to defraud P180 and gain control of its money and assets.

305.   Individual Defendants each committed at least two predicate acts of wire fraud, bank fraud, or money laundering.  Defendants repeatedly committed these offenses as part of concerted efforts to perpetuate and avoid disclosure of their fraud elsewhere and to use P180 for their own personal financial gain.  This pattern repeated itself over and over again, including through multiple instances of wire fraud, bank fraud, and/or money laundering perpetrated by multiple co-conspirators.

### *Wire Fraud*

306.   Wire fraud is chargeable under 18 U.S.C. § 1343 if a defendant engages in a scheme to obtain money or property by fraud using interstate communications services, including email or phone calls.  Half-truths or fraudulent omissions are also chargeable.

307.   Defendants engaged in multiple instances of wire fraud chargeable under Section 1343 in furtherance of their conspiracy to defraud P180 of its money and assets.  These lies were, in substance, principally the same ones that they told other stakeholders—the fictional subscriber

and revenue numbers and holding a fraudulent business out as a real, successful one.  The

relevant conduct includes but is not limited to:

   a.  In meetings on March 19 and April 10, 2024, with a company called

   elysewalker, which is high-end women's apparel brand, regarding a

   potential strategic opportunity, in which representatives of elysewalker,

   Hoffman, and Defendants attended including Hunsicker and at least

   Goldenberg by video conference link, meeting attendees made statements

   about the robustness of CaaStle's overall business, e-commerce

   ecosystem, logistical capabilities, and ability to execute.  But that was

   false.  CaaStle had no viable business, exponentially fewer subscribers

   than stated, and lacked scale.  Those statements that were not made by

   Hunsicker and Goldenberg were made in their presence, which they failed

   to correct when made.  Some were made by individuals whose statements

   were based on false information they had received from Hunsicker and

   Goldenberg.  Further, Hunsicker and Goldenberg, through their words,

   gestures, body language, and actions, implied capabilities and scale that

   CaaStle did not have and that they knew could not be delivered.  In

   reliance on that information, P180 moved forward to secure a strategic

   relationship with elysewalker without knowing that the Hunsicker

   Enterprise intended to exert control over and raid the value in these assets

   for its own purposes.  The Hunsicker Enterprise then used P180's

   successes with elysewalker to continue their fraudulent business activities

70

at CaaStle, including by using bank transfers discussed below to make CaaStle appear as if it had inbound accounts receivable or revenue.

b. On August 1, 2024, at a meeting with the apparel brand Altuzarra and, in which representatives of Altuzarra, Hoffman, and Defendants including at least Hunsicker and Goldenberg attended, held by video conference link, meeting attendees made statements regarding CaaStle's robust e-commerce ecosystem and capabilities. But that was false. CaaStle had no viable business, exponentially fewer subscribers than stated, and lacked scale. Indeed, CaaStle's business was multiple times smaller in terms of revenue and customers than Altuzarra itself. Those statements that were not made by Hunsicker and Goldenberg were made in their presence, which they failed to correct when made. Some were made by individuals whose statements were based on false information they had received from Hunsicker and Goldenberg. Further, Hunsicker and Goldenberg, through their words and actions, implied capabilities and scale that CaaStle did not have and which they knew could not be delivered. In reliance on that information, P180 moved forward in obtaining an interest in and providing an alleged loan related to Altuzarra without knowing that the Hunsicker Enterprise intended to exert control over and raid the value in these assets for its own purposes. The Hunsicker Enterprise then sought to use P180's alleged debt to obtain control of P180's assets, including the interest in Altuzarra.

71

c. On September 10 and 11, 2024, at a meeting in Mountainview, California regarding Vince and Altuzarra, in which Hoffman and Defendants, including at least Goldenberg, attended, including by via video conference link, Goldenberg knowingly articulated false information regarding value-add of CaaStle's capabilities, ecosystem, and scale that he knew to be untrue. But that was false. CaaStle had no viable business, exponentially fewer subscribers than stated, and lacked scale. In reliance on that information, P180 moved forward in obtaining interest in and alleged debt related to Altuzarra without knowing that the Hunsicker Enterprise intended to exert control over and raid the value in these assets for its own purposes. The Hunsicker Enterprise then sought to use P180's debt to obtain control of P180's assets, including the interest in Altuzarra.

