**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| P180, INC.,<br><br>Plaintiff,<br><br>—against—<br><br>JASWINDER PAL SINGH, CHRISTINE HUNSICKER, GEORGE GOLDENBERG, SCOTT CALLON, CHIRAG JAIN, DAYNA CORLITO, AND DOES 1-50,<br><br>Defendants. | Case No. 25-cv-4432-VM-SDA |

**PLAINTIFF P180'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS JASWINDER PAL SINGH AND GEORGE GOLDENBERG'S <u>MOTION TO DISMISS</u>**

**TABLE OF CONTENTS**

**Page**

TABLE OF CONTENTS.................................................................................................... i

TABLE OF AUTHORITIES .............................................................................................ii

INTRODUCTION ............................................................................................................ 1

STATEMENT OF FACTS ............................................................................................... 2

      A.     Hunsicker leads an enterprise of fraudsters ...................................... 2

      B.     P180's business........................................................................................ 3

      C.     Defendants Goldenberg and Singh manage the fraudulent scheme and target P180 ................................................................................................ 5

           1.     Goldenberg.................................................................................... 5

           2.     Singh .............................................................................................. 7

LEGAL STANDARD........................................................................................................ 8

ARGUMENT..................................................................................................................... 9

I.      DEFENDANTS REPEATEDLY CONTRADICT P180'S ALLEGATIONS ................... 9

II.     DEFENDANTS' STANDING ARGUMENT IS FRIVOLOUS .................................... 11

III.    P180 HAS PROPERLY ALLEGED CIVIL RICO ........................................ 11

      A.     P180 alleges a pattern of at least two predicate acts by each Defendant.............. 11

      B.     P180 adequately pleads an association-in-fact enterprise..................................... 15

      C.     P180 sufficiently alleges proximate causation........................................................ 18

IV.    P180 HAS PROPERLY ALLEGED RICO CONSPIRACY CLAIMS .......................... 19

V.     P180 STATES CONVERSION CLAIMS........................................................ 22

VI.    P180 STATES FIDUCIARY DUTY CLAIMS................................................. 23

VII.   P180 STATES AIDING AND ABETTING FIDUCIARY DUTY CLAIMS.................. 25

VIII.  P180 STATES FRAUD, ACCESSORIAL LIABILITY, AND NEGLIGENT MISREPRESENTATION CLAIMS .................................................................. 25

IX.    DEFENDANTS' REMAINING SCATTERSHOT ARGUMENTS LACK MERIT....... 28

CONCLUSION................................................................................................................ 29

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*1567 56th St., LLC v. Spitzer*,
774 F.Supp.3d 476 (E.D.N.Y. 2025) ...............................................................................9, 16

*Aghaeepour v. N. Leasing Sys., Inc.*,
2015 WL 7758894 (S.D.N.Y. Dec. 1, 2015) ............................................................13

*Alix v. McKinsey & Co.*,
23 F.4th 196 (2d Cir. 2022) ...................................................................................14

*Allen v. City of New York*,
2025 WL 3152723 (2d Cir. Nov. 12, 2025)............................................................28

*Alony v. Chaitchik*,
2025 WL 3551666 (S.D.N.Y. Dec. 11, 2025) ..................................................12, 15

*Angermeir v. Cohen*,
14 F.Supp.3d 134 (S.D.N.Y. 2014).................................................................9, 12, 14

*Bd. of Managers of Trump Tower at City Ctr. Condo. v. Palazzolo*,
346 F.Supp.3d 432 (S.D.N.Y. 2018).......................................................................12

*Belen v. Herman*,
2024 WL 182588 (S.D.N.Y. Jan. 17, 2024) ..........................................................17

*Bisley, Inc. v. Meadows Off. Supply Co.*,
200 A.D.3d 405 (1st Dep't 2021) ...........................................................................23

*Boyle v. United States*,
556 U.S. 938 (2009)........................................................................................15, 16

*Burke v. Dowling*,
944 F.Supp.1036 (E.D.N.Y. 1995) .....................................................................18, 19

*BWP Media USA Inc. v. Hollywood Fan Sites, LLC*,
69 F. Supp. 3d 342 (S.D.N.Y. 2014)...................................................................17, 21

*Cede & Co. v. Technicolor, Inc.*,
634 A.2d 345 (Del. 1993), *modified on reargument,* 636 A.2d 956 (Del. 1994) ..............23, 24

*Cinerama, Inc. v. Technicolor, Inc.*,
663 A.2d 1156 (Del. 1995) ....................................................................................24

*City of Fort Myers Gen. Emps.' Pension Fund v. Haley,*
 235 A.3d 702 (Del. 2020) .................................................................................................24

*Com. Cleaning Servs., L.L.C. v. Colin Serv. Sys., Inc.,*
 271 F.3d 374 (2d Cir. 2001)................................................................................11, 18, 19

*Cruz v. FXDirectDealer, LLC,*
 720 F.3d 115 (2d Cir. 2013)..............................................................................................17

*In re Demetriades,*
 58 F.4th 37 (2d Cir. 2023) ................................................................................................28

*Dover Ltd. v. A.B.Watley, Inc.,*
 423 F.Supp.2d 303 (S.D.N.Y. 2006)..................................................................................27

*Emps.' Fire Ins. Co. v. Cotten,*
 245 N.Y. 102 (1927) .........................................................................................................22

*In re Extended Stay, Inc.,*
 2020 WL 10762310 (Bankr. S.D.N.Y. Aug. 8, 2020) .......................................................24

*First Cap. Asset Mgmt. v. Satinwood, Inc.,*
 385 F.3d 159 (2d Cir. 2004)..............................................................................................17

*First Nationwide Bank v. Gelt Funding, Corp.,*
 820 F.Supp. 89 (S.D.N.Y. 1993)........................................................................................19

*Fountain v. United States,*
 357 F.3d 250 (2d Cir. 2004)..............................................................................................11

*Frommer v. MoneyLion Techs. Inc.,*
 2024 WL 2158589 (S.D.N.Y. May 14, 2024) .............................................................11, 27

*Fuji Photo Film U.S.A., Inc. v. McNulty,*
 640 F.Supp.2d 300 (S.D.N.Y. 2009)..................................................................................16

*In re Gen. Motors LLC Ignition Switch Litig.,*
 257 F.Supp.3d 372 (S.D.N.Y. 2017)..................................................................................27

*Goel v. Bunge, Ltd.,*
 820 F.3d 554 (2d Cir. 2016)................................................................................................8

*Gov't Emps. Ins. Co. v. Hollis Med. Care, P.C.,*
 2011 WL 5507426 (E.D.N.Y. Nov. 9, 2011)......................................................................13

*Gull Keys I LLC v. Fulton Advisory Beef Fund I, LLC,*
 2025 WL 2510608 (S.D.N.Y. Sept. 2, 2025)......................................................................27

-iii-

*Guth v. Loft, Inc.*,
   23 Del. Ch. 255 (1939) ...................................................................................................23

*Hemmerdinger Corp. v. Ruocco*,
   2016 WL 1588500 (E.D.N.Y. Apr. 19, 2016) .........................................................28

*Hemmerdinger Corp. v. Ruocco*,
   976 F.Supp.2d 401 (E.D.N.Y. 2013) .......................................................................16

*Hillcrest Homes, LLC v. Albion Mobile Homes, Inc.*,
   117 A.D.3d 1434 (4th Dep't 2014)...........................................................................22

*Hoover Indus., Inc. v. Chase*,
   1988 WL 73758 (Del. Ch. July 13, 1988).................................................23, 24, 26

*Ingram v. Machel & Jr. Auto Repair, Inc.*,
   148 A.D.2d 324 (1st Dep't 1989) .............................................................................23

*KDW Restructuring & Liquidation Servs. LLC v. Greenfield*,
   874 F.Supp.2d 213 (S.D.N.Y. 2012).........................................................................23

*Knox v. Zarzeski*,
   2006 WL 8461751 (S.D.N.Y. July 11, 2006) ..........................................................11

*Kolari v. New York-Presbyterian Hosp.*,
   455 F.3d 118 (2d Cir. 2006)......................................................................................28

*Lateral Recovery, LLC v. Cap. Merch. Servs., LLC*,
   632 F.Supp.3d 402 (S.D.N.Y. 2022).........................................................................21

*Malone v. Brincat*,
   722 A.2d 5 (Del. 1998) ..............................................................................................23

*Monterey Bay Mil. Hous., LLC v. Ambac Assurance Corp.*,
   531 F.Supp.3d 673 (S.D.N.Y. 2021).........................................................................14

*Nastasi & Assocs., Inc. v. Bloomberg, L.P.*,
   2022 WL 4448621 (S.D.N.Y. Sept. 23, 2022)...........................................19, 20, 21

*Palma-Castillo v. New Tacolandia Inc.*,
   2011 WL 7092652 (S.D.N.Y. May 9, 2011) ...............................................................9

