**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

P180, INC.,

Plaintiff,

—against—

JASWINDER PAL SINGH, CHRISTINE HUNSICKER, GEORGE GOLDENBERG, SCOTT CALLON, CHIRAG JAIN, DAYNA CORLITO, AND DOES 1-50,

Defendants.

Case No. 25-cv-4432-VM-SDA

**PLAINTIFF P180'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT DAYNA CORLITO'S MOTION TO DISMISS**

# TABLE OF CONTENTS


**Page**

TABLE OF AUTHORITIES ..... ii

INTRODUCTION ..... 1

STATEMENT OF FACTS ..... 2

A. Hunsicker leads an enterprise of fraudsters. ..... 2

B. Plaintiff P180's business ..... 3

C. Corlito helps conceal the fraud, cash out co-conspirators, and loot P180. ..... 4

LEGAL STANDARD ..... 6

ARGUMENT ..... 6

I. P180 ADEQUATELY PLEADS A SUBSTANTIVE RICO VIOLATION ..... 6

A. P180 adequately pleads an association-in-fact enterprise. ..... 7

B. P180 adequately pleads Corlito's operation or management of the enterprise. ..... 11

C. P180 adequately pleads Corlito's pattern of racketeering. ..... 13

D. P180 adequately pleads proximate causation. ..... 17

II. P180 ADEQUATELY PLEADS RICO CONSPIRACY ..... 18

III. P180 ADEQUATELY PLEADS CONVERSION ..... 20

IV. P180 ADEQUATELY PLEADS CO-CONSPIRATOR LIABILITY AND AIDING AND ABETTING ..... 23

A. Corlito has co-conspirator liability. ..... 23

B. Corlito has provided substantial assistance to known fraud. ..... 24

V. P180 STATES AIDING AND ABETTING BREACH OF FIDUCIARY DUTY CLAIMS ..... 26

VI. CORLITO'S GROUP PLEADING ARGUMENT IS MISGUIDED ..... 27

CONCLUSION ..... 29

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*1567 56th St., LLC v. Spitzer*,
774 F.Supp.3d 476 (E.D.N.Y. 2025) ....................6, 8, 9

*Abbot Labs v. Adelphia Supply USA*,
2017 U.S. Dist. LEXIS 1007 (S.D.N.Y. Jan. 4, 2017)....................20

*Abrams v. Pecile*,
84 A.D.3d 618 (1st Dep't 2011) ....................22

*Aghaeepour v. N. Leasing Sys., Inc.*,
2015 WL 7758894 (S.D.N.Y. Dec. 1, 2015) ....................14, 16

*Alix v. McKinsey & Co.*,
23 F.4th 196 (2d Cir. 2022) ....................16

*Alony v. Chaitchik*,
2025 WL 3551666 (S.D.N.Y. Dec. 11, 2025) ....................9

*Angermeir v. Cohen*,
14 F.Supp.3d 134 (S.D.N.Y. 2014) ....................6, 13

*In re Bayou Hedge Fund Inv. Litig.*,
2006 WL 8462703 (S.D.N.Y. Sept. 7, 2006)....................26

*Black v. Ganieva*,
619 F. Supp. 3d 309 (S.D.N.Y. 2022)....................11

*Boyle v. United States*,
556 U.S. 938 (2009)....................7

*Burke v. Dowling*,
944 F.Supp.1036 (E.D.N.Y. 1995) ....................17

*Colavito v. New York Organ Donor Network, Inc.*,
8 N.Y.3d 43 (2006) ....................21

*Com. Cleaning Servs., L.L.C. v. Colin Serv. Sys., Inc.*,
271 F.3d 374 (2d Cir. 2001)....................6, 17, 18

*Corcoran v. Am. Plan Corp.*,
1987 WL 4448 (E.D.N.Y. Feb. 6, 1987)....................28

*D. Penguin Bros. v. City Nat'l Bank*,
587 F.App'x 663 (2d Cir. 2014) ....................10

*D'Addario v. D'Addario*,
901 F.3d 80 (2d Cir. 2018)....................7, 9, 10, 11, 12, 18

*Degulis v. LXR Biotechnology, Inc.*,
928 F.Supp. 1301 (S.D.N.Y. 1996) ....................28

*Eklund v. Pinkey*,
27 A.D.3d 878 (3d Dep't 2006)....................22, 23

*Elsevier, Inc. v. W.H.P.R., Inc.*,
692 F.Supp.2d 297 (S.D.N.Y. 2010)....................9, 12

*Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*,
794 F.3d 297 (2d Cir. 2015)....................25

*Financial Guar. Ins. Co. v. Putnam Advisory Co., LLC*,
783 F.3d 395 (2d Cir. 2015)....................18

*Fiorenti v. Cent. Emergency Physicians, PLLC*,
305 A.D.2d 453 (2d Dep't 2003) ....................22

*First Cap. Asset Mgmt. v. Satinwood, Inc.*,
385 F.3d 159 (2d Cir. 2004)....................10

*Fountain v. United States*,
357 F.3d 250 (2d Cir. 2004)....................13

*Franco v. English*,
210 A.D.2d (2d Dep't 1994)....................25

*Fuji Photo Film U.S.A., Inc. v. McNulty*,
640 F. Supp. 2d 300 (S.D.N.Y. 2009)....................11

*Godlewska v. Human Dev. Ass'n*,
2005 U.S. Dist. LEXIS 36998 (E.D.N.Y. Jul. 18, 2005) ....................11

*Goel v. Bunge, Ltd.*,
820 F.3d 554 (2d Cir. 2016)....................6

*Gov't Emps. Ins. Co. v. Hollis Med. Care, P.C.*,
2011 WL 5507426 (E.D.N.Y. Nov. 9, 2011)....................14

*Hillcrest Homes, LLC v. Albion Mobile Homes, Inc.*,
117 A.D.3d 1434 (3d Dep't 2014) ....................21, 22

*Ingram v. Machel & Jr. Auto Repair, Inc.*,
148 A.D.2d 324 (1st Dep't 1989) ....................21, 22

*Kaufman v. Cohen*,
307 A.D.2d 113 (1st Dep't 2003) ....................26, 27

*Lateral Recovery, LLC v. Cap. Merch. Servs., LLC*,
632 F.Supp.3d 402 (S.D.N.Y. 2022)....................20

*Lenczycki v. Shearson Lehman Hutton, Inc.*,
238 A.D.2d 248 (1st Dep't 1997) ....................20

*Lerner v. Fleet Bank*,
459 F.3d 273 (2d Cir. 2006)....................27

*Loughrin v. United States*,
573 U.S. 351 (2014)....................15

*Maersk, Inc. v. Neewra, Inc.*,
687 F.Supp.2d 300 (S.D.N.Y. 2009)
*aff'd sub nom.* 450 F. App'x 3 (2d Cir. 2011) ....................23, 24

*Meese v. Miller*,
79 A.D.2d 237 (1981) ....................22

*Minnie Rose LLC v. Yu*,
169 F.Supp.3d 504 (S.D.N.Y. 2016)....................28

*Montalvo v. J. Petrocelli Const., Inc.*,
8 A.D.3d 173 (1st Dep't 2004) ....................22

*Nastasi & Assocs., Inc. v. Bloomberg, L.P.*,
2022 WL 4448621 (S.D.N.Y. Sept. 23, 2022)....................18, 19

*Old Republic Natl. Tit. Ins. Co. v. Cardinal Abstract Corp*,
14 A.D.3d 678 (2d Dep't 2005)....................23

*Pludeman v. N. Leasing Sys., Inc.*,
10 N.Y.3d 486 (2008) ....................23

*Republic of Haiti v. Duvalier*,
211 A.D.2d 379 (1st Dep't 1995) ....................20

*Reves v. Ernst & Young*,
507 U.S. 170 (1993)....................11

*Salinas v. United States*,
522 U.S. 52 (1997)....................19

*Shaw v. United States*,
580 U.S. 63 (2016) ........ 15

*Skillgames, LLC v. Brody*,
1 A.D.3d 247 (1st Dep't 2003) ........ 22

*Somerville v. Major Exploration, Inc.*,
576 F.Supp. 902 (S.D.N.Y. 1983) ........ 27

*Sperrazza v. Kail*,
267 A.D.2d 692 (3d Dep't 1999) ........ 20

*State Farm Mut. Auto. Ins. Co. v. CPT Med. Servs., P.C.*,
375 F.Supp.2d 141 (E.D.N.Y. 2005) ........ 19