d. In a meeting on January 10, 2025, with Vince regarding a potential transaction, in which representatives of Vince and Defendants, including at least Hunsicker, attended, and which at least Hunsicker attended via video conference link, Hunsicker made statements regarding CaaStle's capacities, technology, and scale that were known to be false, and, on information and belief, which she had already confessed to be false a month previously. CaaStle had no viable business, exponentially fewer subscribers than stated, and lacked scale. Indeed, CaaStle's business was multiple times smaller in terms of revenue and customers than Vince itself. Other Defendants present did not correct those statements, despite

72

the fact that they knew that CaaSle was no longer a going concern and its scale was nonexistent.

e. In meetings on February 4 and February 24, 2025, with Vince regarding the recent transaction, in which representatives of Vince, Hoffman and Defendants including at least Hunsicker and Goldenberg attended, and at which at least Goldenberg attended via video conference link, statements were made regarding CaaStle's robust e-commerce ecosystem, capabilities, and ability to execute. Those statements that were not made by Hunsicker or Goldenberg were made in their presence, which they failed to correct when made. Some were made by individuals whose statements were based on false information they had received from Hunsicker and Goldenberg. Further, Hunsicker and Goldenberg, through their words and actions, implied capabilities and scale that CaaStle did not have and which they knew could not be delivered. These knowingly false or misleading statements or omissions were made in the course of the Defendants' fraudulent scheme to use P180 to acquire assets, including any interest in Vince.

308. Many other instances of wire fraud were committed. The Defendants ensured that outsiders, including vendors and retail partners, did not have complete information regarding CaaStle's true number of subscribers, the size of its operation, and its revenue. This was achieved, as described above, by multiple Defendants working in concert, including by way of nonlimiting example, Hunsicker's, Jain's, and Corlito's falsifying financial documents regarding growth, business metrics, and finances.

73

309.    Instead, multiple times at least as early as 2019 and continuing throughout 2024 and 2025, Defendants made statements or took actions, on information and belief over phone lines or video conference, to give the impression that CaaStle was a large, successful company with extensive operations.  These include, for example, multiple texts by Singh after he claimed to no longer be involved with the company regarding the "momentum and growth" of CaaStle, its "profit and money," and that it was "signing and renewing deals."  Many other instances of wire fraud were committed.

310.    The Defendants ensured that outsiders, including vendors and retail partners, did not have complete information regarding CaaStle's true number of subscribers, the size of its operation, and its revenue.  This was achieved, as described above, by multiple Defendants working in concert, including by way of nonlimiting example, Hunsicker's, Jain's, and Corlito's falsifying financial documents regarding growth, business metrics, and finances.

311.    The goal was to create an image for CaaStle that would head off any questions regarding actual performance, operations, subscribers, or revenue.  In other words, if CaaStle were so successful, why would anyone need these details.  When others expressed beliefs regarding CaaStle's scale, subscribers, and revenue, members of the Hunsicker Enterprise remained silent and therefore concealed the truth, leading to half-truths and implied truth of these (ultimately false) facts.

312.    The overarching scheme of this wire fraud was clear: to obtain and deploy P180's money and assets in furtherance of the Defendants' unlawful business activities, to eventually obtain control over (through merger or otherwise) those assets, and to induce P180 to obtain further assets.  Also, false statements or omissions were made to cover up and perpetuate the Defendants' unlawful activities in 2025.

313. Further, Defendants worked together to prevent the disclosure of their fraudulent actions at CaaStle, including from as early as October 2023, when individuals such as Jain, Corlito, and Goldenberg began discovering and then covering up fraudulent activities after years of misconduct.

314. In doing so, Defendants committed numerous other instances of wire fraud through statements or omissions. Demonstrative examples include, without limitation:

a. On information and belief and based on public reporting, the conspirators' repeated falsification of records was disclosed to the CaaStle Board between October and December 2024. Yet on or around December 16, 2024, Singh had a 50-minute phone conversation with Jean-Paul St. Germain, a shareholder of P180 and CaaStle and eventual board member of P180, including regarding a proposed Vince transaction, CaaStle's cash position, and its strong network of subscribers (echoing Hunsicker). Although Singh had recently illegally redeemed $6,000,000 in shares and had been appointed to the Board knowing of Hunsicker's fraud, Singh did not disclose the falsification of records at CaaStle, even though the primary purpose of the Vince transaction and other transactions was to generate value by deploying CaaStle's platform, technology, and customer network. On information and belief, Singh's activities were part of a concerted strategy by the Defendants, including Callon, to cover up Hunsicker's fraud.

b. Leading up to and at the time of the Vince transaction, Singh, Goldenberg, and Hunsicker had inarguably known for more than a month (and likely

75

knew for much, much longer) that CaaStle could not fulfill its promises.