*Reif v. Nagy*,
   175 A.D.3d 107 (1st Dep't 2019) .............................................................................22

*Royal Canin U.S.A., Inc. v. Wullschleger*,
   604 U.S. 22 (2025)......................................................................................................28

*Salinas v. United States*,
   522 U.S. 52 (1997)..................................................................................................20

*Sedima, S.P.R.L. v. Imrex Co.*,
   473 U.S. 479 (1985)................................................................................................14

*State Farm Mut. Auto. Ins. Co. v. CPT Med. Servs., P.C.*,
   375 F.Supp.2d 141 (E.D.N.Y. 2005) ......................................................................20

*State v. Seventh Regiment Fund, Inc.*,
   98 N.Y.2d 249 (2002) .............................................................................................22

*Stewart v. Metro. Life Ins. Co.*,
   2025 WL 2710112 (S.D.N.Y. Sept. 22, 2025)...........................................................9

*Swersky v. Dreyer & Traub*,
   219 A.D.2d 321 (1st Dep't 1996) ...........................................................................27

*Todaro v. Orbit Int'l Travel, Ltd.*,
   755 F.Supp.1229 (S.D.N.Y. 1991)...........................................................................13

*In re Tower Air, Inc.*,
   416 F.3d 229 (3d Cir. 2005).....................................................................................24

*United States v. Bortnovsky*,
   879 F.2d 30 (2d Cir.1989).........................................................................................13

*United States v. Hunsicker*,
   1:25-cr-00318 (S.D.N.Y.) .........................................................................................15

*United States v. Kelly*,
   128 F.4th 387 (2d Cir. 2025) ..............................................................................15, 17

*United States v. Rare Breed Triggers, LLC*,
   690 F.Supp.3d 51 (E.D.N.Y. 2023) .........................................................................12

*United States v. White*,
   7 F.4th 90 (2d Cir. 2021) .........................................................................................21

*Van Buskirk v. The N.Y. Times Co.*,
   325 F.3d 87 (2d Cir. 2003)........................................................................................29

*In re Warner Music Grp. Data Breach*,
   2025 WL 2531832 (S.D.N.Y. Sept. 3, 2025)..............................................................9

*Weinberger v. UOP, Inc.*,
   457 A.2d 701 (Del. 1983) ........................................................................................23

*Zamora v. FIT Int'l Grp.*,
    834 F. App'x 622 (2d Cir. 2020) ...........................................................................25

**Statutes**

18 U.S.C.
    § 1961..............................................................................................................15
    § 1962.......................................................................................11, 18, 19, 20
    1964(c) ...................................................................................................14, 18

28 U.S.C. § 1367.......................................................................................................28

**Other Authorities**

Fed. Rule Civ. Proc.
    Rule 8 .................................................................................................................9
    Rule 9 ...............................................................................................9, 12, 13, 14
    Rule 12 ...............................................................................................................8
    Rule 23.1 ..........................................................................................................24

Raghavan, A., *Fraud. Her Board Let Her Stay in Charge*.
    THE NEW YORK TIMES (June 7, 2026),
    https://www.nytimes.com/2026/06/07/business/caastle-fraud-christine-
    hunsicker.html....................................................................................................29

**INTRODUCTION**

P180 not only adequately alleges claims against each Defendant, including Singh and Goldenberg, but—unlike most cases at the pleading stage—the fraud described in P180's Complaint has largely been admitted by Defendant Hunsicker, CaaStle's former CEO and Co-Founder. Earlier this year, Hunsicker pleaded guilty to criminal fraud and to the entry of a $283 million judgment against her, and she has answered the operative First Amended Complaint ("Complaint") here. For their part, Singh and Goldenberg move to dismiss, insisting that the Court adopt a narrative, without any support to do so at the pleading stage and contrary to P180's well-pleaded allegations, that they did nothing wrong and had nothing to do with the fraud at CaaStle. According to them, even though they worked closely with her over many years at multiple companies, Hunsicker acted completely alone and pulled off one of the largest corporate frauds in history without their assistance. Nonsense. As set out in the Complaint and confirmed by P180's citations to Hunsicker's guilty plea, Singh (CaaStle's Co-Founder and eventual board member) and Goldenberg (CaaStle's COO and eventual board member) helped her perpetrate and cover up the historic fraud at CaaStle.

Even before the benefit of discovery, the Complaint details Singh and Goldenberg's intimate involvement in the operation and management of this fraudulent scheme using court filings, P180's own investigation, and press reporting. Singh lied about stepping away from CaaStle, then orchestrated an internal investigation using his college roommate's law firm to defer public disclosure of the fraud and to avoid scrutiny of anyone but Hunsicker, and then implemented a plan to bury evidence of the fraud by taking over P180. Goldenberg micromanaged CaaStle's finances to obscure the fraud, repeatedly lied about CaaStle technology, capabilities, and subscriber bases, and used his role on P180's board to try to

manipulate P180 into Singh's planned takeover by not telling P180 what he knew about the fraud and trying to tie it to CaaStle through debt. And when CaaStle investors threatened public disclosure, Goldenberg and Singh immediately cashed out shares reaping millions in cash (using money looted from P180's bank accounts), all while knowing that CaaStle was insolvent and the shares, in fact, were worthless.

Not only do Singh and Goldenberg ignore these well-pleaded allegations, they instead offer their own unsupported factual narrative and impermissibly contradict P180's allegations. Further, Defendants present legal arguments supported by cases that have been abrogated or that hold the opposite of Defendants' own positions.

None of Defendants' arguments have merit. The Court should deny the motion.

### STATEMENT OF FACTS

The Complaint sets forth in detail the wrongful acts at issue here; a summary is below.

### A.    Hunsicker leads an enterprise of fraudsters

Hunsicker, Goldenberg, and Singh have been close since the mid-2000s. ¶27.[1] Hunsicker and Singh worked as executives together at a company called Right Media in the early aughts, where they became romantically involved. ¶¶28-29. When that company was sold to Yahoo! in the mid-aughts, Hunsicker and Goldenberg began working together. ¶31.

In 2011, Hunsicker co-founded a clothing rental startup with Singh called Gwynnie Bee, and Goldenberg joined as Chief Operations Officer to oversee technology and finances. ¶¶32-40. Outwardly, Hunsicker, Singh, and Goldenberg touted Gwynnie Bee's success, even landing Hunsicker a position as a judge on a *Project Runway* spinoff. ¶37. But, by 2018, the company was recording huge losses and struggling to grow. ¶¶37-40.

---

[1] Unless otherwise stated, "¶" refers to the First Amended Complaint (Doc. 89).

To hide that failure, Hunsicker, Singh, and Goldenberg embarked on a plan to rebrand the company and, proverbially, fake success until they could make it. ¶¶40-48. They re-named the company CaaStle ("clothing-as-a-service," a play on the tech buzz-word "software-as-a-service"). ¶42. Hunsicker pitched the company as a platform, backed by solid financials, deploying technology to alleviate logistical problems in the retail clothing industry. ¶43. Singh and Goldenberg were integral to this rebranding effort. Singh, seen by many as the face of the company (¶63), touted to industry and investment contacts how "results have been quite amazing" with "[l]arge increases in spend per customer" while discussions with "CEOs of major retailers" were ongoing. ¶53. Goldenberg put tight controls on financial information and approvals (¶75) to hide the alarming truth that losses far outpaced revenue (¶¶54-55).

The rebrand was a success: CaaStle reached a valuation of $1,400,000,000 and attracted over $500,000,000 in outside investments on promises of financial stability, innovative technology, and a robust ecosystem of over 700,000 subscribers. ¶49. The company, in truth, though, was a house of cards containing exponentially fewer subscribers and resting on a foundation of falsified financials. ¶¶52, 135.

### B.     P180's business

In 2023, against this backdrop, Hunsicker pitched CaaStle's business to Brendan Hoffman, a veteran of the apparel industry who had never been in Hunsicker's orbit. ¶117-119. She described CaaStle's success with efficient reverse-logistics shipping platform, back-end logistics, distribution centers, yield optimization technology, and an e-commerce ecosystem of hundreds of thousands of subscribers. ¶¶120-121. Hoffman saw an opportunity to acquire existing apparel brands and increase their profit margin by shifting focus from sell-through of full-price items to optimizing profit on discounted items. ¶123. Originally nicknamed Project 180 (because it could turn the industry around 180-degrees), P180 was incorporated in February

2024. ¶127-128. Hoffman owned 75% of the initial common stock, and CaaStle received 25% of the initial common stock based on Hunsicker's promises, including yield-optimization technology and logistical capacity. ¶¶129-130. Hunsicker brought Goldenberg on to P180's board and as de facto COO. ¶¶131, 246.