*In re Time Warner Inc. Sec. Litig.*,
9 F.3d 259 (2d Cir. 1993) ........ 25

*United States Sec. & Exch. Comm'n v. DiMaria*,
207 F.Supp.3d 343 (S.D.N.Y. 2016) ........ 26

*United States v. Bortnovsky*,
879 F.2d 30 (2d Cir.1989) ........ 14

*United States v. Kelly*,
128 F.4th 387 (2d Cir. 2025) ........ 8, 9, 10

*United States v. Louie*,
625 F.Supp. 1327 (S.D.N.Y. 1985) ........ 12

*United States v. Maher*,
108 F.3d 1513 (2d Cir. 1997) ........ 16

*United States v. Rare Breed Triggers, LLC*,
690 F.Supp.3d 51 (E.D.N.Y. 2023) ........ 14

*United States v. Teman*,
465 F.Supp.3d 277 (S.D.N.Y. 2020) ........ 15

*United States v. Vidal*,
2024 WL 397630 (2d Cir. Feb. 2, 2024) ........ 15, 17

*United States v. White*,
7 F.4th 90 (2d Cir. 2021) ........ 20

*W. 79th St. Corp. v. Congregation Kahl Minchas Chinuch*,
2004 WL 2187069 (S.D.N.Y. Sept. 29, 2004) ........ 12

*Wright v. Bank of Metropolis*,
110 N.Y. 237 (1888) ....................21

**Statutes**

18 U.S.C.
Section 1344....................15
Section 1961....................16
Section 1962....................6, 12, 17, 19
Section 1964....................17

**Other Authorities**

Fed. Rule Civ. Proc.
Rule 8....................6
Rule 9....................6, 13, 14, 16, 24, 27, 28
Rule 12....................6

## INTRODUCTION

The scale of the fraud at CaaStle, Inc., is hard to overstate. The company swindled investors out of over $250,000,000, and Christine Hunsicker, the ringleader, has pleaded guilty and been sentenced to prison. But Hunsicker did not act alone. Dayna Corlito, the moving Defendant here, was CaaStle's Financial Controller for more than six years, responsible for the company's accounting, financial reporting, and internal financial controls. She played a critical role in the fraud. When CaaStle's auditor resigned because of forged documents in late 2023, Corlito managed the cover-up. Over the ensuing eighteen months, Corlito lied to replacement auditors about the fraud, processed payments to silence suspicious investors, enabled Defendants Singh and Goldenberg to take millions through sham stock buy-backs, and transferred money from P180's bank accounts without authorization. All the while she knew CaaStle lacked financial assets to justify the buy-backs or subscribers to justify the business spend.

Corlito's motion boils down to three arguments: that she was not involved in every predicate act and so cannot be part of the scheme's "operation and management"; that she was just a functionary following orders; and that Plaintiff's allegations are insufficiently distinct. None warrant dismissal. RICO does not require every participant to commit every predicate act: Corlito is liable for her own acts, including managing the cover-up and financial function of the fraudulent scheme. Nor was she merely following orders: Corlito had opportunities to step out of the conspiracy, but instead she stepped up to help. And the allegations are sufficiently distinct. The federal rules recognize that direct evidence of fraudulent intent is often in the fraudster's sole possession and permit pleading by circumstantial inference. Plaintiff alleges that Corlito consciously lied to the new auditors to prevent the fraud from being discovered (¶¶91-92); had extensive access to the true financial data that contradicted Hunsicker's statements to CaaStle

employees and others (¶¶84, 102); personally processed payments at Hunsicker's direction that she knew Hunsicker could not authorize alone (¶¶250(a)-(b), 266); and executed sham stock buy-backs to insiders when she knew the company was near insolvency (¶¶184-185) at prices so low that P180 can infer fraudulent intent (¶¶167, 178, 180). The Court should deny this motion.

## STATEMENT OF FACTS

The Amended Complaint sets forth the wrongful acts at issue here; a summary is below.[1]

### A. Hunsicker leads an enterprise of fraudsters.

CaaStle, Inc., which began life named Gwynnie Bee in 2011, was co-founded by Defendants Hunsicker and Singh to provide online clothing rental, initially focused on plus-sized women. ¶¶32-42. Defendant Goldenberg joined to oversee the company's technology (¶34), and, by 2015, Defendant Jain—who had "never served in any finance role in any company"—had been installed as its "Head of Finance." ¶35. Outwardly, Gwynnie Bee was touted as a success, and Hunsicker became "the telegenic, confident face" of the company, even "hosting a Project Runway spinoff TV show." ¶37. But Gwynnie Bee "was not a success"; by 2018, former employees reported that "[e]veryone feels like the company is doing very poorly." ¶¶38-39.

At about this time, Defendant Corlito joined as Financial Controller ("Controller"). ¶48. Defendants then "embarked on a scheme to make it seem like they had succeeded." ¶¶39-48. They worked to rebrand the company CaaStle—"clothing-as-a-service," a play on the tech buzzword "software-as-a-service"—"to position itself more squarely as a high-tech company." ¶¶41-42. CaaStle was pitched as a technology platform, backed by solid financials. ¶43.

[1] "Complaint" or "¶" refers to the First Amended Complaint (Doc. 89).

That required knowing assistance from CaaStle's finance department—"led by de facto CFO Chirag Jain and Controller Dayna Corlito"—who "had previously supplied Hunsicker with fake numbers and lied to auditors about the reason why prior auditors had resigned." ¶7.

As CaaStle's Controller, Corlito, of course, "had pervasive access to the ledgers, revenue figures, and financial statements and reporting; that was her job." ¶84. This manifested as tight controls on financial information, with other outsiders "denied access to detailed information regarding CaaStle's financial status" (¶132); crafty money management to hide the alarming truth that losses far outpaced revenue (¶¶54-55, 75); and falsifying internal and external financial documents (¶¶54-57).

Externally, the rebrand was a success: CaaStle reached a valuation of $1,400,000,000 and attracted over $500,000,000 in outside investments. ¶49. In truth, though, the company was an empty shell containing exponentially fewer subscribers than it claimed and resting on a foundation of fake financials that Corlito helped create. ¶¶135, 308, 310.

**B. Plaintiff P180's business**

In 2023, against this backdrop, Hunsicker pitched CaaStle's business to Brendan Hoffman, a veteran of the apparel industry. ¶¶117-119. After talking with Hunsicker, Hoffman had a money-ball moment: he would acquire existing apparel brands and increase their valuations by optimizing profit on discounted items using CaaStle's supposedly-proven online clothing rental service. ¶123. Originally nicknamed Project 180 (because it could turn the industry around 180 degrees), P180 was incorporated in February 2024. ¶¶127-128. As a startup, P180 relied heavily on CaaStle to provide shared services, including for Corlito to oversee P180's funds. ¶247.

By the time Hoffman founded P180, CaaStle's auditor, BDO, had already discovered the falsification of corporate financial records and resigned in October 2023 after learning that

Hunsicker "used [BDO's] logo in connection with falsified numbers." ¶90. Rather than disclose this, Defendants covered it up.

Corlito was integral to that covering up. She "worked hand in hand with Hunsicker[] to prevent BDO from going to the investors, retail partners, or other stakeholders directly with this information." ¶91. That included "Corlito responding 'No' to a question from a new auditor about whether 'there have been any recent frauds'—despite knowing that BDO had, in fact, resigned due to a very recent fraud." ¶91. And when another defendant "came up with the plan to falsely tell people that the switch from BDO occurred as a 'cost saving' measure and directed Corlito to tell that to others … she did, knowing that her statements were false." ¶91. In short, she "became instrumental to the cover-up, telling employees, investors, and other stakeholders that the auditors had been changed as a cost-saving measure, which they knew was a lie." ¶92.

Ignorant of the truth (¶133), P180 set about engaging in strategic partnerships to build its business. ¶¶134-136 (elysewalker partnership); ¶¶143-144 (summer 2024 capital raise); ¶137 (Altuzarra investment). Then, over the winter of 2024-2025, P180 had an opportunity to acquire a controlling share in Vince, a mainstay luxury clothing brand, and pursued it, expecting to use CaaStle's technology to increase Vince's profits. ¶¶117, 142-145.