They knew that the transaction was proceeding on the assumption that

P180 could deploy CaaStle's proprietary technology and customer

network to derive profit above the standard retail margins.  At the time,

Singh, Goldenberg, and Hunsicker knew about the falsified business

records at CaaStle, knew that CaaStle had no ecosystem of subscribers,

and thus knew that the transaction had little value as CaaStle could not

provide the services to Vince as contemplated.  Despite Hunsicker's and

Goldenberg's respective positions on the P180 Board, they did not

disclose CaaStle's fraud to P180, independent directors, or P180's

investors.  Hunsicker and Goldenberg pushed P180 to move forward with

the Vince transaction without informing Hoffman or P180 of the true

situation at CaaStle and without recusing themselves from the transaction,

even though they were on both sides of the deal.  Specifically, Hunsicker,

Goldenberg, and Singh induced P180 to enter into an agreement to

purchase a controlling interest in Vince Holding Company and pay off a

significant portion of Vince's debt.  But when the transaction date came,

P180 was about $5,000,000 short.  Hunsicker and Goldenberg pushed

P180 to move forward with the purchase of Vince without informing

Hoffman or P180 of the true situation at CaaStle and without recusing

themselves from the transaction, even though they were on both sides of

the deal.  Thus, the Hunsicker Enterprise members, who were also

directors of CaaStle, conspired to approve this fraudulent loan despite liquidity issues at CaaStle.

c. Similarly, Plaintiff engaged in confidential talks with an e-commerce business in early 2025.  On two separate video conference calls, Hunsicker and Goldenberg either made false statements regarding CaaStle's technological capabilities, finances, and scale—which were undisputably known to be false after the disclosures at CaaStle—or failed to correct materially false statements made by others who were not aware of the fraud at CaaStle.  Although no deal occurred, these acts of wire fraud were part of the same scheme to continue the fraud on P180.

315.    Further, Defendants engaged in a cover-up of their racketeering activities from at least as early as 2019 through until March 2025.  During that time, Plaintiff is informed and believes that members of the Hunsicker Enterprise conspired to have Hunsicker continue to lead and be involved in CaaStle's affairs.  The Hunsicker Enterprise then conspired to prevent the public—and in particular P180 and Hoffman—from learning the truth about their fraudulent business activities.  They also conspired to place Hunsicker at the head of P180 and plotted to change CaaStle's business from software to brand ownership.  These activities show how the Hunsicker Enterprise coordinated its activities in an attempt to perpetuate its fraud for months while concealing material information, loading P180 up on debt, and positioning themselves to obtain P180's assets.

### *Bank Fraud and/or Money Laundering*

316.    Money laundering is chargeable under 18 U.S.C. § 1956 when a defendant transfers money or some financial instrument to promote unlawful activity or to conceal

unlawful activity.  Bank fraud is chargeable under 18 U.S.C. § 1344 if a defendant executes a scheme to obtain money under the custody or control of a financial institutions and anticipates using false or fraudulent pretenses, representations, or promises.

317.   Individual defendants engaged in multiple instances of bank transactions chargeable either as money laundering under Section 1956 or as bank fraud under Section 1344 in furtherance of their conspiracy to defraud P180.  Goldenberg was aware of and/or facilitated these transfers in his role as director of P180 and his de facto position in managing P180 funds. Similarly, Jain and Corlito were involved in transferring funds through interstate and international banking systems to facilitate the fraudulent business activities of the conspirators

318.   The relevant conduct chargeable as bank fraud and/or money laundering includes:

a.   In or around October 2023, Hunsicker, Goldenberg, Corlito, and Jain conspired to transfer money to an investor in exchange for the investor's silence in furtherance of their scheme to defraud, knowing that the transaction was designed to conceal the nature of their unlawful activity, knowing that the proceeds were the product of an unlawful activity, and/or with the intent to carry out the unlawful activity or conceal it while conducting a transaction with proceeds known to be the product of fraud.

b.   On or about June 26, 2024, Hunsicker and, on information and belief Goldenberg, Corlito, and Jain, conspired to transfer $1,400,000 from P180's bank account at Chase Bank without right to do so.  On information and belief, Defendants sought to use this transfer to hide the Defendants' fraud at CaaStle.  Indicative of Defendants' fraudulent intent, this transfer occurred within a day of funding into P180 by an investor.