By this time, CaaStle's auditor had already discovered the falsification of corporate financial records (¶90) and both Hunsicker and Goldenberg were actively working to cover up those lies, including paying off investors to keep quiet (¶103-116). But neither Hunsicker nor Goldenberg (a director of P180) disclosed the truth about CaaStle's finances, its technology's failings, or its lack of genuine logistical abilities. ¶132. Instead, they actively kept Hoffman from obtaining that information. *Ibid.*

Ignorant of the truth (¶133), P180 set about engaging in strategic partnerships to build its business. In the spring of 2024, it partnered with a high-end women's apparel brand (¶¶134-136); in the summer of 2024, it raised capital and brought on outside investors (¶¶143-144); and in the fall of 2024, it secured a minority interest in a luxury women's ready-to-wear and accessory brand (¶137).

Then, over the winter of 2024-2025, P180 had an opportunity to acquire a controlling share in Vince, a mainstay luxury clothing brand, and pursued it, expecting to use CaaStle's technology to increase Vince's profits. ¶¶142-145, 233.

What P180 (and Hoffman) did not know is that, starting at least as early as September 2024, investors learned that Hunsicker had given out false financials and raised this alarm with CaaStle. ¶¶151, 158, 182, 186-193, 201. Shortly thereafter, Singh and Goldenberg sold their own shares in CaaStle for millions. ¶¶163-170, 176-184. In December 2024, Hunsicker made a show of "confessing" and resigning from the board—but only if Singh took her place. ¶¶5, 205-211.

-4-

So Singh joined the CaaStle board, and, shortly thereafter, Goldenberg did too. ¶¶5, 206-207, 213. By this point, Singh and Goldenberg had incontrovertible knowledge of the fraud, but nevertheless concealed it and induced P180 to buy Vince as part of a plan to use P180's real assets, including Vince (¶¶141-143, 145(c)-(d)), as well as the experience and credibility that Hoffman brought to P180 (¶¶117-127), to prop up, and to bury, their fraud at CaaStle.

The acquisition of Vince required significant capital. Hunsicker put in over $9,300,000. ¶264. Goldenberg, at the time sitting on both CaaStle's board and P180's board, negotiated an over-$5,000,000 "loan" from CaaStle at a 10% interest rate payable in two weeks. ¶¶261-262. All of this was done to induce completion of the Vince deal. ¶¶145(d), 261-265. That deal closed in January 2025. ¶267.

Weeks later, Defendants' fraud became public. ¶¶270-277. But Goldenberg and Singh continued to try to use P180 to bury the fraud at CaaStle using the loans they had fraudulently induced P180 to obtain. ¶¶4, 261, 279.

### C.    Defendants Goldenberg and Singh manage the fraudulent scheme and target P180

As set out in detail in the Complaint and summarized below, Goldenberg and Singh were active participants in the wrongful acts that have resulted in millions of dollars of damage to P180. *E.g.*, ¶320.

#### 1.    Goldenberg

As CaaStle's COO, Goldenberg knew the true financial data, sales data, performance data, and technological capabilities. ¶¶73-74, 77. Despite that, he enabled and participated in Hunsicker's brazen lies. ¶¶74-77. Even as CaaStle was supposedly a billion-dollar company, he required personal approval of any expenditure over $1,000. ¶75. The scheme depended upon

appearing financially strong, so he micromanaged finances to reduce the risk of disclosure through, *e.g.*, bounced payments. ¶¶75-76.

In addition to managing the scheme's money, Goldenberg was directly involved in defrauding P180. From the outset, he misled P180 and its strategic partners to induce transactions. In meetings on March 19 and April 10, 2024, he lied about (or, despite knowing the truth, did not correct lies about) "the robustness of CaaStle's overall business, e-commerce ecosystem, logistical capabilities, and ability to execute." ¶¶134-135. He did the same at least on August 1, 2024 (¶¶137-139), on September 10 and 11, 2024 (¶145(a)), and on February 4 and 24, 2025 (¶145(c)).

Goldenberg participated in covering up these lies, too. When CaaStle investors raised concerns, he helped transfer money in exchange for their silence. ¶¶318(a), (f). And cashed out $3,000,000. ¶¶318(g)-(h). Indeed, fearing the fraud would become public, Goldenberg's control of the finances enabled himself and Singh to cash out over $9,000,000, despite insolvency. ¶¶163-185. Those transactions occurred within weeks of Goldenberg's transfer of millions from P180 to CaaStle and required coordinating with Hunsicker's fundraising efforts. *See* ¶¶164-165, 169, 176, 184.

Goldenberg used his control over P180's bank accounts to prop up that fraud. When P180's investors deposited money, he supervised the unauthorized transfer of those funds "to make CaaStle appear as if it had inbound accounts receivable or revenue." ¶136. In two transactions on June 26, 2024 (¶¶149(a)-(b)) and in two more transactions on July 22, 2024 (¶¶149(c)-(d)) he supervised and directed the transfer of over $3,000,000 from P180 to CaaStle. In January of 2025, he helped Hunsicker convert $1,300,000. ¶¶250(a)-(b). Then, as part of a plan to coerce a merger with P180 to hide the fraud at CaaStle (¶¶227(a)-(e)), Goldenberg

"negotiated a purported 'loan' from CaaStle to P180 for $5,000,000 and 10% interest over a matter of weeks" without ever disclosing his knowledge of the fraud at CaaStle (¶¶145(d), 261-262, 314(b)) and looted the remaining balances from P180's bank account to leave P180 with less than $20,000 by the end of March 2025 (¶318(k)).

### 2. Singh

As a co-founder, at least through 2018, Singh participated in meetings where Hunsicker lied and, choosing not to correct lies made in his presence, adopted her lies as his own. ¶¶63, 69. He shared an investor update in July 2018 that identified a number of metrics and other information, like the status of negotiations with business partners and clients, that were all made up. ¶53. It touted Gwynnie Bee as proof of concept, despite knowing full well it was a failure. *Ibid.* Although he later self-servingly claimed to have stepped away in 2017 (¶64), he had not. From 2017 onward, Singh continued to pitch investors, touted information he had about CaaStle's "momentum and growth," used the pronoun "we" to refer to his actions with Hunsicker, sought introductions with senior members of Walmart's e-commerce team on behalf of CaaStle, purported to be able to obtain priority access to "round/valuations," held strategic meetings with Hunsicker at the CaaStle office in 2020, and continued using his @caastle.com email address. ¶¶65(a)-(i). In short, he remained in the inner circle and continued sharing information that he knew was false, and still had ready access as the co-founder to the true financial and subscriber metrics. ¶¶66-67.

Like Goldenberg, Singh cashed out $6,000,000 in shares "at the same time an investor confronted Hunsicker over the fake [financial] statements." ¶164. They both sold their stock at a price well below what outside investors were contemporaneously paying precisely because they understood those shares lacked value. ¶¶167-168. Hunsicker further admitted in her guilty plea that she obtained funds to pay a "co-founder" through fraud—and Singh was the only other co-

founder. ¶¶169-170. Goldenberg knew, approved the stock repurchases, and lined up funds to pay Singh off. ¶¶75, 164-165.

And, as mentioned above, when Hunsicker was forced to cede control, she ensured that Singh replace her on the CaaStle board. ¶205. That same day, he attempted to cash out *again*. ¶211. And rather than expose the fraud and wind down the business—as one might expect an outsider to do—Singh doubled down. As he explained at a January 3, 2025, meeting, given the "limited cash reserves" of CaaStle and the unprofitability of the company, the plan was to restructure CaaStle and fold it into P180. ¶¶225-226. Singh's plan was to use loans to coerce compliance by P180 and then leverage the loans to force P180 into a merger with CaaStle. ¶¶227(a)-(e). Astonishingly, Singh even kept Hunsicker as the face of the company. ¶¶229-231. He sought to ensure that P180 would be tied to CaaStle by loans while hiding the fraud. ¶¶232-235.  Executing on this plan, Singh demanded payment from P180 of a purported "debt" north of $14,000,000 while the Defendants drained P180's bank account. ¶279. Singh then communicated the plan openly (if weakly) to CaaStle's investors: use this leverage to fold CaaStle into P180. ¶¶280-281.



Ultimately, the scheme only became public because a criminal investigation of Hunsicker. ¶277. Singh and Goldenberg continued to try to coerce P180's merger, but as the truth of CaaStle's situation spread, the company collapsed and declared bankruptcy. ¶¶278-294.

### LEGAL STANDARD

"A motion brought under Rule 12(b)(6) challenges only the 'legal feasibility' of a complaint." *Goel v. Bunge, Ltd.*, 820 F.3d 554, 558 (2d Cir. 2016). Because the motion "tak[es] no account of [the complaint's] basis in evidence, a court adjudicating such a motion may review

only a narrow universe of materials:" the "facts stated on the face of the complaint," incorporated

documents, or matters subject to judicial notice. *Id.* 559 (citation omitted). "[T]he Court must

assume the truth of all well-pleaded, nonconclusory factual allegations in the complaint." *1567

56th St., LLC v. Spitzer*, 774 F.Supp.3d 476, 488 (E.D.N.Y. 2025) (citation omitted).