**C. Corlito helps conceal the fraud, cash out co-conspirators, and loot P180.**

What P180 and Hoffman did not know is that, for nearly a year, Corlito had been actively covering up the fraud that she learned of no later than October 2023. As the Bankruptcy Trustee's review of CaaStle's records revealed, "Jain and Corlito both knew about the [fraudulent audit] report and worked to cover it up." ¶112. "They facilitated the buy-back of shares and they also prevented the spread of the information," agreeing "to keep it quiet and lie about the reason BDO left by saying that it was just a natural transition," and "even directly lied to the new auditor when asked whether there had been any prior fraud . . . responding 'No'

despite knowing that there had been." ¶112. When some investors got close to exposing the fraud, Hunsicker "paid off" investors by redeeming their stock in exchange for "gag order" agreements (¶¶109-111, 158-159), and those redemptions "required the knowing assent and, likely, the active participation of … Corlito" (¶¶152, 160) "despite their fraudulent bases" (¶185). Corlito was "involved … in moving the money, addressing or minimizing any concerns raised by other employees, and ensuring that the bank accounts could handle the redemptions." ¶¶152, 155, 160.

Corlito also helped Singh and Goldenberg cash out by facilitating a supposed buy-back of (worthless) shares for $9,000,000 just as investors began to blow the whistle. ¶185. She did so despite the fact that the "withdrawals were made by insiders and from a company that was losing tens of millions of dollars each year and that, just the month before, had had only $200,000 in its bank account" (¶184)—facts that Corlito knew as Controller (¶¶85, 89). These "redemptions" were made at a fraction of the price they would have commanded from outside investors if Hunsicker's lies were accurate. ¶¶167, 178, 180.

Moreover, Corlito led the looting of P180. Under P180's shared-services arrangement with CaaStle, "Jain managed P180's accounting and Corlito executed the flow of funds from the bank account." ¶247. Through that access, "Defendants could dictate the flow of money to and through P180 and CaaStle, and onward to their personal bank accounts when they thought they could get away with it." ¶249. Defendants "caused P180's money to be fraudulently transferred out of P180's bank account, both to CaaStle … and to personal bank accounts." ¶250. On or about January 30, 2025, "Hunsicker and, on information and belief, Goldenberg, Jain, Corlito, and Singh conspired to, and did, transfer" $1,000,000, and then $300,000, "from P180's bank account at Chase Bank to Hunsicker's personal account," transfers that were "made through

material misstatements and/or omissions regarding the lawfulness of th[ose] transfer[s]", ¶¶318(i)-(j), 328, and "conducted … with the assistance of Corlito and Goldenberg at the instruction of Hunsicker." ¶¶250(a)-(b), 266. This "coordinated looting would have required Jain, Corlito, Goldenberg, and Hunsicker—at least—to communicate closely about the quantity and location of P180's cash." ¶251. The unauthorized transfers Corlito executed—transfers any controller would surely know were wrong—were not isolated. They included multiple transactions from P180's Chase account in 2024 and early 2025 (¶¶318(b)-(e), (i)-(j)), the redemptions made to buy investors' silence (¶¶318(a), (f)), and the eventual draining of P180's accounts "to less than $20,000" by the end of March 2025 (¶318(k)).

## LEGAL STANDARD

A Rule 12(b)(6) motion "challenges only the 'legal feasibility' of a complaint." *Goel v. Bunge, Ltd.*, 820 F.3d 554, 558 (2d Cir. 2016). Because the motion "tak[es] no account of [the complaint's] basis in evidence, a court adjudicating such a motion may review only a narrow universe of materials:" the "facts stated on the face of the complaint," incorporated documents, or matters subject to judicial notice. *Id.* 559 (citation omitted). "[T]he Court must assume the truth of all well-pleaded, nonconclusory factual allegations in the complaint." *1567 56th St., LLC v. Spitzer*, 774 F.Supp.3d 476, 488 (E.D.N.Y. 2025) (citation omitted). Counts I and VII against Corlito are subject to Rule 9(b). Counts II, III, and VIII are subject to Rule 8. *See Angermeir v. Cohen*, 14 F.Supp.3d 134, 154-55 (S.D.N.Y. 2014).

## ARGUMENT

### I. P180 ADEQUATELY PLEADS A SUBSTANTIVE RICO VIOLATION

P180 more than adequately states a RICO claim by pleading "(1) the defendant's violation of § 1962, (2) an injury to the plaintiff's business or property, and (3) causation of the injury by the defendant's violation." *Com. Cleaning Servs., L.L.C. v. Colin Serv. Sys., Inc.*, 271

F.3d 374, 380 (2d Cir. 2001). Corlito (at 9) calls this an "attempt to piece together disjointed acts," but Hunsicker, the conspiracy's leader, has admitted elements of the scheme, pleaded guilty to federal criminal charges, agreed to entry of a nearly $300 million judgment against her, been sentenced to five years in prison, and must surrender by October 2026. *United States v. Hunsicker*, 1:25-cr-00318, Doc. 35 (Sentencing Mem.) (S.D.N.Y.).

P180 alleges that Corlito served as Hunsicker's critical lieutenant. After discovering the scheme in October 2023 (or earlier), she could have quit or refused to cooperate. But, instead, she leaned in: repeatedly lied to cover up the auditor's resignation (¶¶91-92), managed CaaStle's accounts to buy the silence of suspicious investors (¶¶112, 155, 160, 185), and participated in looting P180 (¶¶250(a)-(b), 318(b)-(e), (i)-(l)). Corlito cannot avoid liability by arguing that she knew nothing about crimes she did not commit: not every conspirator knows every crime of the conspiracy, and RICO makes co-conspirators liable for the acts of the whole organization.

**A. P180 adequately pleads an association-in-fact enterprise.**

"RICO associations-in-fact need exhibit only three structural features: (1) a shared purpose; (2) relationships among the associates; and (3) 'longevity sufficient to permit these associates to pursue the enterprise's purpose.'" *D'Addario v. D'Addario*, 901 F.3d 80, 100 (2d Cir. 2018) (quoting *Boyle v. United States*, 556 U.S. 938, 946 (2009)). "[T]he Supreme Court has rejected attempts to graft onto the statute formal strictures that would tend to exclude amorphous or disorganized groups of individuals from being treated as RICO enterprises." *Id.* 100. P180 has alleged all three structural features in spades. When, as here, Defendants "were formally associated" within a business entity, that "indisputably comprise[s] an 'association-in-fact.'" *Id.* 103.

P180 pleads that Defendants had a shared purpose of operating CaaStle with a false appearance of solvency to extract funds and assets, including from P180, and to shield insiders

from exposure. ¶¶149, 300-302, 304. Although "an association-in-fact enterprise need not have an explicitly fraudulent or illegal common purpose to be cognizable as an enterprise under RICO" (*United States v. Kelly*, 128 F.4th 387, 411 (2d Cir. 2025)), the Hunsicker Enterprise had an illegal common purpose. Hunsicker admitted her criminal activity (Doc. 118 (Hunsicker Answer) at ¶¶295-298; *United States v. Hunsicker*, 1:25-cr-00318, Docs. 26, 27 (S.D.N.Y.)), and P180 pleads repeated fraudulent transfers of P180's cash in which Corlito participated (¶¶149(a)-(d), 250(a)-(b)), transfers to and by Singh and Goldenberg to cash out with Corlito's participation (¶¶24, 113, 152, 155, 160, 185), and an extensive cover-up (¶¶91-92 (Corlito concealing auditor's resignation), ¶112 (Corlito "facilitated the buy-back of shares" of suspicious investors to "prevent[] the spread of information"), ¶¶149(a)-(d) (manipulating P180 to hide fraud)).

P180 alleges extensive relationships among the Defendants. *See* Doc. 123 at 5-8 (collecting allegations). Corlito worked with Jain and Hunsicker to conceal BDO's resignation and lie to the successor auditor (¶¶88-92), coordinated with Goldenberg on fraudulent share redemptions and unauthorized P180 transfers, including that Corlito and other Defendants "communicate[d] closely about the quantity and location of P180's cash" (¶¶113, 149(a)-(d), 250-251), and worked with Hunsicker to facilitate investor buy-outs (¶112)—all done in ways that protected her interest in a fraudulent endeavor from becoming completely worthless. These allegations, even considering Corlito's relationships alone, suffice to "connect[] the Defendants to each other." *See Spitzer*, 774 F.Supp.3d 476, 491 & n.5 (E.D.N.Y. 2025) ("[N]amely, that Defendants, working out of the same office space, all served distinct but necessary roles in perpetuating a common scheme[.]")