78

c.  On or about June 26, 2024, in a separate transaction, Hunsicker and, on information and belief Goldenberg, Corlito, and Jain, conspired to transfer $500,000 from P180's bank account at Chase Bank without the right to do so.  On information and belief, Defendants sought to use this transfer to hide the Defendants' fraudulent business activities at CaaStle.  Indicative of Defendants' fraudulent intent, this transfer occurred within a day of funding into P180 by an investor.

d.  On or about July 22, 2024, Hunsicker and, on information and belief Goldenberg, Corlito, and Jain, conspired to transfer $950,000 from P180's bank account at Chase Bank without right to do so.  On information and belief, Defendants sought to use this transfer to hide the Defendants' fraudulent business activities at CaaStle.

e.  On or about July 22, 2024, in a separate transaction, Hunsicker and, on information and belief Goldenberg, Corlito, and Jain, conspired to transfer $450,000 from P180's bank account at Chase Bank without right to do so.  On information and belief, Defendants sought to use this transfer to hide the Defendants' fraudulent business activities at CaaStle.  In or around September 2024, Hunsicker, Goldenberg, Corlito, and Jain conspired to transfer some amount of money to an investor who had learned of the fraud in exchange for the investor's silence in furtherance of their scheme to defraud others, including P180.

f.  In or around September 2024, Hunsicker, Goldenberg, Corlito, and Jain conspired to transfer money to an investor in exchange for the investor's

79

silence in furtherance of their scheme to defraud, knowing that the transaction was designed to conceal the nature of their unlawful activity, knowing that the proceeds were the product of an unlawful activity, and/or with the intent to carry out the unlawful activity or conceal it while conducting a transaction with proceeds known to be the product of fraud.

g. On or about October 8, 2024, Singh, Hunsicker, Goldenberg, and Jain, and on information and belief Callon and Corlito, participated in the transfer of, or conspired with others to transfer a total of $6,000,000 to Singh in furtherance of their scheme to defraud, knowing that the transaction was designed to conceal the nature of their unlawful activity, knowing that the proceeds were the product of an unlawful activity, and/or with the intent to carry out the unlawful activity or conceal it while conducting a transaction with proceeds known to be the product of fraud.

h. On or about November 6 and 7, 2024, Goldenberg, Hunsicker, and Jain, and, on information and belief Callon, Singh, and Corlito, participated in the transfer of, or conspired with others to transfer a total of $3,000,000 in two transactions to Goldenberg in furtherance of their scheme to defraud, knowing that the transaction was designed to conceal the nature of their unlawful activity, knowing that the proceeds were the product of an unlawful activity, and/or with the intent to carry out the unlawful activity or conceal it while conducting a transaction with proceeds known to be the product of fraud.

i.  On or about January 30, 2025, Hunsicker and, on information and belief, Goldenberg, Jain, Corlito, and Singh conspired to, and did, transfer $1,000,000 from P180's bank account at Chase Bank to Hunsicker's personal account.  As Defendants had no right to do so, the transfer was made through material misstatements and/or omissions regarding the lawfulness of that transfer.

j.  In a second theft, on or about the same day January 30, 2025, Hunsicker and, on information and belief, Goldenberg, Jain, Corlito, and Singh, conspired to, and did, transfer $300,000 from P180's bank account at Chase Bank to Hunsicker's personal account.  As Defendants had no right to do so, the transfer was made through material misstatements and/or omissions regarding the lawfulness of that transfer.

k.  Throughout February and March of 2025, Hunsicker and Jain, and on information and belief Goldenberg, Corlito, and Singh, conspired to, and did, loot the remaining balances from P180's bank account to CaaStle's account, leaving Plaintiff by the end of March 2025 with less than $20,000.  Defendants had no right to remove these monies and the transfers were made through material misstatements and/or omissions regarding the lawfulness of those transfers.

l.  Plaintiff anticipates that many more instances of unauthorized or fraudulently-induced transfers, including for personal enrichment, will be unearthed in discovery, but these are readily apparent.



81

319. The actions of the Hunsicker Enterprise went on for years and presented a threat of continuing criminal activity extending indefinitely into the future, operating from at least 2018 until the collapse of the scheme due to Hunsicker's indictment and CaaStle's bankruptcy.