Contrary to Defendants' assertion (at 7), only three of P180's claims (Counts I, VI, VII)

are subject to Rule 9(b). The remaining claims (Counts II, III, V, VI, VIII, IX, X) are subject to

Rule 8, including RICO conspiracy and negligent misrepresentation. *Angermeir v. Cohen*, 14

F.Supp.3d 134, 154-55 (S.D.N.Y. 2014); *In re Warner Music Grp. Data Breach*, 2025 WL

2531832, *16 (S.D.N.Y. Sept. 3, 2025).

## ARGUMENT

## I.    DEFENDANTS REPEATEDLY CONTRADICT P180'S ALLEGATIONS

The "Court cannot rely on factual allegations set forth in a brief in resolving a motion to

dismiss." *Stewart v. Metro. Life Ins. Co.*, 2025 WL 2710112, *7 (S.D.N.Y. Sept. 22, 2025). A

motion "should be denied" if it "violates the fundamental rule that a motion to dismiss cannot

controvert the truth of the factual allegations set forth in the complaint." *Palma-Castillo v. New

Tacolandia Inc.*, 2011 WL 7092652, *1 (S.D.N.Y. May 9, 2011).

Defendants openly violate this fundamental rule by labeling "the narrative upon which

P180's claims depend" as "false." Br. 3. Citing nothing, they argue (at 2, 4, 7, 12, 20) that "Singh

had absolutely no involvement with P180 at any time."[2] That contradicts P180's factual

allegations explaining Singh's involvement in P180's business planning (¶173-174) and his

effort to bury CaaStle's fraud in P180's real business by foisting debt on P180 and then obtaining

---

[2] The Court must of course ignore supposed "facts" not found in the Complaint. Consequently, P180 does not address each of defendants' unsubstantiated assertions and does not admit that any are true.

P180's assets by coercing a merger (¶¶222-227, 241, 279-280). Similarly—also citing nothing—Defendants suggest (at 2, 8, 12, 25-26) that because Singh "left the CaaStle board in December 2017" he had no involvement "during the relevant period" and (at 2, 12) only "rejoined" CaaStle in 2024. But that too contradicts P180's allegations of his continued, intimate involvement. *E.g.*, ¶¶64, 65(a)-(i), 66 (collecting examples).

The motion portrays CaaStle COO Goldenberg (at 2, 3, 5, 17) as merely involved in "routine corporate transactions." This contradicts the allegations that he lied in meetings, reiterated false statements, negotiated a conflicted loan while on both sides of the deal, controlled and diverted P180's funds, participated in unauthorized transfers, engaged in cover-up of the fraud, and micromanaged finances to safeguard the scheme from discovery. ¶¶73-79, 131-145, 149, 176-185, 245-253, 261-263. Far from "not identify[ing] any knowingly false statement by Goldenberg" (at 2-3), the Complaint details Goldenberg's knowledge (¶¶73-79) and false statements (¶¶134-135, 137-139, 145(a), 145(c)). Nor is it true that "Goldenberg did not participate in the approvals of the alleged transactions or even know of them." Br. at 2. P180 extensively alleges how he maintained control of expenditures and finances (¶¶132, 153, 246), micromanaged expenses to avoid discovery of the fraud (¶75), and knew of and approved large redemptions and transfers at the center of the scheme (¶¶113, 149, 152-154, 160, 250).

Further, the motion flatly mischaracterizes (at 1, 2, 5) P180 as trying to evade "legitimate debt obligations," ignoring that the Complaint specifically alleges that the debt and money movements were procured by fraud, self-dealing, concealment, and unauthorized transfers (¶¶149(a)-(d), 250-253, 261-265, 279, 343-345). Nor is it credible to suggest (at 1) that P180 was "funded by capital it obtained from CaaStle" given clear allegations that P180 had independent

investors whose money was almost immediately exploited by Goldenberg to fund or conceal Defendants' fraud (¶¶136, 149(a)-(d)).

Likewise, Defendants repeatedly recite elements of a cause of action, assert P180's allegations are "conclusory," and cherry-pick general allegations while ignoring specific ones. Such "perfunctory" arguments without analysis are not preserved. *E.g.*, *Frommer v. MoneyLion Techs. Inc.*, 2024 WL 2158589, at *6 (S.D.N.Y. May 14, 2024).

The Court can deny the motion on this basis alone.

## II.    DEFENDANTS' STANDING ARGUMENT IS FRIVOLOUS

Defendants (at 8) cite *Knox* to argue that P180 lacks standing because it fails to allege that "P180's board authorized the commencement of this action." First, *Knox* creates no such pleading requirement—the issue arose there due to a parallel state-court dissolution proceeding. *Knox v. Zarzeski*, 2006 WL 8461751, at *6 (S.D.N.Y. July 11, 2006). Second, P180 nonetheless pleads that it passed a corporate resolution on April 30, 2025, authorizing suit in this district. ¶16. Defendants' argument has neither legal nor factual merit.

## III.    P180 HAS PROPERLY ALLEGED CIVIL RICO

P180 more than adequately states a RICO claim by pleading "(1) the defendant's violation of § 1962, (2) an injury to the plaintiff's business or property, and (3) causation of the injury by the defendant's violation." *Com. Cleaning Servs., L.L.C. v. Colin Serv. Sys., Inc.*, 271 F.3d 374, 380 (2d Cir. 2001).

### A.    P180 alleges a pattern of at least two predicate acts by each Defendant

P180 alleges a long-running scheme of related mail and wire fraud, bank fraud, and money laundering. Defendants challenge only P180's mail and wire fraud allegations.

The elements of mail and wire fraud are "(1) a scheme to defraud, (2) money or property [as the object of the scheme], and (3) use of the mails [or wires] to further the scheme." *Fountain*

*v. United States*, 357 F.3d 250, 255 (2d Cir. 2004) (alteration in original)(citation modified). A party commits wire fraud by either (a) alleging that fraudulent communications in furtherance of the scheme occurred over the wires or, (b) where "mails or wires were simply used in furtherance of a master plan to defraud," "Rule 9(b) requires only that the plaintiff delineate with adequate particularity in the body of the complaint, the specific circumstances constituting the overall fraudulent scheme." *Angermeir*, 14 F.Supp.3d at 145-146 (citation omitted)(collecting cases). Thus, where the wires were merely used in furtherance of a master plan, P180 need only allege that each Defendant "*personally* knew of, or participated in, the fraud" and "Rule 9(b) does not require Plaintiff[] to allege a specific connection between fraudulent representations and particular defendants." *Id.* 148 (citation modified). Violation of "the mail and wire fraud statutes may turn on either an affirmative misrepresentation or omissions of material information" as "it is just as unlawful to speak half truths or to omit facts." *United States v. Rare Breed Triggers, LLC*, 690 F.Supp.3d 51, 102 (E.D.N.Y. 2023) (quotations omitted).

P180 adequately alleges wire fraud. P180 details a scheme to defraud it of its money and property (¶¶149(a)-(d), 227(a)-(e), 264-269) by showing that defendants "raise[d] millions" and "transfer[ed] money intended for [Plaintiff] … for personal use." *Alony v. Chaitchik*, 2025 WL 3551666, at *11 (S.D.N.Y. Dec. 11, 2025). P180 further alleges that Singh and Goldenberg used their control and management to "divert[] enormous unauthorized" payments to themselves. *See Bd. of Managers of Trump Tower at City Ctr. Condo. v. Palazzolo*, 346 F.Supp.3d 432, 458 (S.D.N.Y. 2018).

P180 specifically alleges multiple fraudulent statements or omissions made over the wires in furtherance of that scheme. Taking Goldenberg first, the Complaint alleges multiple meetings conducted online where Goldenberg made fraudulent statements over the wires in

-12-

furtherance of this scheme. ¶¶134-135, 137-139, 145(a)-(d). Goldenberg knew what he was saying was false, including because he prepared the company's diligence materials (¶¶73-77) and cashed out when the scheme risked exposure (¶¶176-183). Singh also repeatedly made false statements, including to CaaStle investors (¶¶65(a), (d), (e), (g)), over the wires in furtherance of this fraudulent scheme, including a telephonic meeting planning the fraudulent takeover of P180 (¶¶223, 227(a)-(e)) and fraudulently demanding payment directly from P180 (¶279). P180 alleges Singh's deep and enduring knowledge of CaaStle's true finances (¶¶66-67, 102) and active cover-up of the fraud (¶229).