P180 alleges the longevity of Corlito's involvement.[2] Corlito joined CaaStle in 2018 (¶48) and her own racketeering activity goes back to 2023 when she began covering up the fraud by lying about BDO's resignation (¶¶90-92) and facilitating the buy-out of suspicious investors (¶¶109-112). Her involvement in racketeering continued for nearly two years before the scheme was unmasked. (¶¶90-92, 112, 155, 160, 185, 318(a)-(l), 363; *see also* ¶¶270, 277.) The duration demonstrates the scheme's longevity and Corlito's commitment to it. Corlito's later entry into the operation and management of the scheme does not defeat its longevity. Corlito's own case recognizes as much: "The fact that not every individual defendant is alleged to have engaged in fraudulent activity for that entire period is of no moment for longevity purposes, since (as is well known) a person can join in some ongoing fraudulent activity at any point." *Elsevier, Inc. v. W.H.P.R., Inc.*, 692 F.Supp.2d 297, 306 (S.D.N.Y. 2010).

Corlito tries to sidestep this analysis, arguing (at 10-11) that P180 failed to allege an association-in-fact because *she* has no "relationship with [Defendants] outside ordinary corporate functions." That's wrong. Relationships formed through corporate functions suffice: individuals "formally associated" through an entity comprise an association-in-fact. *D'Addario*, 901 F.3d at 103; *see also Spitzer*, 774 F.Supp.3d at 491 & n.5. The Second Circuit has warned against "blur[ing] the line between the RICO enterprise on the one hand (which need not be inherently criminal) and the pattern of racketeering activity on the other (which necessarily is the course of criminal activity by the enterprise)." *Kelly*, 128 F.4th at 410. Corlito's "relationship" by

[2] P180 also alleges the enterprise's longevity. "[T]he relevant period is the length of time that the association-in-fact operated," not just how long Defendants are "engaged in racketeering activity." *Alony v. Chaitchik*, 2025 WL 3551666, *9 (S.D.N.Y. Dec. 11, 2025). The core group here goes back more than a decade (¶¶32-36 (2012)) and racketeering is alleged as far back as February 2019 (*e.g.*, ¶52) and further (*e.g.*, ¶53 (Singh's lies in 2018); ¶54 (2018 falsified financials)).

"ordinary corporate functions" (at 10-11) to other Defendants thus "indisputably comprise[s] an 'association-in-fact'" (*D'Addario*, 901 F.3d at 103).

She ignores this holding of *D'Addario* to focus (at 18) on an alternative holding that individuals acting "independently and without coordination" does not establish an association-in-fact. Unlike here, the allegations in *D'Addario* suggested that some defendants were not "even aware of the … forbearance scheme" or purported illicit transfers and the "schemes themselves [were] not sufficiently similar in method or aim to suggest that Defendants were acting in coordination." *D'Addario*, 901 F.3d at 102. Here, by contrast, P180 plausibly alleges Corlito's knowledge of the scheme by virtue of her role in controlling financial transactions (¶¶84, 102, 245, 247), that she directly participated in fraudulent transfers (¶¶149(a)-(d), 247, 250(a)-(b), 266, 318(a)-(l)), and that she coordinated buy-outs of suspicious investors precisely to keep the fraud silent (¶¶112, 155, 160, 185). These coordinated acts built upon one another through cover-ups (¶¶78, 103-116, 222, 229-230), looting P180 to fund cash-outs (¶¶163-185), breaches of fiduciary duty (¶¶136, 261-262), and a scheme to coerce P180 into submission (¶¶227, 242-249, 261-267).

These allegations completely distinguish Corlito's cases: P180 alleges related predicates and each participant's role. ¶¶91-92, 112, 247, 250(a)-(b), 308, 310, 313, 317, 318(a)-(k); *contra First Cap. Asset Mgmt. v. Satinwood, Inc.*, 385 F.3d 159, 174-175 (2d Cir. 2004) (no relationship other than predicates themselves and "fail[ure] to explain each participant's role").[3] It alleges a direct connection between the enterprise and the racketeering used to prop it up and enrich its participants. ¶¶112, 185, 247, 250(a)-(b), 318(a)-(k); *contra D. Penguin Bros. v. City Nat'l Bank*,

[3] The Second Circuit has since abrogated any "interpretation of *Satinwood* as setting a heightened standard for RICO enterprises," *Kelly*, 128 F.4th at 410, which Corlito appears to argue here.

587 F.App'x 663, 667 (2d Cir. 2014). It alleges Corlito's awareness because she controlled the finances and coordinated closely with other Defendants to cover up the fraud and execute payments. ¶¶84, 91-92, 112, 155, 247, 251, 266; *contra Black v. Ganieva,* 619 F. Supp. 3d 309, 331 (S.D.N.Y. 2022) *and Godlewska v. Human Dev. Ass'n*, 2005 U.S. Dist. LEXIS 36998, *22 (E.D.N.Y. Jul. 18, 2005).

**B. P180 adequately pleads Corlito's operation or management of the enterprise.**

The operation-or-management test is "a relatively low hurdle for plaintiffs to clear, especially at the pleading stage," and it is not confined to upper management: even "lower rung" participations may be liable if they "participate[d], directly or indirectly" in the enterprise's affairs. *Reves v. Ernst & Young*, 507 U.S. 170, 179, 184 (1993); *Fuji Photo Film U.S.A., Inc. v. McNulty*, 640 F. Supp. 2d 300, 309 (S.D.N.Y. 2009) (citation omitted). *Reves* requires only "some part in directing" the enterprise's affairs, not top-level control. *Reves*, 507 U.S. at 179. That's because the statute "prohibits *both* 'conduct[ing]' an enterprise's affairs and 'participat[ing]' in the conduct of an enterprise's affairs." *D'Addario*, 901 F.3d at 104 & n.14 (italics and alterations in original). Thus while "mere participation in a racketeering act" is not enough, "participation in the operation or management" of an enterprise is. *Id.* 103 (quotation and citation omitted).

P180 sufficiently alleges that Corlito, CaaStle's Controller, was a "necessary tool for the scheme's operation." *D'Addario*, 901 F.3d at 103. Corlito held a critical financial position with pervasive access to CaaStle's ledgers and reporting (¶84); personally executed the flow of funds out of P180's bank account under the shared-services arrangement (¶247); lied to CaaStle's successor auditor and spread the false "cost-saving" cover story (¶¶91-92); and facilitated the investor redemptions to buy their silence, including by ensuring the accounts could fund them (¶¶112, 155, 160, 185). This type of assistance suffices, even if "used simply to effectuate [the

Enterprise's] schemes." *D'Addario*, 901 F.3d at 104. In *D'Addario*, some corporate defendants assisted the scheme "simply by their formation and existence," which was sufficient to "fairly be considered 'participation' in the operation and management of an enterprise." *Ibid.* Corlito's participation was much more active than merely being alongside, and she therefore "participated" under Section 1962(c).

Corlito insists (at 13-14) that she did not participate in the operation or management of the enterprise because she did not participate in some predicate acts. Wrong. A "proper RICO allegation does not require that each member agree with the actions taken by other members of the enterprise but only that they intended to 'participate in the enterprise.'" *United States v. Louie*, 625 F.Supp. 1327, 1333 (S.D.N.Y. 1985). The question is not whether Corlito participated in *every* predicate act, but whether she participated in the operation of the enterprise such that she was a necessary tool. Her own case acknowledges that "no additional relationship is necessary" other than participation in operation of Enterprise affairs, "so long as facts are alleged tending to make it plausible that the Court is confronted with something more than parallel conduct of the same nature and in the same time frame by different actors in different locations." *Elsevier*, 692 F.Supp.2d at 306-307. Corlito's actions were coordinated with other Defendants to avoid discovery and assist them in cashing out. ¶¶91-92, 112, 155, 160, 185, 247, 250(a)-(b), 266, 308, 310, 318(b)-(e), (i)-(k). Her lack of direct involvement in some other acts does not absolve her of participation in the operation of the enterprise.