320. P180 suffered great harm because of Defendants' racketeering activity, including but not limited to:

    a. Pre-bankruptcy, the Board of CaaStle asserted that P180 is indebted to it based on multiple fraudulent transactions that would not have occurred but for Defendants' fraudulent activities, including payments related to the strategic relationship with elysewalker, the Altuzarra transaction, and Vince transaction.

    b. Pre-bankruptcy, the Board of CaaStle asserted that P180 had incurred $5,350,000 in purported indebtedness to CaaStle, the validity of which P180 disputes as a result of the fraud.

    c. The Defendants' racketeering activities and fraud have also caused Plaintiff to incur business obligations and costs at prices and on terms which were predicated on P180's ability to deploy CaaStle's (non-existent) distribution capabilities and network of subscribers.

321. P180 seeks trebling of damages and attorneys' fees to the fullest extent permitted by the Racketeer Influenced and Corrupt Organizations Act.

## COUNT II
### CONSPIRACY TO VIOLATE THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (RICO) 18 USC § 11962(D)
### (AS TO ALL DEFENDANTS)

322. Plaintiff incorporates by reference all foregoing and following paragraphs as if set out at length herein.

323.    Defendants conspired, aided, and abetted each other, as the Hunsicker Enterprise, in the commission of multiple offenses in violation of RICO as part of a scheme to defraud P180 and its investors.

324.    Members of the conspiracy have committed multiple acts of wire fraud under 18 U.S.C. § 1343 as overt, predicate acts of racketeering to further the conspiracy of the Hunsicker Enterprise, as described above.  Further, members of the conspiracy have committed multiple acts of bank fraud under 18 U.S.C. § 1343 or money laundering under 18 U.S.C. § 1956 as overt, predicate acts of racketeering to further the conspiracy of the Hunsicker Enterprise, as described above.

325.    As members of the Hunsicker Enterprise, Defendants knew of and adopted the goal of furthering the conspiracy to defraud P180.  They began falsifying financials at least as early as 2019 and worked together to prevent the disclosure of their fraudulent actions until March 2025.  By way of non-limiting examples, Defendants did so by agreeing to prevent the disclosure of the fraud at CaaStle, continuing to fake financial and subscriber information, and approving or inducing fraudulent bank transactions.

326.    P180 has been harmed as described above and seeks trebling of damages and attorneys' fees to the fullest extent permitted by the Racketeer Influenced and Corrupt Organizations Act.

### COUNT III
### CONVERSION
### (AS TO HUNSICKER, GOLDENBERG, JAIN, SINGH, CORLITO, AND DOES 1–50)

327.    Plaintiff incorporates by reference all foregoing and following paragraphs as if set out at length herein.

328. On or about January 30, 2025, Hunsicker, Goldenberg, Jain, Corlito, and Singh caused two separate transfers totaling $1,300,000 to be made from P180 to Hunsicker's personal account without cause, reason, or explanation. Goldenberg was aware of and/or facilitated these transfers in his role as director of P180 and his de facto position in managing P180 funds, and Hunsicker, Jain, and Singh caused these transactions through their positions at CaaStle.

329. That $1,300,000 is P180's property.

330. Plaintiff is entitled to recover the entire $1,300,000.

331. Hunsicker, Goldenberg, Jain, Corlito, Callon, and Singh exercised control and dominion over that property intentionally and without authority, through Goldenberg's de facto position controlling P180 funds and Jain, Singh, and Callon's positions at CaaStle, including by wiring it to Hunsicker and alienating it from P180.

332. Defendants' conduct was malicious, fraudulent, or demonstrated a reckless disregard for P180.

333. Defendants had no right to exercise control and dominion over the $1,300,000.

334. Defendants have deprived Plaintiff of its rights to the $1,300,000.

335. Plaintiff has suffered damages in an amount to be proven at trial.

**COUNT IV**
**UNJUST ENRICHMENT**
**(AS TO HUNSICKER AND DOES 1–50)**

336. Plaintiff incorporates by reference all foregoing and following paragraphs as if set out at length herein.

337. Hunsicker has enriched herself by $1,300,000 without justification at P180's expense. Hunsicker cannot be allowed to enrich herself at P180's expense.

84

338.    It is against equity and good conscience to permit Defendants to reap the unjust enrichment created by their conduct.