Singh and Goldenberg also "could reasonably have foreseen" that the wires would be used "in the ordinary course of business as a result of" their acts. *Gov't Emps. Ins. Co. v. Hollis Med. Care, P.C.*, 2011 WL 5507426, at *8 (E.D.N.Y. Nov. 9, 2011) (quoting *United States v. Bortnovsky*, 879 F.2d 30, 36 (2d Cir.1989)). And they both "received some of the funds improperly taken from plaintiffs," their "fraudulent representations were part of a scheme by defendants to defraud plaintiffs," and they were "personally involved in this scheme." *See Todaro v. Orbit Int'l Travel, Ltd.*, 755 F.Supp.1229, 1233-34 (S.D.N.Y. 1991). That's enough.

Further, P180 alleges an "ongoing scheme to defraud Plaintiffs." *Aghaeepour v. N. Leasing Sys., Inc.*, 2015 WL 7758894, *5 (S.D.N.Y. Dec. 1, 2015). Thus, even if any particular allegation "fails to [sufficiently] specify" a statement with necessary particularity (as Defendants claim at 13), "when viewed in light of the specifics of the [overall] fraudulent scheme, they are sufficient under Rule 9(b)." *Aghaeepour*, 2015 WL 7758894, *5 (collecting cases). Here, P180 shows "how their individual responsibilities demonstrate their participation." *Id. *6. That is "sufficient to put Defendants on notice of their allegedly wrongful conduct." *Ibid.* Indeed, "the details" of RICO fraud "are rarely within the knowledge of a victim of fraud and are more

-13-

appropriately left for discovery." *Alix v. McKinsey & Co.*, 23 F.4th 196, 209 (2d Cir. 2022). P180 easily meets the applicable standards by raising sufficiently "strong inference[s] of fraud" (*ibid.*).

Defendants' arguments are unavailing. To start, they incorrectly suggest (at 9) that whether the scheme "to gain control of P180's money and assets" was "ultimately unsuccessful" is relevant. That is a red herring. Ultimate success does not matter. Section 1964(c) only requires that P180 show it experienced "harm caused by predicate acts sufficiently related to constitute a pattern." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 497 (1985). P180 has, even if Defendants never achieved their ultimate aim of taking over P180.

Defendants suggest (at 11) that the Complaint fails to allege specific false statements made to P180. But that is neither factually true (Goldenberg and Singh both made false statements to P180, *e.g.*, ¶¶145, 279) nor legally required (RICO merely requires showing a defendant's knowing or intentional participation in a scheme, not that each defendant personally spoke the falsehood, *Monterey Bay Mil. Hous., LLC v. Ambac Assurance Corp.*, 531 F.Supp.3d 673, 703 (S.D.N.Y. 2021)).

Selectively citing summary paragraphs, they argue (at 11) that P180 refers to "'defendants' generically." But that ignores P180's myriad specific allegations. As Defendants' own case explains, even where "the Complaint contains a number of allegations against all Defendants in general, the Complaint's other allegations specific to each Defendant are sufficient to give Defendants fair notice of the claims against them and to accomplish the other goals of Rule 9(b)." *Angermeir*, 14 F.Supp.3d at 150. Defendants' other case, *Bayshore* (cited at 11-12), is distinguishable. That complaint alleged business relationships through group pleading (667 F.Supp.3d at 129), whereas P180 alleges the exact something "more" that was "[a]bsent"

-14-

there: specific facts demonstrating that Goldenberg and Singh each knowingly and intentionally participated in the scheme to defraud.

### B.    P180 adequately pleads an association-in-fact enterprise

A RICO enterprise includes "any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). Although an association-in-fact enterprise must function as a "continuing unit" with a "common purpose," its organization can be "informal" and need not have "a hierarchical structure or chain of command." *Boyle v. United States*, 556 U.S. 938, 939, 948 (2009). It requires: (1) a common purpose; (2) relationships among those associated with the enterprise; and (3) longevity sufficient to permit the associates to pursue the enterprise's purpose. *Alony*, 2025 WL 3551666, at *8.

P180 sufficiently pleads an enterprise: the common purpose of operating CaaStle with a false appearance of solvency to extract funds and assets, including from P180 and to shield insiders from exposure. ¶¶149, 276, 302, 304. Although "an association-in-fact enterprise need not have an explicitly fraudulent or illegal common purpose to be cognizable as an enterprise under RICO" (*United States v. Kelly*, 128 F.4th 387, 411 (2d Cir. 2025)), the Hunsicker Enterprise had an illegal common purpose. Hunsicker has admitted her criminal activity (Doc. 118 (Hunsicker Answer) at ¶¶295-298, *United States v. Hunsicker*, 1:25-cr-00318, Docs. 26, 27 (SDNY)), and P180 pleads repeated fraudulent transfers of P180's cash (¶¶149(a)-(b), 250(a)-(b)), fraudulent transfers to and by Singh and Goldenberg to cash out their fraud (¶¶167, 178), and extensive fraudulent cover-up to avoid discovery or consequences (¶78 (concealing auditor's resignation), ¶222 (manipulating P180 to hide fraud), ¶¶229-230 (Singh misdirecting an internal investigation to cover up Defendants' involvement)).

P180 catalogues extensive relationships among Defendants, the longevity of those relationships, and Defendants' respective roles in the enterprise. Indeed, P180 pleads that Singh

and Goldenberg each participated in the "operation or management" of the enterprise, which is "a relatively low hurdle for plaintiffs to clear[,] especially at the pleading stage." *Fuji Photo Film U.S.A., Inc. v. McNulty*, 640 F.Supp.2d 300, 309-310 (S.D.N.Y. 2009) (citation omitted). Here, P180 easily clears that hurdle. Singh and Goldenberg operated and managed the enterprise (¶¶59-79, 222-254) and, together with Hunsicker, had a long-running relationship for nearly two decades (¶¶27-28). Together, they founded and operated Gwynnie Bee (¶¶31-32, 72-73) and worked to avoid discovery of CaaStle's failings (*see supra* Statement of Facts, Section C).

Defendants argue (at 15-16) that an "enterprise [must] exist[] separate and apart" from the predicate acts. They misunderstand that requirement. "[W]hile the enterprise must be separate from the pattern of racketeering activity alleged, 'the evidence used to prove the pattern of racketeering activity and the evidence establishing an enterprise may in particular cases coalesce.'" *Hemmerdinger Corp. v. Ruocco*, 976 F.Supp.2d 401, 413 (E.D.N.Y. 2013) (quoting *Boyle*, 556 U.S. at 947). The key question, "simply-stated" is "[i]f each act of fraud is not effective without the other acts of fraud, then a RICO enterprise exists." *Ibid.* (citation omitted). Here, P180 alleges that each fraud built upon the others, including among other things through cover-ups (¶¶78, 103-116, 222, 229-230), looting P180 to fund Defendants' cash-outs (¶¶163-185), coordinated breaches of fiduciary duty (¶¶136, 261-262), and executing a scheme to coerce P180 into submission (¶¶227, 242-249, 261-267). Courts routinely find an enterprise adequately alleged when individuals in a discrete economic association proceed through fraud. *See Hemmerdinger*, 976 F.Supp.2d at 414 ("series of employment and contractual relationships between Defendants, who shared a common purpose to defraud Plaintiff" sufficient); *Spitzer*, 774 F.Supp.3d at 491 & n.5 ("working out of the same office space, all served distinct but necessary roles in perpetuating a common scheme to enrich themselves" sufficient). Defendants'

-16-

case is inapposite. *Belen* involved bare allegations of fraud which, if "removed from the equation" meant "there would be no enterprise between the Defendants." *Belen v. Herman*, 2024 WL 182588, *5 (S.D.N.Y. Jan. 17, 2024). Even removing the predicate acts of wire fraud, mail fraud, bank fraud, and money laundering from the record, P180 still alleges coordinated action and business ties between Defendants.

Defendants' other, cobbled-together arguments do not change this result. Defendants suggest (at 16) that P180's claims fail because "those ventures had [no] nefarious purpose." But Defendants' case (Br. 14, quoting *BWP Media* quoting *Cruz*) has been abrogated on exactly that point: RICO enterprises "need *not* have an explicitly fraudulent or illegal common purpose." *Kelly*, 128 F.4th at 411 (emphasis added).[3] Additionally, P180 does not merely rely upon Goldenberg's or Singh's positions as officers or shareholders. Br. at 16 & n.9. P180 alleges their active participation. *E.g.*, ¶¶59-79, 149(c)-(d), 163-185, 205, 225-235, 250(a)-(b), 279, 318(a), (f), (k). Again, Defendants cherry-pick general allegations (at 15 citing ¶¶300-301) ignoring myriad specific allegations regarding how Defendants' individual acts accomplished their common purpose (*e.g.*, ¶¶78, 167, 178, 222, 250(a)-(b)). Further (*contra* 15), P180 alleges each Defendant's role, including Goldenberg's control of finances and Singh's ascent to leadership. ¶¶75, 152-154, 160, 244-250. Mischaracterizing P180's allegations as discussing "a few ordinary business meetings" (Br. 16) is absurd given the extensive allegations of fraudulent statements, fraudulent transfers, breaches of fiduciary duty, and coercion.