Nor is it true, as she suggests (at 13), that she was "[m]erely providing services." *Cf. W. 79th St. Corp. v. Congregation Kahl Minchas Chinuch*, 2004 WL 2187069, *14 (S.D.N.Y. Sept. 29, 2004). That case involved services (renting apartments) that were not rendered "in any manner that might distinguish them from an outside provider of professional services." *Ibid.*

Corlito, on the other hand, was an insider who had clear evidence that Hunsicker was cooking the books, and decided to step up and add spices rather than leave the kitchen. She lied to the replacement auditor (¶¶91-92, 112), helped prepare falsified records (¶¶308, 310), facilitated buy-outs to ensure silence (¶¶112, 155, 160, 185), and assisted in looting P180 for its cash (¶¶247, 250(a)-(b), 266, 318(b)-(e), (i)-(k)). That distinguishes her from generic "outside provider of professional services" and is much more than mere "labels and conclusions" with a "formulaic recitation of the elements" of RICO. Br. 15 (quotation omitted).

**C. P180 adequately pleads Corlito's pattern of racketeering.**

P180 alleges a long-running scheme involving mail and wire fraud, bank fraud, and money laundering, including a pattern of more than two predicate acts by Corlito.

The elements of mail and wire fraud are "(1) a scheme to defraud, (2) money or property [as the object of the scheme], and (3) use of the mails [or wires] to further the scheme." *Fountain v. United States*, 357 F.3d 250, 255 (2d Cir. 2004) (alteration in original) (citation modified). A party pleads wire fraud by either (a) alleging that fraudulent communications in furtherance of the scheme occurred over the wires or, (b) alleging that "mails or wires were simply used in furtherance of a master plan to defraud." *Angermeir*, 14 F.Supp.3d at 145-146 (citation omitted). If the latter, "Rule 9(b) requires only that the plaintiff delineate with adequate particularity in the body of the complaint, the specific circumstances constituting the overall fraudulent scheme." *Ibid.* (collecting cases). Thus, where the wires were merely used in furtherance of a master plan, P180 need only allege that each Defendant "personally knew of, or participated in, the fraud" and "Rule 9(b) does not require Plaintiff[] to allege a specific connection between fraudulent representations and particular defendants." *Id*. 148 (citation modified). Violation of "the mail and wire fraud statutes may turn on either an affirmative misrepresentation or omissions of material

information" as "it is just as unlawful to speak half truths or to omit to state facts." *United States v. Rare Breed Triggers, LLC*, 690 F.Supp.3d 51, 102 (E.D.N.Y. 2023) (quotations omitted).

P180 alleges Corlito's commission of mail or wire fraud under both theories. Corlito knew that BDO had resigned because Hunsicker fraudulently modified their audit reports, and yet responded "No" to a question from the new auditor about whether "there have been any recent frauds," and then told employees and investors in other communications that the BDO switch was a "cost-saving" measure. ¶¶91-92, 112. Likewise, Corlito "falsif[ied] financial documents regarding growth, business metrics, and finances" to be sent to "outsiders, including vendors and retail partners." ¶¶308, 310. Those statements were part of the scheme, she knew they were false, and they foreseeably used the wires. Even for the statements she did not communicate herself, she "could reasonably have foreseen" that the wires would be used "in the ordinary course of business as a result of" her actions—violating the wire fraud statute. *Gov't Emps. Ins. Co. v. Hollis Med. Care, P.C.*, 2011 WL 5507426, *8 (E.D.N.Y. Nov. 9, 2011) (quoting *United States v. Bortnovsky*, 879 F.2d 30, 36 (2d Cir.1989)).

Moreover, P180 alleges an "ongoing scheme to defraud Plaintiffs." *Aghaeepour v. N. Leasing Sys., Inc.*, 2015 WL 7758894, *5 (S.D.N.Y. Dec. 1, 2015). Thus, even if any particular allegation "fails to [sufficiently] specify" a statement with necessary particularity, "when viewed in light of the specifics of the [overall] fraudulent scheme, they are sufficient under Rule 9(b)." *Aghaeepour*, 2015 WL 7758894, *5 (collecting cases). Here, P180 shows "how [Corlito's] individual responsibilities"—namely, her control over finances and responsibility for financial information as corporate Controller (¶¶24, 84, 245, 247)—"demonstrate[s] [her] participation." *Id.* *6. That is "sufficient to put Defendants on notice of their allegedly wrongful conduct." *Ibid*.

These allegations of wire fraud are enough, but P180 alleges much more.

Corlito, as CaaStle's Controller, with access to and control over CaaStle's finances (and P180's, through a shared services arrangement), repeatedly executed transfers under false pretenses, including beyond her authority. ¶¶24, 84, 247. By thus "execut[ing] … a scheme or artifice … to obtain any of the moneys … under the custody or control of, a financial institution, by means of false or fraudulent pretenses" (18 U.S.C. § 1344(2)), Corlito committed bank fraud. *United States v. Vidal*, 2024 WL 397630, *1 (2d Cir. Feb. 2, 2024) (bank fraud includes false "pretenses" as well as false representations) (applying *Shaw v. United States*, 580 U.S. 63, 71 (2016) and *Loughrin v. United States*, 573 U.S. 351, 363 & n.6 (2014)); *United States v. Teman*, 465 F.Supp.3d 277, 313 (S.D.N.Y. 2020) (false pretenses includes depositing money without or beyond one's authorization). In specific detail, P180 alleges her involvement in sweeping millions of dollars from P180's bank account for purposes beyond her authorization in the summer of 2024 (¶¶318(b)-(e)) and looting P180's bank account in the spring of 2025 just as the public became aware of the fraud (¶¶318(i)-(k)). Had Corlito called the banks and told them she was transferring money (*e.g.*, from P180 to cover up the fraud at CaaStle (¶¶149(a)-(d)), or from CaaStle to pay off investors to keep quiet about Hunsicker's fraud (¶¶112, 318(a), (f)), or to Singh and Goldenberg to cash out before the fraud became public (¶¶185, 318(g)-(h))), the banks never would have authorized the transfers. She could only have effectuated those transfers through pretense—the very misstatements or omissions P180 alleges. *E.g.*, ¶¶318(a)-(*l*).

Moreover, Corlito was critically involved in at least two instances of money laundering. By October of 2023, Corlito knew that Hunsicker had been raising funds through criminal material misrepresentations (¶¶90-91) and knew that transfers from P180 were the result of bank fraud (as discussed above), yet then transferred funds to Singh and Goldenberg as supposedly bona fide stock buy-backs even though she knew the money was obtained unlawfully. (¶¶163-

185; 318(g)-(h)). Those two transfers sufficiently plead money laundering because they were designed to conceal the illicit nature of those funds—obtained in violation of 18 U.S.C. § 1961(1)—as legitimate stock buy-backs. *United States v. Maher*, 108 F.3d 1513, 1527-1528 (2d Cir. 1997).

None of Corlito's arguments support dismissal. She argues (at 16-17) that P180 has not alleged her participation in meetings where Hunsicker, Goldenberg, and Singh committed wire fraud. But that is a red herring, as it ignores her own (coordinated, but different) predicate acts in furtherance of the scheme to defraud. *E.g.*, ¶¶91-92, 112. And her argument (at 17) about P180's document falsification allegations improperly raises P180's pleading burden. Rule 9(b) is satisfied where a plaintiff alleges an "ongoing scheme to defraud" and Plaintiff explicitly allege "mail and wire fraud to the best of their knowledge." *Aghaeepour*, 2015 WL 7758894, *5. Indeed, "the details" of RICO fraud "are rarely within the knowledge of a victim of fraud and are more appropriately left for discovery." *Alix v. McKinsey & Co.*, 23 F.4th 196, 209 (2d Cir. 2022). Pleading "strong inference[s] of fraud," P180 easily meets this standard. *Ibid*.

Similarly, Corlito's money laundering argument focuses myopically on summary paragraphs (at 19) while ignoring the detailed allegations regarding her involvement in sham buy-backs designed to launder money CaaStle obtained by defrauding other investors by giving it, under supposedly "legitimate" circumstances, to Singh and Goldenberg (¶¶163-185; ¶318(g)-(h)). This argument is all the more specious given that a fact finder could easily conclude from her participation, as CaaStle's Controller, in over $9,000,000 in insider stock buy-backs a month after having only $200,000 in the bank (¶¶164, 176, 185; see ¶¶151, 165, 184, 318(g)-(h)), that Corlito was in on the scheme.