339.    Defendants' conduct was malicious, fraudulent, or demonstrated a reckless disregard for P180.

340.    Principles of equity require restitution of P180's $1,300,000.

**COUNT V**
**BREACH OF FIDUCIARY DUTY**
**(AS TO HUNSICKER, GOLDENBERG, AND JAIN)**

341.    Plaintiff incorporates by reference all foregoing and following paragraphs as if set out at length herein.

342.    Hunsicker and Goldenberg were, for relevant times between formation of P180 and the end of March 2025, directors of P180.  Hunsicker and Goldenberg were also officers of P180 during this time, and Hunsicker, Goldenberg, and Jain (who was running P180's finance function under a shared services arrangement) were agents of P180.  Hunsicker resigned from the P180 Board in March of 2025.

343.    As directors, officers, and/or agents of P180, Hunsicker, Goldenberg and Jain, owed fiduciary duties to P180.  These fiduciary duties included, whether statutory or common law and without limitation, the duty of care to perform their duties in good faith for the benefit of P180, the duty of loyalty, the duty of candor, the duty to disclose material facts impacting a transactions, the duty of honesty, and the duty to avoid self-dealing.

344.    Hunsicker breached these duties, including but not limited to by the following actions.

85

a. Hunsicker knowingly caused misrepresentations regarding CaaStle's distribution capabilities and subscriber network and did not correct the known falsehoods when others repeated her statements.

b. Hunsicker conspired to force P180 to engage in transactions, including for the purchase of various assets, which were not in the interest of P180 because the success of these transactions was undermined by the fraud at CaaStle, but instead sought those transactions to hide her fraud and/or execute further fraud.

c. Hunsicker knew of the financial fraud at CaaStle and the falsity of the representations regarding its distribution capabilities and subscriber network and did not timely disclose that information to any independent, non-conflicted director on P180's Board.

d. Hunsicker transferred or caused to be transferred $1,300,000 to her personal bank account without authorization in two separate transactions.

345.    Goldenberg breached these duties, including but not limited to by the following actions.

a. Goldenberg conspired to force P180 to engage in transactions, including purchase of various assets, which were not in the interest of P180 and despite knowing that the success of the Vince transaction was undermined by the fraud at CaaStle and instead sought those transactions to hide his fraud and/or execute further fraud. Goldenberg was aware of and/or facilitated these transfers in his role as director of P180 and his de facto position in managing P180 funds.

86

b.  Goldenberg knew of the financial fraud at CaaStle and the falsity of the representations regarding its distribution capabilities and subscriber network and did not timely disclose that information or correct others who stated that CaaStle was a viable, thriving company with good technology.

346.    Jain violated his duties, including but not limited to processing transfers of P180 funds to CaaStle and Hunsicker on numerous occasions without due authorization from the unconflicted members of P180's Board and by failing to disclose what he knew about the fraud at CaaStle in his capacity as an agent of P180.

347.    Had Hunsicker, Goldenberg, and Jain performed their fiduciary duties, P180 would never have entered into the transactions it did on the terms that it did so because those cost of those transactions only made sense if the acquired brands could access the purported distribution and customer network of CaaStle.

348.    As a direct and proximate result of Hunsicker, Goldenberg, and Jain's breaches of their fiduciary duties, P180 has sustained and will continue to sustain significant damages as alleged herein in an amount to be proven at trial.

349.    Defendants' conduct was malicious, fraudulent, or demonstrated a reckless disregard for P180.

350.    As a result of the misconduct alleged herein, Hunsicker and Goldenberg are liable to P180.

87

## COUNT VI
## FRAUD:
### FRAUDULENT INDUCEMENT, FRAUDULENT CONCEALMENT, AND CONSTRUCTIVE FRAUD
### (AS TO HUNSICKER, GOLDENBERG, SINGH, JAIN, AND DOES 1–50)

351.    Plaintiff incorporates by reference all foregoing and following paragraphs as if set out at length herein.

352.    Hunsicker, Goldenberg, and Singh made material misrepresentations or omissions as discussed above and remained silent while under a duty to speak regarding CaaStle's capabilities.

353.    Those representations were not true, the omissions implied the truth of false statements, and they failed to correct false statements while under a duty to speak.

354.    Hunsicker, Goldenberg, and Singh knew or had reason to know the falsity of these statements.

355.    They intended to defraud P180 by making these representations or omissions for the purpose of inducing P180's reliance.

356.    These facts were material to P180's decisions to obtain assets and incur indebtedness.

357.    P180 reasonably relied upon these statements in obtaining a loan for the Vince transaction and accepting money from CaaStle (which it now claims is a loan) related to the strategic relationship with elysewalker and the Altuzarra transaction.  Had P180 known that CaaStle had neither the distribution capabilities nor the customer network it purported to have, P180 never would have entered into those transactions or incurred that indebtedness on the terms as presented.