---

[3] Defendants' quotation of *BWP Media*'s quotation of *Cruz* is actually a direct quotation of *Satinwood*. *See Cruz v. FXDirectDealer, LLC,* 720 F.3d 115, 120 (2d Cir. 2013) (quoting *First Cap. Asset Mgmt. v. Satinwood, Inc.*, 385 F.3d 159, 174 (2d Cir. 2004)). *Kelly*, addressing the exact sentence quoted by Defendants, rejects any "interpretation of *Satinwood* as setting a heightened standard for RICO enterprises." *See Kelly*, 128 F.4th at 410.

C.     **P180 sufficiently alleges proximate causation**

"[A]ny person injured in his business or property by reason of a violation of [§ 1962]" can sue for damages. *Commercial Cleaning*, 271 F.3d at 380 (quoting 18 U.S.C. § 1964(c)). Causation is measured with the "direct relation" test which looks to a "direct relation between the injury asserted and the injurious conduct alleged" and prevents recovery by "plaintiff[s] who complain[] of harm flowing merely from the misfortunes visited upon a third person by the defendant's acts." *Id.* 388-381. Plaintiffs "need not establish that they can obtain the precise relief they seek to survive [a] motion [to dismiss], so long as they can demonstrate that they are entitled to some relief." *Burke v. Dowling*, 944 F.Supp.1036, 1052 (E.D.N.Y. 1995).

P180 pleads the necessary direct relation between the harm caused and Defendants' predicate acts. Even at this preliminary stage, P180 has identified multiple sources of monetary damages, including loans Defendants induced it to procure, payments made in reliance upon Defendants fraudulent statements, and obligations it undertook based upon Defendants' representations. ¶¶4, 137-145, 320. P180 has also lost income from partnerships that failed because Defendants had lied about capabilities, technology, and subscribers. ¶¶140, 145(d), 261, 264, 269, 279. These harms directly resulted from the predicate acts alleged. ¶¶134-145, 250-254, 307(a)-(c), 357, 364.

None of this is "contingent" harm "flowing merely from the misfortunes visited upon a third party." *Commercial Cleaning*, 271 F.3d at 381. Business harms—including lost opportunities, stolen property, or higher costs—are classic examples of direct harm. *Id.* 383. While Defendants *also* harmed others (including CaaStle and its investors), P180 is "not alleging an injury that was derivative of injury [of] others." *Ibid*. It is suing for what *P180* lost. P180 was the direct target of Defendants' fraudulent scheme in its final days; "the direct target of the RICO violation" clearly has standing. *Id.* 381. Indeed, no one is "more directly injured" or "ha[s] a

-18-

greater incentive to ensure that a RICO violation does not go undetected or unremedied" than the direct target. *Id.* 385. That sufficiently alleges proximate cause.

None of Defendants' other arguments support dismissal. Their suggestion (at 17) that these injuries "flow not from any conduct by the Moving Defendants" ignores the wrongful acts by Singh and Goldenberg described in the Complaint and detailed above. Their argument (at 17) that P180 is the "beneficiary—not a victim" is nonsense and impermissibly contradicts the Complaint. Nor does *Gelt* help Defendants. That case involved claims by a mortgagee against a mortgage broker for damages from foreclosures resulting from a cascading series of increasingly attenuated events involving borrowers who overstated the value of a house prior to the housing market's collapse and wherein, regardless, the mortgagee alleged it would have made the same "decision to lend in the first place." *First Nationwide Bank v. Gelt Funding, Corp.*, 820 F.Supp. 89, 93 (S.D.N.Y. 1993). P180's injuries are not only direct, but P180 also alleges it would not have incurred these business damages had it known the truth. ¶¶133, 320(a)-(c).

Nor was the harm caused by "voluntary business decisions." Br. 17. P180 relied on Singh's and Goldenberg's fraudulent misrepresentations and omissions regarding (non-existent) distribution capabilities and network of subscribers, causing P180 to incur business obligations and costs at elevated prices and on disadvantageous terms. ¶¶134, 145(d), 264, 320(c). Proximate cause is satisfied where plaintiffs alleged they were induced to purchase interests based on fraudulent representations and "a reasonable person might not have chosen to invest in the [] interests if they had been disclosed." *Burke*, 944 F.Supp. at 1053.

## IV.    P180 HAS PROPERLY ALLEGED RICO CONSPIRACY CLAIMS

To plead RICO conspiracy, "a plaintiff must allege the existence of an agreement to violate RICO's substantive provisions." *Nastasi & Assocs., Inc. v. Bloomberg, L.P.*, 2022 WL 4448621, at *18 (S.D.N.Y. Sept. 23, 2022) (quotation omitted). Section 1962(d)'s requirements

-19-

are "less demanding" than those for substantive violations. *Ibid.* Plaintiff need not plead a substantive RICO claim against defendants to allege a conspiracy claim. *State Farm Mut. Auto. Ins. Co. v. CPT Med. Servs., P.C.*, 375 F.Supp.2d 141, 150-51 (E.D.N.Y. 2005). If conspirators have a plan which calls for "some conspirators to perpetrate the crime" and others to provide "support," the supporters are still "guilty as the perpetrators." *Salinas v. United States*, 522 U.S. 52, 63-64 (1997). Thus, contrary to Defendants' arguments, even if the Complaint "fails to state a plausible *substantive* RICO claim" against a particular defendant, that is "not required … to allege a claim for RICO conspiracy" against that particular defendant. *Nastasi*, 2022 WL 4448621, at *16 (quotations omitted). For conspiracy, it is sufficient to allege that defendants intended to further a scheme, not that defendants themselves committed two predicate acts, or even that these acts were carried out. *State Farm*, 375 F.Supp.2d at 150-151.

P180 has indisputably pleaded substantive RICO allegations against Hunsicker at this stage. Indeed, she has admitted much of them in her answer. Doc. 118 ¶¶3, 295-298. With Hunsicker liable under the substantive statute as "perpetrator," P180 adequately pleads RICO conspiracy against Singh and Goldenberg even if the substantive RICO claims against them fail. *E.g.*, *Nastasi*, 2022 WL 4448621, at *18 (RICO conspiracy alleged "notwithstanding [the court's] holding above that the Complaint fails to state a plausible *substantive* RICO claim.") (emphasis in original). The Complaint plausibly alleges how Singh and Goldenberg agreed to, and actively supported, the criminal objectives. Goldenberg, through his position, had access to both CaaStle and P180's true financial statements (¶¶73-77), which he used to facilitate false statements about those figures and assist in the transfer of millions of dollars from P180 accounts (¶149(a)-(d)). He then cashed out when the exposure was imminent. ¶¶176-183. Singh likewise had access to complete information about CaaStle's business, which he used to cover up

-20-

Hunsicker's fraud (¶229), to further the scheme to defraud P180 (¶¶223, 227(a)-(e)), and also to cash out when the exposure was imminent (¶¶164-175). These allegations sufficiently show that Singh and Goldenberg knew of and agreed to "the general criminal objective of a jointly undertaken scheme." *Nastasi,*, 2022 WL 4448621, at *18 (quotation omitted).

Singh and Goldenberg's arguments lack merit. They cannot ignore P180's specific allegations by misleadingly citing a summary paragraph (at 19). Their citation to *BWP Media* (at 18) is inapposite. The plaintiff there failed to state a substantive RICO violation against *any* defendant and only mentioned RICO conspiracy in passing in the complaint. *BWP Media USA*, 69 F.Supp.3d at 362. Here, P180 indisputably pleads at least some substantive RICO violations and extensively alleges conspiracy (including as a separate count). *BWP Media* has no application and, in fact, as P180 has sufficiently pleaded at least some underlying substantive RICO claims, that suffices for the conspiracy claims, too. *Lateral Recovery, LLC v. Cap. Merch. Servs., LLC*, 632 F.Supp.3d 402, 465 n.28 (S.D.N.Y. 2022). Defendants' claim (at 19) that P180 failed to allege any agreement "to associate themselves in a RICO enterprise" or "to commit two or more predicate acts" is the wrong legal standard. P180 must allege that "the defendant knew of, and agreed to, the general criminal objective of a jointly undertaken scheme." *United States v. White*, 7 F.4th 90, 99 (2d Cir. 2021) (quotation omitted). And allegations that defendant agreed to function as a unit with a common purpose suffices. *Ibid.* Moreover, agreement can be implied, as here, "given the positions of the Defendants in the Enterprise, the acts that they took, and the financial benefits alleged." *Lateral Recovery, LLC*, 632 F.Supp.3d at 465 n.28. P180 specifically alleges how Goldenberg and Singh functioned as a unit with a common purpose by, for example, coordinating a coercive takeover of P180 through multiple acts of fraud to cover up the scheme and enrich themselves through pay-outs. ¶¶222-249, 259-269. That suffices.