And Corlito's argument that P180 must allege that "Corlito made any misrepresentation to Chase Bank or any other financial institution"(at 18) is wrong. It misunderstands the requirements of bank fraud, which does not require false statements made to "the bank itself"—false pretenses are enough. *See Vidal*, 2024 WL 397630, *1 (2d Cir. Feb. 2, 2024). And it fails to appreciate that bank fraud can be accomplished by material omissions as well.

**D. P180 adequately pleads proximate causation.**

"[A]ny person injured in his business or property by reason of a violation of [§ 1962]" can sue for damages. *Com. Cleaning*, 271 F.3d at 380 (quoting 18 U.S.C. § 1964(c)). Causation looks to a "direct relation between the injury asserted and the injurious conduct alleged." *Id.* 381 (citation omitted). Plaintiffs "need not establish that they can obtain the precise relief they seek to survive [a] motion [to dismiss], so long as they can demonstrate that they are entitled to some relief." *Burke v. Dowling*, 944 F.Supp.1036, 1052 (E.D.N.Y. 1995).

P180 pleads the necessary direct relation between the harm caused and Defendants' predicate acts. Even at this preliminary stage, it identifies monetary damages including induced loans, payments made in reliance on Defendants' fraudulent statements, and obligations undertaken based on those representations. ¶¶4, 136-145, 320. It also lost income from partnerships and lost equity interests because Defendants lied about capabilities, technology, and subscribers. ¶¶8, 140, 145(d), 261, 264, 269, 279, 320(c). As to Corlito, the Complaint alleges her involvement in the P180 transfers (¶¶149(a)-(d), 250, 318) and looting (¶¶266, 318(k)). These harms directly resulted from the predicate acts P180 alleges. ¶¶134-145, 250-254, 307(a)-(e), 357, 364.

Corlito (at 20) attempts to re-frame the Complaint as "center[ed] around Hunsicker's fraud and allegedly fraudulent loans/transactions involving CaaStle, P180, and other third-parties." Corlito claims "there are no allegations that [she] was remotely involved or privy to

these events." But that ignores the allegations in the Complaint, detailed above. She cannot ignore the harm flowing directly those actions.

More importantly, Corlito misunderstands the "direct relation" test. That test is designed to "preclude[] recovery by a plaintiff who complain[s] of harm flowing merely from the misfortunes visited upon a third person by the defendant's acts." *Com. Cleaning*, 271 F.3d at 381 (citation omitted). None of P180's harm is such "contingent" harm. Business harms—including stolen property, lost opportunities, or higher costs—are classic examples of direct harm. *Id*. 383. While Defendants also harmed others (including CaaStle's investors), P180 is "not alleging an injury that was derivative of injury [of] others." *Id*. 384. In its final days, Defendants' fraudulent scheme directly targeted P180 to try to exploit P180 to cover up the fraud at CaaStle, and "the direct target of the RICO violation" clearly has standing. *Id*. 381. No one is "more directly injured" or "ha[s] a greater incentive to ensure that a RICO violation does not go undetected or unremedied" than the direct target. *Id*. 385. Corlito's cover-up and money transfers lead in a direct and straightforward way to P180's injuries without relying on derivative injury from others. The Second Circuit has even found proximate causation where the alleged damages, strictly speaking, are a step removed from the defendant's conduct. *D'Addario*, 901 F.3d at 97.

At this stage of the case, P180 "need only allege sufficient facts to raise a reasonable inference that [Defendant's] overall involvement caused an ascertainable portion of its loss." *Financial Guar. Ins. Co. v. Putnam Advisory Co., LLC*, 783 F.3d 395, 404 (2d Cir. 2015). P180 has alleged Corlito's direct involvement in an ascertainable portion of its loss and sufficiently alleged a direct connection between her actions and P180's other harms. That easily suffices.

## II. P180 ADEQUATELY PLEADS RICO CONSPIRACY

Pleading RICO conspiracy requires "alleg[ing] the existence of an agreement to violate RICO's substantive provisions." *Nastasi & Assocs., Inc. v. Bloomberg, L.P.*, 2022 WL 4448621,

*18 (S.D.N.Y. Sept. 23, 2022) (quotation omitted). Section 1962(d)'s requirements are "less demanding" than those for substantive violations. *Ibid.* Plaintiff need not plead a substantive RICO claim against defendants to allege a conspiracy claim. *State Farm Mut. Auto. Ins. Co. v. CPT Med. Servs., P.C.*, 375 F.Supp.2d 141, 150-51 (E.D.N.Y. 2005). If the plan calls for "some conspirators to perpetrate the crime" and others to provide "support," the supporters are as "guilty as the perpetrators." *Salinas v. United States*, 522 U.S. 52, 64 (1997). Thus, contrary to Corlito's suggestion, even if the Complaint "fails to state a plausible *substantive* RICO claim" against her, that is "not required … to allege a claim for RICO conspiracy" against her. *Nastasi*, 2022 WL 4448621, *18 (quotations omitted). For conspiracy, it is sufficient to allege that Corlito intended to further a scheme. *State Farm*, 375 F.Supp.2d at 150-151.

P180 has pleaded substantive RICO allegations against other Defendants. Hunsicker has admitted much of them in her answer (Doc. 118 (Hunsicker Answer); ¶¶3, 295-298), pleaded guilty to others, agreed to entry of a nearly $300 million judgment against her, and has received a sentence of five years' imprisonment. P180 has also adequately alleged participation by other Defendants in the conspiracy (*e.g.*, ¶¶73-77, 93-99, 164-183, 223, 227(a)-(e), 229)—which Corlito does not expressly contest. With Hunsicker and other Defendants adequately alleged as "perpetrator[s]," P180 adequately pleads RICO conspiracy. *E.g.*, *Nastasi*, 2022 WL 4448621, *18 (RICO conspiracy alleged "notwithstanding [the court's] holding above that the Complaint fails to state a plausible *substantive* RICO claim."). Corlito's participation—including lying to auditors (¶¶91-92, 112), facilitating false statements about financial figures (¶¶308, 310), and the transfer of millions of dollars from P180's accounts (¶¶149(a)-(d), 247, 250(a)-(b), 266, 318(b)-(e), (i)-(k))—sufficiently pleads RICO conspiracy.

Corlito wrongly states that P180 "does not articulate a single fact" that she agreed to join and knew of the conspiracy. Br. 22. While P180 must allege that "the defendant knew of, and agreed to, the general criminal objective of a jointly undertaken scheme," allegations that a defendant agreed to function as a unit with a common purpose suffice. *United States v. White*, 7 F.4th 90, 99 (2d Cir. 2021) (quotation omitted). P180 alleges Corlito's explicit agreement on that point. ¶¶91, 112, 366. But agreement can also be implied "given the positions of the Defendants in the Enterprise, the acts that they took, and the financial benefits alleged." *Lateral Recovery, LLC v. Cap. Merch. Servs., LLC,* 632 F.Supp.3d 402, 465 n.28 (S.D.N.Y. 2022). Corlito's hands-on conduct—executing unauthorized transfers out of P180's account (¶¶247, 318(b)-(e), (i)-(k)) and lying to conceal the fraud from the successor auditor (¶¶90-92)—is more than enough. This supplies the exact something "more" absent in *Bayshore*. Br. 22. Her remaining cases are inapposite, including *Abbot Labs v. Adelphia Supply USA*, 2017 U.S. Dist. LEXIS 1007, *35-36 (S.D.N.Y. Jan. 4, 2017), where the plaintiff merely pleaded that "Each Defendant … conspired with others." P180's detailed allegations regarding the conspiracy and its division of labor go well beyond that, including Corlito's role, transactions, knowledge, and participation.

## III. P180 ADEQUATELY PLEADS CONVERSION

In New York, a person with access to a specific bank account who directs unauthorized transfers from that account commits conversion. *Sperrazza v. Kail*, 267 A.D.2d 692, 693 (3d Dep't 1999); *Lenczycki v. Shearson Lehman Hutton, Inc.*, 238 A.D.2d 248, 248 (1st Dep't 1997); *Republic of Haiti v. Duvalier*, 211 A.D.2d 379, 384 (1st Dep't 1995).

That is precisely what P180 alleges here. Corlito was CaaStle's Controller (¶24) and managed bank accounts and personally approved transactions made through them (*e.g.*, ¶113). The Complaint alleges that, while P180 was relying on CaaStle's finance department (including

Corlito) to manage its accounts as part of a shared services arrangement (¶247), Corlito personally executed a series of transactions that P180 had not authorized to move over $3 million from P180's accounts to CaaStle's accounts in June and July of 2024 (¶149) and processed $1.3 million in unauthorized transfers from P180's accounts to Hunsicker personally in January 2025 (¶¶250(a)-(b)). Thus, Corlito personally participated in and approved transfers of specific funds in P180's accounts without authorization.