358.    Defendants' conduct was malicious, fraudulent, or demonstrated a reckless disregard for P180.

359. Hunsicker, Goldenberg, and Jain had fiduciary duties of disclosure. Additionally, Singh, as well as Hunsicker and Goldenberg, were negotiating against P180 while in possession of information material to the deals being negotiated, including about Hunsicker's fraud, that they knew P180 did not know and could not readily get access to, creating a "special facts" duty of disclosure. Hunsicker, Goldenberg, and Singh discussed CaaStle's business without disclosing the fraudulent activities that they learned of is a misleading partial disclosure that violates their duty to disclose.

360. As a direct and proximate result of Defendants' fraudulent activities, P180 has sustained and will continue to sustain significant damages as alleged herein in an amount to be proven at trial.

## COUNT VII
### AIDING AND ABETTING FRAUD AND/OR CO-CONSPIRATOR LIABILITY
### (AS TO ALL DEFENDANTS)

361. Plaintiff incorporates by reference all foregoing and following paragraphs as if set out at length herein.

362. There was an underlying fraud on P180 perpetrated by Hunsicker, Singh, and Goldenberg as described above.

363. Defendants knew about this fraud for significant periods of time. Although the time periods may be longer, P180 currently believes that Hunsicker, Singh and Goldenberg had known about the fraud at CaaStle since 2019 at the latest, Jain and Corlito had known about the fraud at CaaStle since October 2023 at the latest, and Callon had known about the fraud at CaaStle since October 2024 at the latest.

364.    Defendants provided substantial assistance in perpetuating the fraud by, among other things, failing to report the fraud publicly, approving a loan of over $5,000,000 to induce the purchase of Vince despite knowing of CaaStle's fraud.

365.    Defendant Callon's presence on the Board, and membership in the Hunsicker Enterprise, was instrumental—as it created a false assurance that the corporation was being governed correctly and legitimately.  Callon's international reputation for corporate governance expertise, as mentioned above, lent credibility to the endeavor, helping to keep the truth from coming out until months after Hunsicker "confessed."

366.    Furthermore, each of, at a minimum, Hunsicker, Singh, Goldenberg, and Callon and, on information and belief, also Jain and Corlito, agreed to the plan to deceive P180 once Hunsicker's fraud threatened to come to light and as CaaStle's collapse was increasingly imminent, as alleged above, and each of them took substantial steps to assist that joint plan, and thus they are each liable for the fraud as co-conspirators.

367.    As a direct and proximate result of Defendants' aiding and abetting, P180 has sustained and will continue to sustain significant damages as alleged herein in an amount to be proven at trial.

## COUNT VIII
## AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### (AS TO ALL DEFENDANTS)

368.    Plaintiff incorporates by reference all foregoing and following paragraphs as if set out at length herein.

369.    Hunsicker and Goldenberg breached their fiduciary duties to P180.

370.    Defendants knew about these fiduciary duties and knew or should have known that the actions of the Hunsicker Enterprise would cause the breach of these fiduciary duties.

90

Jain, Singh, and Callon knew, based on their positions at CaaStle, that they were breaching these fiduciary duties by distributing and concealing Hunsicker's falsified information.

371.    Defendants provided substantial assistance in breaching the fiduciary duties by, among other things, approving the fraudulent loan to P180 and inducing the purchase of a controlling interest in Vince.

372.    As a direct and proximate result of Defendants' aiding and abetting, P180 has sustained and will continue to sustain significant damages as alleged herein in an amount to be proven at trial.

**COUNT IX**
**NEGLIGENT MISREPRESENTATION**
**(AS TO HUNSICKER, GOLDENBERG, SINGH, AND DOES 1–50)**

373.    Plaintiff incorporates by reference all foregoing and following paragraphs as if set out at length herein.

374.    In the alternative, if Defendants' statements and actions were not fraudulent, they were negligent and caused harm to P180.

375.    Hunsicker, Goldenberg, and Singh made statements of facts to P180 related to CaaStle's capabilities, financial stability, number of subscribers, their intentions regarding multiple transactions, and as further set forth above.

376.    These statements were false.

377.    Defendants knew or should have known of the falsity of these statements.

378.    P180 reasonably relied upon these statements.

379.    Plaintiff's reliance on these statements was to its detriment, including in obtaining assets and indebtedness as well as consummating transactions, and caused injury to Plaintiff.