-21-

## V.    P180 STATES CONVERSION CLAIMS

"Conversion is the unauthorized assumption and exercise of the right of ownership over goods belonging to another to the exclusion of the owner's rights." *State v. Seventh Regiment Fund, Inc.*, 98 N.Y.2d 249, 259 (2002) (internal quotation marks omitted). Even "[a] very slight interference with the ownership is sufficient to constitute a conversion." *Emps.' Fire Ins. Co. v. Cotten*, 245 N.Y. 102, 105 (1927). Thus, "a manual taking is not necessary to show that a wrongful exercise of dominion has occurred in order to claim conversion." *Reif v. Nagy*, 175 A.D.3d 107, 127 (1st Dep't 2019). And it "does not require an allegation, much less a showing, that defendants took ownership of the property or benefitted therefrom." *Hillcrest Homes, LLC v. Albion Mobile Homes, Inc.*, 117 A.D.3d 1434, 1436 (4th Dep't 2014).

P180 properly alleges conversion. Goldenberg, as COO, maintained tight financial controls and closely monitored CaaStle's funds and bank accounts to make sure that the fraud would not be revealed. ¶¶75, 152-154, 160. Discovery will show more, but based on that and the abundant allegations of his close cooperation with Hunsicker, Corlito, and Jain, P180 alleges four occasions where Goldenberg directly participated in alienating P180's funds without authorization. ¶149. Those funds were used to redeem both Singh and Goldenberg's shares when exposure was threatened—and the proximity of these actions warrant a reasonable inference of their complicity in looting P180 to convert P180's funds. ¶¶163-184, 252-253. Additionally, after Singh and Goldenberg were fully in charge of the company, they repeatedly used CaaStle to loot P180's bank accounts. ¶¶244-250.

Defendants' contrary arguments fail. Again, they cherry-pick general-sounding quotes without confronting P180's detailed allegations. Br. 20. Worse, they misrepresent the Complaint, arguing (at 20) that P180 "does not allege Goldenberg personally took any P180 funds for himself" despite P180 alleging precisely that (¶¶252-253). Arguing (at 20) that Singh had no role

-22-

at P180 is a non sequitur: he still directed transfers from P180 bank accounts without authorization. Nor is it dispositive whether Defendants acted in the "scope of [their] corporate duties" (*ibid.*) as New York courts unequivocally hold that "[o]fficers and agents of corporations are personally liable for their own acts which bring about a conversion of a third party's property, and it is no defense to personal liability that the officer or agent may have been acting on behalf of a corporate principal." *Ingram v. Machel & Jr. Auto Repair, Inc.*, 148 A.D.2d 324, 325 (1st Dep't 1989). An officer or director's "direct[] participat[ion]" is enough. *Bisley, Inc. v. Meadows Off. Supply Co.*, 200 A.D.3d 405, 406 (1st Dep't 2021).

## VI.    P180 STATES FIDUCIARY DUTY CLAIMS

As a Delaware corporation (¶17), the fiduciary duties owed to P180 by its officers and directors are internal affairs governed by Delaware law. *KDW Restructuring & Liquidation Servs. LLC v. Greenfield*, 874 F.Supp.2d 213, 221 (S.D.N.Y. 2012). Goldenberg, as director and officer of P180 (¶21), owed "the corporation" duties of "due care, good faith, and loyalty." *Malone v. Brincat*, 722 A.2d 5, 10 (Del. 1998). It is irrelevant if he was also a fiduciary of CaaStle. There is "no dilution" of the duty of loyalty when a director "holds dual or multiple" fiduciary positions; rather, "[t]here is no 'safe harbor' for such divided loyalties in Delaware." *Weinberger v. UOP, Inc.*, 457 A.2d 701, 710 (Del. 1983). Because "[t]he duty of loyalty includes… a duty of disclosure," "failure or refusal of a director to disclose to the board a defalcation or scheme to defraud the corporation of which he has learned, itself constitutes a wrong." *Hoover Indus., Inc. v. Chase*, 1988 WL 73758, at *2 (Del. Ch. July 13, 1988).

Obviously, looting a corporation for personal profit, whether directly or to save one's investment in another company, violates the duty of loyalty. *Guth v. Loft, Inc.*, 23 Del. Ch. 255, 270 (1939); *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993), *modified on reargument,* 636 A.2d 956 (Del. 1994). The Complaint alleges that in droves. It describes how

-23-

Goldenberg knew about and assisted the fraud for years while helping to conceal it (¶¶72-79, 102, 113-114, 152-154), that he disclosed none of this to P180, despite his duty to do so (¶¶132, 148), that he delayed disclosure (including to P180) so he could cash out millions of dollars in stock (¶¶176-180, 184), that Goldenberg personally lied about CaaStle's capabilities (¶¶134-135, 137-139, 145-146), that he covered up the fraud and tried to force P180 into a merger (¶¶186-265), and that he looted P180's bank accounts both for CaaStle and for personal gain. ¶149, 250. These are detailed allegations showing Goldenberg breached his fiduciary duty to P180—lying, failing to disclose his knowledge of the fraud as *Hoover* requires, sabotaging P180 to aid CaaStle, and participating in theft.

In response, Defendants rely upon New York law (at 21-22)— not applicable here—and, once again, ignore P180's detailed allegations. Further, Goldenberg's only substantive response is inapplicable: The business judgment rule—the rebuttable presumption that a decision of a loyal and informed board is entitled to deference unless it is irrational— is an affirmative defense not properly raised on a motion to dismiss. *In re Extended Stay, Inc.*, 2020 WL 10762310, at *112 (Bankr. S.D.N.Y. Aug. 8, 2020); *In re Tower Air, Inc.*, 416 F.3d 229, 238 (3d Cir. 2005). Nevertheless, P180 has plainly pleaded facts rebutting that inference by showing Goldenberg's disloyalty and failure to inform the board of material information. *Cede*, 634 A.2d at 361. Failure to disclose a material conflict of interest, alone, rebuts that protection. *City of Fort Myers Gen. Emps.' Pension Fund v. Haley*, 235 A.3d 702, 717 (Del. 2020); *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1168 (Del. 1995). And while Goldenberg argues (citing nothing) that a heightened pleading standard applies, no such standard applies here. *In re Tower Air, Inc.*, 416 F.3d at 238. And, of course, since P180 is bringing its own claims, pleading standards for derivative standing under Federal Rule of Civil Procedure 23.1 are irrelevant.

## VII.   P180 STATES AIDING AND ABETTING FIDUCIARY DUTY CLAIMS

Defendants' arguments regarding aiding-and-abetting claims again apply the wrong state's law while mischaracterizing the Complaint. Goldenberg had actual knowledge that Hunsicker was violating her fiduciary duties to P180 but nonetheless helped her compile fraudulent materials and lent her support at meetings, even adopting her lies by failing to correct them (despite himself owing fiduciary duties to P180). ¶¶73-79, 131-139, 145-148. His actual knowledge is amply alleged, both based on his access to the truth and his cashing out. Likewise, the Complaint extensively alleges that Singh (and Goldenberg) decided to coerce P180 into an unfavorable merger. ¶¶3-10, 141, 147, 227(b)-(c), 239. This is a far cry from Defendants' cited case, where a party merely "ignored a host of red flags." *Zamora v. FIT Int'l Grp.*, 834 F. App'x 622, 628 (2d Cir. 2020). And Defendants' citation to inapposite summary judgment cases (at 24 & n.13) does not require holding otherwise.

Singh and Goldenberg even participated in a board meeting to formally approve a plan for Goldenberg and Hunsicker to direct P180's affairs while keeping quiet and not disclosing CaaStle's fraud in order to manipulate P180 into a merger. ¶¶222-228, 259. There could hardly be a clearer example of "awareness" and "substantial assistance" (*contra* Br. 23-24) to breaching fiduciary duties. Unlike *Bayshore* (cited at 24), Plaintiffs have certainly pleaded that Singh and Goldenberg were aware of the scheme to defraud plaintiffs: They voted for it. Having directed P180 fiduciaries including Goldenberg and Hunsicker to violate their duties of candor and loyalty, they are liable for the consequences.

## VIII.   P180 STATES FRAUD, ACCESSORIAL LIABILITY, AND NEGLIGENT MISREPRESENTATION CLAIMS

Defendants' attack on P180's fraud, fraudulent concealment, aiding-and-abetting, conspiracy, and negligent misrepresentation claims principally consists of boilerplate recitations

of elements followed by assertions that the 95-page Complaint is conclusory. Rather than engage with P180's allegations, they pretend the allegations are just not there.