That is all that is required. By personally approving and executing bank transfers, Corlito "assume[d] or exercise[d] control over personal property belonging to [P180], interfering with [P180]'s right of possession." *Colavito v. New York Organ Donor Network, Inc.*, 8 N.Y.3d 43, 49-50 (2006). P180 alleges that her "exercise[]" of "control" was intentional. *Id.* 49. And it repeatedly alleges that she was "without authority" to exercise control by making the transfers. *Ibid.*

Nor must P180 plead any personal benefit to Corlito. Conversion "does not require an allegation, much less a showing, that defendants took ownership of the property or benefitted therefrom." *Hillcrest Homes, LLC v. Albion Mobile Homes, Inc.*, 117 A.D.3d 1434, 1436 (3d Dep't 2014). Indeed, it does not even require that the intent to exercise control be a bad-faith one; conversion based on a mistaken belief is still conversion. *Wright v. Bank of Metropolis*, 110 N.Y. 237, 247 (1888). Thus "[o]fficers and agents of corporations are personally liable for their own acts which bring about a conversion of a third party's property, and it is no defense to personal liability that the officer or agent may have been acting on behalf of a corporate principal." *Ingram v. Machel & Jr. Auto Repair, Inc.*, 148 A.D.2d 324, 325 (1st Dep't 1989).

Likewise, Corlito's argument (at 23) that she must have "received" the funds is flatly wrong. New York law unequivocally holds that participating in the unauthorized control of the

funds is sufficient for liability—actual receipt, possession, or ownership is not required. *Hillcrest Homes*, 117 A.D.3d at 1436; *Ingram*, 148 A.D.2d at 325.

Corlito's arguments to the contrary repeatedly and flagrantly misrepresent the cases it cites. For example, *Montalvo v. J. Petrocelli Const., Inc.*, is a Labor Law personal injury case that does not involve conversion claims. 8 A.D.3d 173 (1st Dep't 2004). *Skillgames, LLC v. Brody*, contrary to Corlito's parenthetical, did not involve conversion claims either and contains no language even remotely reminiscent of what Corlito says about personal control. 1 A.D.3d 247, 249 (1st Dep't 2003). *Meese v. Miller* at least involved a conversion claim, but *reversed* its dismissal because an allegation that funds had been entrusted to the defendants for a specific purpose but was neither used for that purpose nor returned was actionable conversion; it has nothing to do with the parenthetical that follows it in Corlito's brief regarding participants in transactions and appears to uphold claims against both the corporate defendant and the individual officer who directed the actions at issue. 79 A.D.2d 237, 244 (1981). *Fiorenti v. Cent. Emergency Physicians, PLLC*, dismissed conversion claims, but involved failure to pay a contract debt for employment bonuses, not unauthorized transfers of specific funds from someone else's bank account. 305 A.D.2d 453, 455 (2d Dep't 2003).

Corlito ignores these settled principles of New York conversion law. She cherry-picks (at 22-23) a few paragraphs to accuse P180 of making only conclusory allegations. But the Complaint quite clearly alleges that because of her role as Controller, she personally executed the unauthorized transfers. ¶¶24, 149, 247, 250(a)-(b), 251.

Corlito's cases do not hold otherwise. *Abrams v. Pecile* dismissed a claim against the primary thief's coworker where the complaint merely alleged that the coworker helped the thief steal photographs without more. 84 A.D.3d 618 (1st Dep't 2011). *Eklund v. Pinkey* dismissed a

claim for an accounting, not a conversion claim, where the asserted basis for an accounting was an unelaborated allegation that the defendants had converted unspecified corporate assets. 27 A.D.3d 878, 879 (3d Dep't 2006). *Old Republic Natl. Tit. Ins. Co. v. Cardinal Abstract Corp.* briefly rejects a conversion claim on unspecified facts for failure to plead control. 14 A.D.3d 678, 680 (2nd Dep't 2005). But P180 pleads that Corlito controlled the funds by approving and executing the unauthorized transfers. While Corlito throws in a paragraph asserting that P180 is group-pleading, an allegation that the controller personally approved a transaction is plainly an individual allegation, and, at any rate, as CaaStle's Controller, she was a senior finance officer and it is reasonable to infer that she was involved in six- and seven-figure unauthorized payments. *See Pludeman v. N. Leasing Sys., Inc.*, 10 N.Y.3d 486, 493 (2008) ("reasonable inference" that senior officers knew about fraudulent scheme).

In sum, P180 alleges that Corlito personally approved and executed transfers of specific funds in P180's account, thereby exercising control over the funds, without authorization. That is conversion.

## IV. P180 ADEQUATELY PLEADS CO-CONSPIRATOR LIABILITY AND AIDING AND ABETTING

### A. Corlito has co-conspirator liability.

Corlito's argument that New York law does not have a standalone cause of action for civil conspiracy misses the point. New York law recognizes that "a civil conspiracy may be alleged for the purpose of showing that an otherwise actionable tort was committed jointly by the conspirators and that, because of the conspirators' common purpose and interest, the acts of one may be imputed to the others." *Maersk, Inc. v. Neewra, Inc.*, 687 F.Supp.2d 300, 319 (S.D.N.Y. 2009), *aff'd sub nom.* 450 F. App'x 3 (2d Cir. 2011). Thus, "the plaintiff need not prove that each defendant committed every element of the underlying fraud," and Corlito's participation in the

"corrupt agreement" in whose furtherance a coconspirator committed fraud "may be inferred from circumstantial evidence." *Ibid.* P180 alleges that here: Corlito agreed with other Defendants to lie to, and steal funds from, P180, so she is liable for the fraud and other torts committed by the other members of the conspiracy.

Corlito offers no argument on the merits against the conspiracy claims. She signed representation letters lying to CaaStle's new auditors about why its prior auditors had resigned. ¶¶91-92, 112. Her position managing CaaStle's payments and bank accounts perfectly positioned her to see the disconnect between Hunsicker's claims that CaaStle was massively profitable and the reality that she had to manage accounts so that checks did not bounce. ¶¶84, 155. And she personally processed payments from P180's accounts beyond her authorization. ¶¶247, 250(a)-(b), 266. Those facts plausibly suggest that she was in a position crucial to the conspiracy's success *because she was in on the conspiracy*.

**B. Corlito has provided substantial assistance to known fraud.**

Similarly, Corlito aided and abetted the other defendants' fraud: She lied to the auditor (¶¶91-92, 103-114), knew that CaaStle's true financials contradicted Hunsicker's rosy announcements to CaaStle employees and others (¶¶84-92), processed payments from P180's bank accounts beyond her authorization (¶¶247, 250(a)-(b), 266), and processed the cash-for-silence redemptions at CaaStle to prevent CaaStle's victims—including P180 specifically—from learning the truth (¶¶113-116).

Corlito's string cites for uncontroversial propositions like the legal standard for aiding and abetting show little. Rule 9(b) requires the circumstances of fraud to be stated with particularity but permits malice, intent, and knowledge to be alleged generally. Actual knowledge can also be inferred circumstantially, "without direct knowledge of the defendant's state of mind," including by pleading "a motive to commit fraud and an opportunity to do so" or

"facts constituting circumstantial evidence of either reckless or conscious behavior." *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 268-269 (2d Cir. 1993). Obvious access to the truth—Corlito's years as CaaStle's Controller—is a classic basis on which to infer knowledge, especially when combined with intentional illegal behavior and personal benefit. *Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 306 (2d Cir. 2015).

P180 alleges actual knowledge. Corlito fails to engage with P180's allegations of conscious misconduct—deliberately lying to the new auditors about why BDO resigned to prevent discovery of the fraud. *E.g.*, *Employees' Ret. Sys. of Gov't of the Virgin Islands*, 794 F.3d at 308 (concealment from auditors created strong inference of scienter). P180 also alleges that she was one of the few CaaStle employees trusted with access to the true financials while Hunsicker announced false numbers to everyone else, including the employees. *E.g.*, ¶84. P180 alleges motive and opportunity: Corlito made the same fake-it-'til-you-make-it gamble as the rest of the conspirators that it was better to hide the fraud and preserve the chance of getting rich off their shareholdings. *E.g.*, ¶82.