380.     Had P180 been told accurate information about CaaStle's limited distribution capabilities and customer network, P180 would never have proceeded with the loans and transactions on the terms presented.

381.     Defendants' conduct was malicious, fraudulent, or demonstrated a reckless disregard for P180.

382.     As a direct and proximate result of Defendants' negligent misrepresentations, P180 has sustained and will continue to sustain significant damages as alleged herein in an amount to be proven at trial.

**COUNT X**
**DECLARATORY RELIEF:**
**EQUITABLE RECHARACTERIZATION, SUBORDINATION, ESTOPPEL,**
**OR SET-OFF OR OFFSET**
**(AS TO HUNSICKER)**

383.     Plaintiff incorporates by reference all foregoing and following paragraphs as if set out at length herein.

384.     On or about January 22, 2025, a transfer of $2,000,000 was received by P180 from Hunsicker.

385.     In a separate transaction on or about January 22, 2025, a transfer of $7,300,000 was received by P180 from Hunsicker.

386.     Hunsicker did not make full disclosure of all material facts within her knowledge relevant to the transfer to Hoffman, the only unconflicted board member, and, of course, since she did not make such disclosure, there was no knowing approval of it from either Hoffman or shareholders.

387.     Concurrently, Hunsicker was committing fraud as alleged above, which she had not disclosed to the unconflicted board members or shareholders.

388.    Hunsicker also expressly agreed to represented to at least one investor in P180 in a "side letter agreement" that there was no insider debt at P180, a statement made contemporaneously with her transferring funds to P180.

389.    Hunsicker also told Hoffman that she would get paid back for the transfer only if she raised enough money to cover it, suggesting that this may have been a loan for which she only had recourse for repayment to money she would raise for that purpose.  Since Hunsicker never did so, she is in material breach and P180 has no obligation to repay the transfer to the extent it could be characterized as a loan.

390.    Because of, among other things, Hunsicker's fraud, false representations, and failure to follow proper conflict of interest procedures to obtain authorization, to the extent the transfer was a loan, P180 is entitled to a declaration that any purported loan is equitably voidable.

391.    Further, it would not be consistent with equity and good conscience for Hunsicker to be repaid before any of P180's other investors, P180 is entitled to a declaration that the transfer is equitably recharacterized as equity and/or equitably subordinated to all of P180's other investors.

392.    Additionally, or alternatively, P180 is entitled to hold Hunsicker to the condition she stated to Hoffman and treat the transfer (whether characterized as a loan or recharacterized as equity) as having payment conditional on Hunsicker raising the funds she promised, which condition has not been satisfied.  Therefore, P180 is entitled to a declaration that, to the extent to which repayment was conditional and those conditions not having been satisfied, that P180 owes nothing to Hunsicker.

393.    Additionally, or alternatively, P180 is entitled to a declaration that it may set-off or to offset any amount owed to Hunsicker on account of this transfer against what Hunsicker owes P180 due to her fraud or otherwise.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38 and the Seventh Amendment to the U.S. Constitution, Plaintiff demands a jury trial on all claims herein properly tried to a jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgement in its favor and against Defendants as follows:

    A.  As to all Counts, award P180 damages in an amount to be proven at trial;

    B.  As to Counts I and II, award treble damages to the extent available by law;

    C.  As to Counts III, IV, V, VI, and IX, award punitive damages in an amount to be proven at trial and as provided to the extent available by law;

    D.  As to Count X, declare the interest of Hunsicker as set forth above and as according to proof;

    E.  As to all Counts, award P180 its reasonable attorneys' fees and costs to the extent available by law; and,

    F.  As to all Counts, grant P180 such other and further relief, whether at law or in equity, that this Court deems just and proper.

Date:  New York, New York                STEPTOE LLP
       April 7, 2026


                                         By: /s/ Thomas Watson
                                             Thomas Watson (pro hac vice)
                                             Conor Tucker (pro hac vice)
                                             Kaitlyn Sever (pro hac vice)
                                             633 West Fifth Street, Suite 1900
                                             Los Angeles, California 90071
                                             (213) 439-9400
                                             twatson@steptoe.com
                                             ctucker@steptoe.com
                                             ksever@steptoe.com

                                             -and-

                                             Joseph M. Sanderson
                                             1114 Avenue of the Americas
                                             New York, New York 10036
                                             (212) 506-3900
                                             josanderson@steptoe.com

                                         *Counsel for Plaintiff*