As discussed above (*supra* Section III.A), P180 alleges that Singh and Goldenberg made or conspired to make, or remained silent when required to speak, or knowingly helped Hunsicker make false statements. P180 pleads a litany of specific interactions in which falsehoods were shared and specifies who was there, as well as how Singh and Goldenberg participated in, agreed to, or substantially assisted with Hunsicker's pervasive lying. ¶¶51-53, 64-65, 134-139, 145-148, 222-226, 259, 276, 279-283, 288-290. Their knowledge of falsity is clear given their intimate involvement with the inner workings of CaaStle, Goldenberg's control over finances, their decision to cash out shares when threatened with exposure, and more—all classic circumstantial evidence that they each intended to defraud P180 (or to substantially assist Hunsicker's fraud). *Supra* Statement of Facts, Section C.1. & C.2. Defendants' concession (at 25) that motive and access to the truth suffice to plead scienter more or less gives up the game. Thus, just like wire fraud, P180 adequately alleges that Defendants committed common law fraud, aided and abetted other Defendants' fraud, or conspired with Hunsicker. There are ample allegations warranting a reasonable inference that Singh and Goldenberg were each sufficiently in on the fraud and decided it was in their financial interest to continue to help Hunsicker commit her fraud. ¶¶10, 59-79, 100, 113, 163-172, 176-184, 278-290. And P180 alleges the details of its reliance and harm. *E.g.*, ¶357.

As for omissions, Defendants fail to acknowledge that Goldenberg, as director, had an undoubted fiduciary duty of disclosure. *Hoover Indus.*, 1988 WL 73758, at *2. Goldenberg repeatedly failed to disclose what he knew about CaaStle's fraud, its desperate financial

situation, the failures of its technology and logistics systems, and its secret plan to force a P180-CaaStle merger through a "loan-to-own" scheme. *Supra* Statement of Facts Section C.1.

Defendants ignore the allegations of active concealment, including a board meeting to approve forcing P180 into a merger before the truth came out. *E.g.*, ¶¶186-202; 206-214; 215-218; 219-221; 222-241; 242-249. That suffices. *See, e.g.*, *In re Gen. Motors LLC Ignition Switch Litig.*, 257 F.Supp.3d 372, 442 (S.D.N.Y. 2017).

Nor do they discuss their "special facts" duties of disclosure of material facts not discoverable by P180 through exercise of reasonable diligence. *See Swersky v. Dreyer & Traub*, 219 A.D.2d 321, 327 (1st Dep't 1996). Both Singh and Goldenberg participated in CaaStle's negotiations with P180 over technology contracts and loans while knowing highly material facts—like the fact that Hunsicker had secretly been committing fraud—facts not knowable by P180's sole uncompromised, loyal director. *E.g.*, ¶¶4, 238, 262. Defendants' decision to sidestep duties of disclosure dooms their motion.

Because of this specificity, Defendants cases do not help them. The plaintiff in *Dover* (cited at 25) could not allege "any statement to [them] in connection" with the fraud. *Dover Ltd. v. A.B.Watley, Inc.*, 423 F.Supp.2d 303, 324 (S.D.N.Y. 2006). But P180 alleges multiple misrepresentations and omissions. *Gull Keys* (cited at 24) is inapposite: Plaintiff alleged that contract terms themselves were fraudulent statements—allegations not at issue here. See *Gull Keys I LLC v. Fulton Advisory Beef Fund I, LLC*, 2025 WL 2510608, *7 (S.D.N.Y. Sept. 2, 2025). Defendants' throwaway, undeveloped assertions that some element or another is inadequately pleaded does not make it so. Indeed, that is not even enough to preserve the argument. *Frommer*, 2024 WL 2158589, at *6.

-27-

IX.    **DEFENDANTS' REMAINING SCATTERSHOT ARGUMENTS LACK MERIT**

***Defendants' footnoted "jurisdictional" argument is wrong and waived.*** Defendants (at 1 & n.1) argue that dismissing the RICO claims "divests this Court of jurisdiction over this matter entirely." That's wrong. A voluntary dismissal deprives a federal court of jurisdiction because "courts look to the amended complaint to determine jurisdiction," and an amended complaint no longer supports jurisdiction when the claim is withdrawn. *Royal Canin U.S.A., Inc. v. Wullschleger*, 604 U.S. 22, 32 (2025). But dismissal *by a court* is different, and a court retains discretion to continue under § 1367. *Allen v. City of New York*, 2025 WL 3152723, *2 (2d Cir. Nov. 12, 2025) (affirming jurisdiction despite dismissing "all claims over which it has original jurisdiction" after *Royal Canin*). Proceeding under § 1367 is a matter of the Court's discretion, not of subject matter jurisdiction. *E.g. id.* *2-*3, *Kolari v. New York-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006). Regardless, Defendants have abandoned the issue by failing to address the factors to be considered by the Court: judicial economy, convenience, fairness, and comity. *In re Demetriades*, 58 F.4th 37, 54 (2d Cir. 2023) ("perfunctory" arguments "must be deemed waived") (quotation and citation omitted).

***Charging decisions are irrelevant***. Defendants suggest (at 7) that it is somehow "critical[]" that they have not been criminally charged. But P180 could "pursue a civil RICO claim *even after Defendants' criminal acquittals*" (*Hemmerdinger Corp. v. Ruocco*, 2016 WL 1588500, *6 (E.D.N.Y. Apr. 19, 2016) (emphasis added)), so whether they have been charged yet is irrelevant.

***Leave to amend.*** Defendants, without elaboration, request dismissal without leave to amend, similarly waiving the argument. Regardless, Defendants challenge the factual (not legal) sufficiency of P180's allegations and, in those circumstances, "it is often appropriate for a district court, when granting a motion to dismiss for failure to state a claim, to give the plaintiff

-28-

leave to file an amended complaint." *Van Buskirk v. The N.Y. Times Co.*, 325 F.3d 87, 91 (2d Cir. 2003). Here, if the Court grants this motion, it should grant leave to amend. Here, P180 could substantially bolster the facts in its Complaint because of recent developments, including through adversary complaints in CaaStle's bankruptcy estate filed against people and trusts related to Singh, investigative reporting in the *New York Times*,[4] and discovery disclosures in this case, including the identification of additional damages.

**CONCLUSION**

The Court should deny Defendants' motion.

Dated:  July 3, 2026

Respectfully submitted,

STEPTOE LLP

/s/ Conor Tucker

By:    Conor Tucker

Joseph Myer Sanderson
1114 Avenue of the Americas
New York, New York 10036
Tel.:  212-378-7615
Fax: 212-506-3950
josanderson@steptoe.com

- and -

Thomas Watson (pro hac vice)
Conor Tucker (pro hac vice)
Kaitlyn Sever (pro hac vice)
633 West Fifth Street
Suite 1900
Los Angeles, CA 90071

---

[4] Anita Raghavan, *She Confessed to Fraud. Her Board Let Her Stay in Charge*. THE NEW YORK TIMES (June 7, 2026), https://www.nytimes.com/2026/06/07/business/caastle-fraud-christine-hunsicker.html.

213-429-9400
twatson@steptoe.com
ctucker@steptoe.com
ksever@steptoe.com

*Attorneys for Plaintiffs*

## CERTIFICATION OF WORD COUNT

I hereby certify that the word count of this Memorandum of Law complies with the word limits of this Court's Individual Practices. According to the word-processing system used to prepare this memorandum of law, the total word count, excluding the material excluded by rule, is 8643 words.


/s/ Kaitlyn Sever
Kaitlyn Sever

-31-

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 3d day of July, 2026, the foregoing document was served via

electronic mail pursuant to Fed. R. Civ. P. 5(b) upon the following:

Joshua A. Dunn
Rachel Trouba
VEDDER PRICE PC
1633 Broadway 31st Floor
New York, New York 10019
Telephone: (212) 407-7791
jdunn@vedder.com
rtrouba@vedder.com

*Attorneys for Defendant*
*Christine Hunsicker*

Richard W. Boone Jr.
Kieran R. Lang
WILSON, ELSER, MOSKOWITZ,
EDELMAN & DICKER LLP
150 East 42nd Street
New York, NY 10017
Telephone: (212) 490-3000
Richard.boone@wilsonelser.com
kieran.lang@wilsonelser.com

*Attorneys for Defendants Jaswinder Pal*
*Singh and George Goldenberg*


Stuart J. Wells
Tom Butler
Nicole Sullivan
WHITE AND WILLIAMS LLP
810 Seventh Avenue, Suite 500
New York, NY 10019
Telephone: (212) 631-1255
wellss@whiteandwilliams.com
butlert@whiteandwilliams.com
sullivann@whiteandwilliams.com

*Attorneys for Defendant Dayna Corlito*


           */s/ Conor Tucker*
          Conor Tucker

-32-