And while Corlito asserts that P180 needed to plead that she specifically knew that P180 was a target, the nexus needed for aiding and abetting does not require that. For example, in *Franco v. English*, executing a surety bond that triggered the release of investors' escrowed funds to a known fraudulent real estate syndication was enough, even if the aider-and-abetter "was not involved in the solicitation of the investors," and perhaps did not know each of the individual plaintiffs by name. 210 A.D.2d 630, 633 (2d Dep't 1994), *abrogated in nonpertinent part by Eurycleia Partners, LP v. Seward & Kissel, LLP*, 12 N.Y.3d 553 (2009). Corlito knew that *any* of CaaStle's stakeholders—investors, counterparties, customers, and so on—discovering the fraud would spell personal financial harm. It's enough that P180 was in that class of cover-up

victims. And there is substantial reason to infer that Corlito knew precisely that P180 was one of Hunsicker's marks—after all, she was part of the shared services agreement and processed unauthorized transactions looting P180's money. ¶¶245-251, 318.

Substantial assistance is plainly alleged. As Controller, Corlito lied to the auditors to prevent discovery and processed payments knowing they furthered the fraud. These are classic examples of substantial assistance. *In re Bayou Hedge Fund Inv. Litig.*, 2006 WL 8462703, *5 (S.D.N.Y. Sept. 7, 2006). Signing a false representation letter to an auditor to prevent discovery of an underlying fraud has been held to substantially assist the fraud. *E.g.*, *United States Sec. & Exch. Comm'n v. DiMaria*, 207 F.Supp.3d 343, 359 (S.D.N.Y. 2016). Had she not lied to the auditors, the other defendants could not have succeeded in their plan to defraud.

Corlito confuses the primary tort with aiding and abetting: she remains an aider and abettor whether or not she personally falsified specific documents delivered to P180 or voted in a board meeting to deliver lies to P180. Her knowing assistance—covering up the fraud and moving funds for their wrongful purpose—enabled the fraud to succeed.

## V. P180 STATES AIDING AND ABETTING BREACH OF FIDUCIARY DUTY CLAIMS

For similar reasons, P180 pleads aiding and abetting breach of fiduciary duty claims against Corlito. P180 extensively pleads her wrongdoing, motives, and access to true information that strongly implies her knowledge. "Substantial assistance occurs when a defendant affirmatively assists, helps conceal or fails to act when required to do so, thereby enabling the breach to occur." *Kaufman v. Cohen*, 307 A.D.2d 113, 126 (1st Dep't 2003). Corlito's role as Controller was essential to the wrongdoing by covering up the fraud when it was about to be discovered, by lying to auditors, and by processing payments in furtherance of the wrongdoing.

More specifically, Corlito knew that Hunsicker was an officer and director of P180 and processed payments Hunsicker directed to CaaStle and her personal accounts despite the lack of approval by an unconflicted director. As Controller and an experienced accountant, Corlito certainly knew that Hunsicker had a conflict of interest and could not, consistent with her duty of loyalty, unilaterally divert P180 funds to herself. The Second Circuit has held under similar circumstances that where a bank saw a lawyer commingling funds in a way that was *ipso facto* a breach of the lawyer's fiduciary duty, the bank's processing of the payments was substantial assistance and violated its own duty "to prevent a diversion" of fiduciary funds. *Lerner v. Fleet Bank*, 459 F.3d 273, 294 (2d Cir. 2006). And here, as in *Lerner*, Hunsicker's actions were "not only an *indication* of a breach of fiduciary duty—it was, in and of itself, a breach." *Ibid.*

As P180's agent, Corlito owed direct duties to prevent diversion of its funds. *Kaufman*, 307 A.D.2d at 126 (direct duty to act can be basis for aiding-and-abetting liability). Corlito had a duty, absent proper authorization, to refuse. Yet she processed payments that Hunsicker could not have authorized unilaterally without violating that duty, substantially assisting Hunsicker in looting P180.

## VI. CORLITO'S GROUP PLEADING ARGUMENT IS MISGUIDED

Corlito repeatedly suggests (at 1, 16, 18, 24) that allegations against her constitute improper "group" pleading. But the Complaint alleges Corlito's role and involvement in the scheme in detail. *E.g.*, ¶¶84, 91-92, 112, 155, 160, 185, 245, 247, 266, 318(a)-(l). While many allegations plead her coordination with other defendants—particularly Jain and Goldenberg—that does not warrant dismissal.

Defendant cannot use Rule 9(b) to avoid liability merely because Plaintiff lacked access to internal documents of another corporation sufficient to identify which specific defendant made which specific misrepresentation. *E.g.*, *Somerville v. Major Exploration, Inc.*, 576 F.Supp. 902,

911 (S.D.N.Y. 1983). When misstatements or omissions were the result of collective actions, Rule 9(b) is satisfied so long as the defendants "stand apprised of the category of documents … as well as of specific misstatements, to enable them to respond to plaintiff's allegations." *Ibid.* The principal applies to RICO cases, where "dismiss[ing] this complaint because of plaintiff's inability to specify further the individual involvement of the officer and director defendants before plaintiff has had any discovery and when the information is exclusively within the knowledge of defendants would be to use Rule 9(b) as a shield protecting members whose organizations commit fraud from ever being sued for that fraud." *Corcoran v. Am. Plan Corp.*, 1987 WL 4448, *5 (E.D.N.Y. Feb. 6, 1987); *Degulis v. LXR Biotechnology, Inc.*, 928 F.Supp. 1301, 1311-1312 (S.D.N.Y. 1996) ("[W]here, as here, the defendants are a narrowly defined group of highly ranked officers or directors who participated in the preparation and dissemination of a prospectus, plaintiffs are not expected to bear the burden of having to identify the role of each defendant in the fraud without the benefit of any discovery."). And others' possession of information is exactly when the "pleading requirements may be relaxed" and plaintiffs are permitted to plead fraud allegations "upon 'information and belief.'" *E.g.*, *Minnie Rose LLC v. Yu*, 169 F.Supp.3d 504, 517-518 (S.D.N.Y. 2016)

P180's understanding of Corlito's role is based in part on allegations drawn from CaaStle's records in the Bankruptcy Trustee's parallel litigation, which P180 has not yet obtained. *E.g.*, ¶¶112, 185. P180 nevertheless alleges many of Corlito's statements and actions individually, including lying about BDO (¶¶91-92) and laundering money through stock redemptions (¶185). For other allegations, P180 pleads her participation consistent with its understanding of her role in the scheme. That satisfies Rule 9(b) by giving her notice of the documents, statements, actions, and transactions at issue sufficient to defend herself.

## CONCLUSION

The Court should deny Corlito's motion or, alternatively, grant leave to amend. *Van Buskirk v. The N.Y. Times Co.*, 325 F.3d 87, 91 (2d Cir. 2003). Discovery is ongoing, including of the Trustee, and documents P180 has unearthed provide substantial additional evidence of Corlito's wrongful activities. Discovery, not dismissal, is appropriate, but P180 can plead more now than when it filed the Complaint.

Dated: September 4, 2026

Respectfully submitted,

STEPTOE LLP

*<u>/s/ Thomas Watson</u>*
By: Thomas Watson

Joseph Myer Sanderson
1114 Avenue of the Americas
New York, New York 10036
Tel.: 212-378-7615
Fax: 212-506-3950
josanderson@steptoe.com

- and -

Thomas Watson (pro hac vice)
Conor Tucker (pro hac vice)
Kaitlyn Sever (pro hac vice)
633 West Fifth Street
Suite 1900
Los Angeles, CA 90071
213-429-9400
twatson@steptoe.com
ctucker@steptoe.com
ksever@steptoe.com

*Attorneys for Plaintiffs*

**CERTIFICATION OF WORD COUNT**

I hereby certify that the word count of this Memorandum of Law complies with the word limits of this Court's Individual Practices. According to the word-processing system used to prepare this memorandum of law, the total word count, excluding the material excluded by rule, is 8741 words.

*/s/ Kaitlyn Sever*
Kaitlyn Sever

**CERTIFICATE OF SERVICE**

I hereby certify that on September 4, 2026, I caused a true and correct copy of the foregoing submission to be filed via the Court's ECF system, which will serve all counsel of record in this action.

*/s/ Kaitlyn Sever*
Kaitlyn Sever