# EXHIBIT 7

26CV499171
Santa Clara – Civil

M. Arechiga

**GREENBERG TRAURIG, LLP**
Benjamin J. Katz (SBN 272219)
benjamin.katz@gtlaw.com
12830 El Camino Real, Suite 350
San Diego, CA 92130
Telephone: (305) 579-0500
Facsimile: (310) 586-7800

Attorneys for Plaintiffs KSV Holdings L.P. and KSV CaaStle Holdings II L.P.

**Electronically Filed
by Superior Court of CA,
County of Santa Clara,
on 7/27/2026 2:59 PM
Reviewed By: M. Arechiga
Env. #24587965
-
Case #26CV499171**

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**FOR THE COUNTY OF SANTA CLARA**

KSV CAASTLE HOLDINGS L.P., a Delaware limited partnership, and KSV CAASTLE HOLDINGS II L.P., a Delaware limited partnership,

Plaintiffs,

vs.

JOHN HENNESSY, an individual, and SCOTT CALLON, an individual,

Defendants.

CASE NO. 26CV499171

**COMPLAINT FOR DAMAGES**

**(1) BREACH OF FIDUCIARY DUTY;**
**(2) AIDING AND ABETTING; AND**
**(3) UNJUST ENRICHMENT**

**DEMAND FOR JURY TRIAL**

Plaintiffs KSV CaaStle Holdings LP ("KSV-1"), a limited partnership, and KSV CaaStle Holdings II LP, a limited partnership ("KSV-2", and together with KSV-1 "KSV" or "Plaintiffs"), by their undersigned counsel, hereby allege as follows against Defendants John Hennessy ("Hennessy") and Scott Callon ("Callon"):

## SUMMARY

1. KSV find themselves the victim of this now highly publicized, more-than-half-billion-dollar fraud scheme in which they were conned into sending millions of dollars in what were supposed to secondary investment funds to CaaStle Inc. ("CaaStle" or the "Company").[1]

2. For nearly a decade, Christine Hunsicker ("Hunsicker"), an experienced tech executive with an alleged track record of success, touted CaaStle,[2] a company she co-founded and led, to potential investors and the media as a "Fashion-Tech Unicorn." KSV-1 and KSV-2 were two such investors.

3. Hunsicker served as CaaStle's CEO and Chair of its Board of Directors.

4. To induce KSV to invest, and conceal the Company's deplorable financial conditions, Hunsicker, among other things, misrepresented the basic facts regarding the Company's operations, finances, and profitability. Hunsicker also misrepresented the way in which KSV's invested funds would be used. In addition to making these false statements, Hunsicker forged and falsified financial records that overstated the Company's revenue by as much as 30 times, misrepresented the Company's earnings by hundreds of millions of dollars, and falsely claimed CaaStle had tens of millions of dollars in cash on hand, when, in reality, it had less than $1 million.

5. Part of the reasons KSV was comfortable investing in CaaStle included its governing body: Hunsicker's pitch to KSV was not only CaaStle's success to date, but the

---

[1] *See, e.g.*, *CaaStle let CEO remain after learning of alleged fraud*, Axios (Apr. 7, 2025), *available at* https://www.axios.com/2025/04/07/caastle-let-ceo-remain-after-learning-of-alleged-fraud, last accessed Oct. 30, 2025.

[2] CaaStle was founded as "Gwynnie Bee" but changed its name in 2018. For ease of reading, the name CaaStle is used throughout this complaint.

fact that its investors and Board of Directors included Hennessy and Callon—two experienced and well-known board members for other prestigious and successful companies.

6. Hennessy, known in tech circles as the "godfather of Silicon Valley," is an internationally known figure in tech, academia, and, notably, corporate governance.

7. Hennessy has often opined on the importance of board oversight and the risks of ethical lapses compounding and bringing down companies without appropriate safeguards in place. For example, in 2018, Hennessy was asked how he would advise two large public companies, which at the time were both dealing with the fallout of corporate scandals, and responded:

> I would say they need a complete overhaul of the management chain. Anybody who was directly responsible, knew about it, or should have known about it and was simply negligent in trying to see what was going on . . . "hear no evil see no evil" is not an excuse.[3]

8. Hennessey, who has been part of Stanford University's faculty since the 1970s, has held lectures on his philosophy on leadership and notably said:

> What do you do with a founder who is the heart and soul of a company and yet isn't behaving? I think he needs a stronger board. He needs a board that's going to push back.[4]

9. Callon, on the other hand, is a world-renowned expert in corporate governance. When interviewed about serving as an Independent Director at Fujitsu, Callon specifically noted the active role in overseeing company affairs that he believes Independent Directors should play, saying:

> I find it troubling when an item is proposed for Board approval after the policy and content have in effect been pre-decided upon by management. I would like to be

[3] *John Hennessy: Why Leading Matters*, The Commonwealth Club of California Interview (September 27, 2018), *available at* https://www.commonwealthclub.org/events/archive/podcast/john-hennessy-why-leading-matters, last accessed Oct. 28, 2025.

[4] *Id.*

involved in discussions from an early stage and be fully convinced before agreeing to any proposal.[5]

10. Callon certainly knew his position as a Board member for CaaStle was not merely honorary. In fact, he said so himself to Hunsicker:

**RE: Catch up** Sent: Sun 6/9/2019 6:54:54 AM (UTC)

From: Scott Callon - Ichigo Asset Management
To: Christine Hunsicker

Hi, Christine. The reason I send such finicky emails as a director is that it is important that we have our corporate governance processes right and can document them to be right if anyone ever wants to double-check them. Apologies for coming across as such a stuffed shirt!

And I remembered the amount was 40,000 options – wrote 50,000 to give us some room. :^)

Take care,

Scott

11. Although Hennessy and Callon certainly talked the talk, here, they failed to walk the walk. Under their watch, they allowed a chairperson and CEO to perpetrate a half-billion-dollar fraud scheme right under their noses and without any pushback or oversight of any kind.

12. Hennessy and Callon, for more than six years, provided no meaningful managerial oversight on an informed basis of CaaStle and particularly Hunsicker as she manipulated financials, lied to investors, and fraudulently solicited and burned through hundreds of millions of dollars of investor funds with no accountability.

13. As discussed in detail below, Hennessy and Callon were utterly derelict in exercising the fiduciary duties they owed to KSV. They not only ignored numerous red flags about Hunsicker's operation of CaaStle but also failed to perform the most basic tasks of independent board members, including, for example, holding regular board meetings, regularly reviewing the company's finances, or soliciting or receiving reports from any single person other Hunsicker.

14. Only when the fraud was discovered by an investor did Hennessey and Callon purportedly first learn of the fraud that had been ongoing for more than seven years. Yet, they failed to disclose it to KSV or any other defrauded investors, or even to take steps to remove

[5] *Fujitsu Group 2020 Integrated Annual Report*, 17, https://www.fujitsu.com/global/documents/about/ir/library/integratedrep/Integrated Report 2020-08.pdf.

Hunsicker from her role as CEO. Instead, recognizing the gravity of the situation, Hennessy quietly resigned, trying to wash his hands of the destruction he allowed to happen, even trying to suggest that he had resigned from the Board three years prior, even though he had attended Board meetings since. Callon, on the other hand, worked with other longtime CaaStle insiders to assist Hunsicker in attempting to raise even more funds from investors.

15. By that time, the damage to KSV had been done. Hunsicker's representations to KSV regarding how its funds were to be used were entirely untrue. Hunsicker represented that KSV's investments would be go towards secondaries—not investments in CaaStle directly, but instead the purchase of other investors' shares in CaaStle thus reducing the total volume of CaaStle's outstanding shares. Instead, KSV's first investment was used, in part, to repay money fronted to Hunsicker to cover hush money[6] that she had paid an earlier investor who had caught on to her scheme, and in another part to pay purported million dollar "consulting agreements" Hunsicker entered, upon information and belief, without Board or CaaStle approval. KSV's second and third investments were instead transferred from KSV into the pockets of Callon to repay his contribution to Hunsicker's hush money, to pay another multi-million dollar "consulting agreement" to the same "consultant," and to other CaaStle insiders, notably her CaaStle co-founder Jaswinder Pal Singh ("Singh") and longtime CaaStle officer George Goldenberg ("Goldenberg"), giving them both multi-million-dollar windfalls—notably without any net effect on total outstanding shares—conveniently just before CaaStle's operations collapsed.

16. None of this would have been possible had Hennessy and Callon lived up to even a modicum of their fiduciary duties as CaaStle's independent directors. Hennessy and Callon failed to keep themselves informed regarding CaaStle's performance; their only points of reference were cherry-picked and facially incomplete snippets of information Hunsicker inconsistently fed them. Hennessy and Callon did not press Hunsicker for complete records, for consistent board meetings, for CaaStle financial records, for capitalization tables, or for

[6] In 2023, Hunsicker was confronted by an investor, Granite Capital Management, LLC ("Granite") regarding a fraudulent audit report and desperately sought a loan from Callon to settle with the investor and make them "go away." Callon quickly made the loan to Hunsicker to fulfill her wish.

regular updates or even irregular ones. They scrutinized nothing. And Hennessy and Callon did not abide by CaaStle's bylaws regarding the obligations of their roles, did not review or sign off on major corporate decisions, did not communicate to anyone at CaaStle other than Hunsicker, did not review or approve share issuances as required, and did not approve secondary and insider sales as required. These corporate governance "pros" were everything but; they "mailed in" their board service at CaaStle.

17. Because they failed to do all these things and so much more, Hunsicker's fraud went unchecked, allowing her to victimize KSV, which as a result suffered substantial losses that they are entitled to recover in this action.

18. Today, Hunsicker has pleaded guilty to her fraudulent scheme and, more importantly, her fraud against KSV has been confirmed through an unpaid final judgment entered against her on August 19, 2025, granting KSV damages of more than $51 million.[7]

## THE PARTIES

19. Plaintiff KSV-1 is a Delaware limited partnership with its principal place of business in West Palm Beach, Florida. At least one ultimate owner of KSV-1 is domiciled in California.

20. Plaintiff KSV-2 is a Delaware limited partnership with its principal place of business in West Palm Beach, Florida. At least one ultimate owner of KSV-2 is domiciled in California.

21. Defendant Hennessy is an individual residing in Atherton, California.

22. Defendant Callon is an individual residing in Saratoga, California.

## JURISDICTION AND VENUE

23. This Court has subject matter jurisdiction over this action because the amount in controversy exceeds the jurisdictional minimum.

24. This Court has personal jurisdiction over Hennessy and Callon because they reside and regularly transact business in the state of California.

[7] A copy of the Final Judgment against Hunsicker is attached hereto as **Exhibit A**.

25. Venue in this Court is proper because Defendants reside in the county of Santa Clara.

## ALLEGATIONS

### Hunsicker and CaaStle, the "Fashion-Tech Unicorn"

26. Hunsicker and co-founder Singh founded CaaStle as a clothing rental subscription service in 2011.

27. Hunsicker had previously served as COO of multiple successful tech startups, and in the years that followed, CaaStle appeared to be on the same trajectory. It received regular glowing media attention about both the company and Hunsicker herself, who by 2019 was recognized as one of Inc. Magazine's "Most Impressive Women Entrepreneurs," Crain's New York Business' "40 Under 40" list, and who in her introduction as an fashion reality show judge was described as "a tech marketplace maven and founder."[8]

### Defendants Serve as CaaStle's Board Members Along with Hunsicker

28. Callon and Hennessy were both early investors in CaaStle. Callon, through his investment firm, made his first investment in November 2012 and Hennessy in March 2013.

29. Callon joined CaaStle's Board of Directors in 2014. He is an international expert in corporate governance who serves as CEO of a publicly traded Japanese firm and has previously served as an Independent Director of Fujitsu. He has served as the only foreigner on Japan's Council of Experts Concerning the Corporate Governance Code.

30. Hennessy joined the CaaStle board in 2018. He is an internationally recognized academic and business leader who has been called the "Godfather of Silicon Valley." Hennessy had previously served as President and Provost of Stanford University, as an Independent Director of Cisco Systems, and as the first Independent Chairman of Alphabet Inc., Google's parent company. When announcing that Hennessy had decided to join CaaStle's Board, Hunsicker referred to his addition as "quite a coup."

---

[8] "Welcome to Fashion Startup." *Project Runway: Fashion Startup*. Dir. Nick Murray. The Weinstein Company. 2016. Lifetime.

31. CaaStle regularly cited Hennessy and Callon's roles as investors and board members as proof of its bona fides. For example, in the pitch materials sent to KSV, both were cited as board members and among the Company's "exceptional investor list."

32. Pursuant to its bylaws, CaaStle's Board of Directors was required to hold regular board meetings; to designate officers (including a secretary to maintain minutes of the Board's meetings); and to approve any transfer of CaaStle stock by its shareholders.

33. Throughout their board service, however, Hennessy and Callon failed to hold regular meetings as required and, as a result, ensured they stayed uninformed and out of the loop regarding the CaaStle's operations, financing, and viability. Over the years, both Callon and Hennessy acknowledged that board meetings were not regularly occurring but took no meaningful steps to rectify the situation. For example, in June 2024, Hennessy emailed Hunsicker and Singh on another topic and included as a post-script, "we haven't had a board meeting in ages -- what's up??"

**Fwd: Note from Henry Kravis' office** Sent: Wed 6/5/2024 2:03:10 PM (UTC)

From: John Hennessy
To: Christine Hunsicker, Jaswinder Pal Singh

Christine/JP,
Background? thoughts?
john

P.S. we haven't had a board meeting in ages--what's up??

34. The next month, Callon texted Singh and similarly noted, "everything OK at CaaStle? We haven't had a board meeting this year so should do one . . . .":

SJ Scott Callon Japan ([redacted]) 7/18/2024, 1:53 PM
Hi, JP. I hope you are great. I just arrived in Manhattan, here through Sunday am. Sorry for the total lack of notice, my usual incredibly behind failure to be on top of things. If you're around for a quick get together, that'd be great, but no worries if not. Totally my bad. Also , everything OK at CaaStle? We haven't had a board meeting this year, so should do one...Thanks!

35. Not only did Hennessy and Callon fail to hold regular board meetings, they also failed to take any meaningful steps to stay informed as to the status of the Company's structure, profitability, and fundraising. At one point in 2021, more than two years into his board service and almost two years after the Company's name was changed from Gwynnie Bee to CaaStle, Hennessy was unaware of the basic corporate structure or even which company's Board of Directors he was serving on.

**question** Sent: Mon 1/18/2021 1:02:49 AM (UTC)

From: John Hennessy
To: Christine Hunsicker

Christine
For reporting purposes, I need some clarification: has Caastle replaced GB? Do both exist? Which board am I on?
thanks,
j

--

**John Hennessy**
James F. and Mary Lynn Gibbons Professor of Computer Science and Electrical Engineering
Shriram Family Director, Knight-Hennessy Scholars
**Stanford University**
[redacted]
@knighthennessy | knight-hennessy.stanford.edu

36. Even on the rare occasions that board meetings were held, no meeting minutes were kept, and at no point did Hennessy or Callon request or receive information from the lawyers, accountants, auditors, officers, or other employees of the Company.

37. Instead, Hennessy and Callon relied solely on Hunsicker and, in doing so, received limited, fabricated information. Hunsicker's fraudulent financials showed that the Company was profitable and flush with cash. For example, the limited excerpts of quarterly financials that Hunsicker shared with Hennessy and Callon in November 2023 stated that at the close of the previous quarter the Company had more than $112 million in cash on hand and an operating profit of more than $33 million from $143 million in quarterly revenue.

38. In reality, as captured by reports done for CaaStle by independent analysts that neither Callon nor Hennessy ever reviewed, CaaStle's cash on hand at the time was no more than approximately $933 *thousand.* Rather than $143 million in quarterly revenue, it actually generated only $15.75 million in *annual* revenue, and rather than gaining tens of millions in profits each quarter, it had *lost* $56 million that year.

39. In that same period, Hennessy and Callon were very well aware that Hunsicker was raising substantial investor funds—she told them so—yet, neither Hennessy nor Callon ever questioned why they were never made to approve any share issuances or transfers as required by CaaStle's governance documents.

**Defendants Ignore Years of Red Flags in Breach of Their Fiduciary Duties**

40. Callon and Hennessy both ignored numerous other red flags about the truth of what was occurring at CaaStle and yet still took no steps to investigate it.

41. For example, on November 28, 2022, Callon emailed Hunsicker with a simple request. In his years as an Independent Director, he had been granted thousands of CaaStle stock options as compensation, and in connection with his personal estate planning, he asked to be connected with an employee at CaaStle who could provide him with basic information regarding the details of his stock options as well as CaaStle's current valuation for the shares so that he could calculate the options' current value. As Callon knew from his time in corporate governance, such a request is a simple one that could be referred to a number of different employees at CaaStle that could readily provide the information.

42. Instead, Hunsicker at first did not respond, then when Callon followed up, responded on December 7, 2022, stating that "I will get you the information in the next 24 hours." Instead, it took Hunsicker over a month to respond to Callon's basic request.

43. But even if the delay in responding could be dismissed as a reason for concern, the contents of the response could not. Hunsicker sent Callon a single page excerpt of an outdated valuation report dated January 10, 2022, nearly a full year prior, that had been provided by an outside firm stating that "the Common Stock of CaaStle Inc. has a value of $1.32 per share as of September 30, 2021."

44. This response, when finally received, raised at least two red flags, both of which Callon ignored. The first was that the conclusion page had been removed from the report as a whole. This is clear from its face, as the page provided specifically references other exhibits, a letter, and an "accompanying report." For a CEO to take steps to hide the full report from a board member is both unusual and concerning. In fact, Hunsicker chose to send only the single excerpt page because the financial data in the full report presented a truthful picture of CaaStle's financial shape. For example, the full report noted that the Company as of September 30, 2021, had $4.5 million in cash on hand and the company's annual revenues were $18.6 million. According to the limited financial data that Hunsicker had otherwise

provided to Callon and Hennessy in that period, the Company's 2021 cash on hand allegedly was $26.6 million and total revenues had been $143.9 million.

45. Second, the stated share price of $1.23 should have served to alert Callon—an experienced executive who had spent more than a decade as the CEO of an investment management firm—that something was amiss. This share price was not in any way consistent with the value of a company that was growing as fast and that supposedly was in as good of financial shape as Hunsicker had represented to the Board.

46. On or about October 9, 2023, Hunsicker got caught. Granite Capital Investors ("Grantie"), an investor which had been asking Hunsicker in vain to clarify inconsistencies in audited financial records she had sent them, went straight to CaaStle's then-auditor, BDO USA, P.C. ("BDO"), for clarifying information. BDO informed Granite they had not in fact prepared the purportedly "audited" financials and that their signature was forged. BDO confronted Hunsicker, along with two other employees, CaaStle's controller and CFO, and subsequently fired CaaStle. Granite, in turn, also confronted Hunsicker, who—in a desperate attempt to silence them from alerting others—offered to buy out Granite of their investment in CaaStle in a confidential settlement. Granite agreed, so as to recuperate its entire $10,509,208.45 investment.

47. By October 26, 2023, Hunsicker and Granite had settled, and Hunsicker was then left to try to find $10.5 million.

48. She immediately approached Callon and requested a short-term personal loan in the amount of $5,000,000. Callon, without much inquiry or diligence, agreed and authorized a loan to Hunsicker from the corporate account of Ichigo Asset Management International Pte. Ltd., a branch of the Japanese company of which he is CEO (and which is operated by Callon's brother). The loan documents, which called for repayment one month after the loan was made, on November 30, 2023, were signed by Callon's brother, one of Ichigo's Directors. Hunsicker replied to Callon by stating how "relieved and humbled" she was.

49. If the CEO's need for such a significant amount of funds on such a short timeline was not enough of a red flag, what followed regarding Hunsicker's repayment was even worse.

Hunsicker failed to repay the loan a month later as required by the promissory note, but rather took almost a full year, until September 27, 2024, to pay—incredibly using KSV's monies transferred that same day. Instead of using her personal funds, Hunsicker wired the repayment for her personal loan from a CaaStle corporate account. This was evident on the face of the transaction records. After finally arranging for the CaaStle funds to be sent to Ichigo to repay this loan, Hunsicker emailed Callon apologetically, stating, "You completely bailed me out of a very rough situation, and I was unbelievably delinquent in getting it back to you. Thank you for the grace you showed me."

50. Had Callon, as a Director of Castle, looked into the circumstances surrounding this unusual loan request, its delinquent repayment, and the fact that Hunsicker arranged for him to be paid with CaaStle's corporate funds, he would have at the very least discovered that Hunsicker had instructed a Senior Vice President to record the $5.25 million repayment not as a personal loan but as a share buyback, an event that required board approval.

51. Furthermore, had he performed the most basic oversight, Callon also would have discovered the reason for Hunsicker's frantic need for significant cash. The "very rough situation" that Callon "bailed" Hunsicker out of was a secret settlement agreement with an investor (Granite) which in early October 2023 had uncovered the truth about CaaStle.

52. Importantly, had Callon or Hennessey had regular communications with CaaStle's controller or CFO, they would have learned of BDO's termination of CaaStle due to a fraudulent audit report distributed by Hunsicker to investors far and wide.

53. On another occasion, Hennessy was approached in June 2024 by one of CaaStle's investors with a request for a discussion "regarding our mutual investment in CaaStle." Such a request should have raised concerns for Hennessy, because it was unprecedented to hear from CaaStle investors and because his role as a Director was to provide oversight of the funds provided by such an investor. Rather than responding to the request, Hennessy merely forwarded it to Hunsicker and Singh – while in the same email noting that CaaStle had not had a board meeting "in ages." Rather than meeting with the investor at issue,

Hennessy accepted Hunsicker's representation the following day that "[t]hey said they wanted to connect and get your perspective. Overall they are very happy / excited[.]"

54. Had Hennessy responded to the investor's request, rather than punting it to Hunsicker, he would have found out that the investor was in fact regularly raising concerns about the lack of financial information regarding the company's performance, despite regular requests for updates from shareholders. It was this same investor—as discussed in detail below—that approximately six months later brought to the Board's attention the fact that Hunsicker had forged the signatures of external auditors and falsified financial records that were being provided to investors. Had Hennessy responded to that investor in June 2024 and been diligent, KSV-2 could have been spared at least $36.8 million in losses.

**With No Oversight to Contend With, Hunsicker Succeeds in Convincing KSV to Invest and Misappropriates KSV's Funds**

55. Through a series of meetings in 2024, Hunsicker approached KSV seeking to secure funding for CaaStle in several investment rounds.

56. At and following those meetings, Hunsicker shared with KSV "audited" financial statements for 2022 and 2023 and projections for 2024 and 2025 that showed CaaStle to be incredibly profitable, flush with cash, and on an upward trajectory. She shared those financial statements and other materials related to CaaStle—including documents relating to the Company's management structure that listed Defendants and their roles—with KSV through a shared data room and via emails at various intervals, starting around March 12, 2024, and continuing through March 2025.

57. For example, on April 22, 2024, Hunsicker shared through email falsified financials of Q1 2024 results. On August 20, 2024, she did the same thing for Q2 2024.

58. On September 24, 2024, Hunsicker represented, through what she described as audited consolidated financial statements, that CaaStle's fiscal 2022 revenue was $238 million, and 2023 revenue was $439 million. Hunsicker also represented that CaaStle's EBITDA was $91 million for 2023 and projected that CaaStle's revenue for 2024 and 2025 would be $793 million and around $1 billion, respectively. All financials were false.

59. Relying on Hunsicker's purported track record in the fashion and ecommerce industries, CaaStle's alleged audited financial records, and the representations Hunsicker shared with KSV, including Hunsicker's representations regarding the roles played by Defendants and other prominent tech entrepreneurs, and the profitability of each of CaaStle's lines of business, KSV saw an investment in CaaStle as a low-risk and lucrative opportunity.

60. Ultimately, KSV invested significant funds in CaaStle through one investment made by KSV-1 on May 31, 2024, and two investments made by KSV-1 on September 27, 2024, and October 9, 2024. Both KSV-1 and KSV-2 were issued stock in CaaStle in exchange. However, none of KSV's funds was spent how Hunsicker had represented.

61. Specifically, with respect to KSV-1's $10 million investment made in May 2024, rather than using the funds to reduce share counts in secondary transactions, Hunsicker instead took KSV's funds and used them, on the one hand, to repay, with interest, more than $1,000,000 to one of the personal lenders that she had used to fund her hush money payments to Granite, and on the other hand, $3,750,000 towards an ambiguous "consulting agreement" entered into by Hunsicker, on information and belief, without Board or CaaStle approval.

62. Hunsicker similarly failed to use the $36.8 million in additional funds that she received from KSV-2 in September and October 2024 as she claimed she would, in secondary transactions. Instead, more than $5,000,000 went to Callon to repay the "bail out" loan to silence Granite, $1,000,000 went straight into Hunsicker's personal account, $3,000,0000 went to the same unapproved "consultant," and $9,000,0000 went to provide a windfall in the form of stock buybacks to Goldenberg and Singh. Notably, the stock buybacks resulted in no net reduction of CaaStle's shares because Hunsicker had also falsified CaaStle's outstanding share count.

63. Moreover, the buyback of Singh's and Goldenberg's shares required board approval and instead of Hennessey and Callon overseeing and approving the process, Hunsicker was left unmonitored. She ultimately not only forged the board members' signatures to complete the buybacks, but she also forged all of KSV's transaction documents that called for Board approval.

64. But for Hennessy and Callon's failures to discharge their fiduciary duties to KSV, KSV would not have invested. For example, had Hennessy and Callon asked to review CaaStle's financial records or even simply scrutinized those provided by Hunsicker, spoken to officers or employees other than Hunsicker, asked Hunsicker questions about CaaStle's fundraising efforts, held regular board meetings, or generally complied with their obligations as set out in CaaStle's governance documents, Hunsicker would not have been empowered to promote and provide KSV with falsified financials and other information.

65. Moreover, had Hennessy and Callon informed themselves of their obligations as set forth in CaaStle's governance documents, they would have known their approval was required for share issuances and secondaries. Had they scrutinized KSV's purchase of shares, the share price and issuances would have raised valuation issues that would have halted the transactions.

**Hennessy Learns of Hunsicker's Fraud and Quietly Resigns**

66. On November 27, 2024, an investor emailed Hennessy to alert him that, a month earlier, he had met with Hunsicker to review what she represented was CaaStle's most recent independent financial audit issued by BDO. After the investor noticed irregularities in the report, he contacted BDO and learned that the audit was a forgery and that CaaStle was no longer its client. Finally, when the investor approached Hunsicker about this, she offered to buy back the investor's shares or for time to "fix" the issue.

67. Over the next 10 days, Hennessy informed Callon of what he had learned from the investor, which they agreed was "deeply disturbing." Hennessy took no steps to inform KSV or any other CaaStle investors with the exception of Singh – Hunsicker's co-founder who only weeks earlier had received $6 million of KSV's funds.

68. On December 6, 2024, Hennessy resigned from CaaStle's board, effectively washing his hands of the certain financial chaos and its aftermath, leaving only Callon and Hunsicker as the remaining board members.

**Callon and Singh Confront Hunsicker About the Fraud But Leave Her in Place as CaaStle's CEO**

69. On or about December 13, 2024, Callon and Singh finally confronted Hunsicker about the issue. Callon, Singh, and Hunsicker agreed that Hunsicker would resign from the Board immediately with Singh taking her place as a Director.

70. The Board did not, however, remove Hunsicker from her position. Nor did they notify investors or other CaaStle officers of her departure from the Board or the concerns that Hunsicker had been relying on falsified financial information when making representations to investors.

71. Instead, the Board informed Hunsicker that she could remain CEO, but that restrictions would be placed on her authority. These restrictions included prohibitions on raising capital for CaaStle or communicating with investors on CaaStle's behalf.

72. For the next three months, while investors remained in the dark, Hunsicker remained as CEO, and the Board's directive regarding her permissible activities went unenforced. Between December 2024 and March 2025, Hunsicker continued to solicit investments from KSV and was publicly named CEO of P180, an entity related to CaaStle and with nearly all the same investors. For example, on a video call in December 2024 between Hunsicker and KSV (the "Video Pitch")—well after the Board had learned of her fraud—Hunsicker walked KSV through CaaStle's business model and represented that all of CaaStle's lines of business (enterprise rental, branded affiliates, and ecommerce optimization) were profitable. On that Video Pitch, Hunsicker represented that CaaStle's "balance sheet had a lot of cash on it, and very little of everything else . . . [CaaStle] is stockpiling cash. . . . [CaaStle] ha[s] several hundred million in the bank."

73. Still with a veil over its eyes, KSV spent considerable time and resources in December 2024, and January, February, and early March 2025, vetting Hunsicker's proposals, negotiating, including through outside counsel, investment terms, and engaging with its limited partners for potential investments in Hunsicker's companies.

74. Callon was fully aware that Hunsicker continued to attempt to raise funds from CaaStle investors and to attempt to resolve the liquidity issues that she had spent years

concealing from CaaStle's investors. For example, on January 20, 2025, Singh sent a text message to Callon stating that he was looking forward to speaking with Goldenberg, Callon, and Hunsicker the following day and noting that Goldenberg and Hunsicker had seemingly "been working incredibly hard on the restructuring and on getting the deal done, respectively." Put simply, Hunsicker's work to "get the deal" done was soliciting more funds from KSV and other CaaStle investors for a new restructured entity to serve as a lifeline for CaaStle.

75. While she was further soliciting funds from KSV despite having been secretly removed from CaaStle's Board of Directors, Hunsicker was also selling off her own shares in CaaStle to existing investors. As she did this, she presented multiple investors with even more fraudulent financial records and forged external audit reports, up through at least March 18, 2025. Neither Callon nor anyone from the Board did anything.

76. On March 24, 2025, Hunsicker resigned as CEO shortly after the Board learned that she and CaaStle were under investigation by law enforcement.

77. Finally, on March 25, 2025, for the first time, CaaStle's Board informed investors via letter that Hunsicker had resigned as CEO and Board member and disclosed that Goldenberg had been appointed to the Board of Directors and had now been appointed as Interim CEO; there was a law enforcement investigation pending; the company was facing a "severe and immediate liquidity problem"; and any financial or capitalization information that Hunsicker previously had shared could not be relied upon because of her history of providing investors with "misstated financial statements and falsified audit opinions."

78. On the same day that the letter was sent, Callon resigned from the Board. KSV was left to pick up the pieces.

79. Not a modicum of Hennessey's or Callon's fiduciary duties was exercised while Hunsicker was left to perpetrate a fraud upon KSV.

80. On February 27, 2026, Hunsicker pleaded guilty to securities fraud and agreed to make restitution in an amount of $283,291,940.

## COUNT I
**Breach of Fiduciary Duty Under Delaware Law**
**(All Plaintiffs as to All Defendants)**

81. KSV repeats and re-alleges each and every allegation contained in Paragraphs 1 through 80 of this Complaint as if fully set forth herein.

82. Defendants, as Directors of CaaStle, each had a fiduciary duty of loyalty to KSV as a shareholder of CaaStle. This duty of loyalty includes as part of it the duties of good faith, oversight, and disclosure.

83. Defendants knew that their fiduciary duty of loyalty required them to serve an important oversight function to prevent violations of law and applicable regulations and ensure accurate information was shared with KSV as a CaaStle investor.

84. Defendants knew that they were not discharging their fiduciary obligations by ignoring their most basic duties of holding meetings, receiving and reviewing updated Company information, particularly of its financials, and making sure that systems and controls were in place to assure that accurate information was reaching CaaStle's Board.

85. Instead, Defendants failed to put any controls in place for numerous years including the time that Hunsicker was permitted to defraud KSV into investing in CaaStle. Through conscious disregard for their duties and obligations, they provided no oversight at CaaStle and failed to discover Hunsicker's fraud and prevent her from using her position as CEO to misappropriate KSV's funds through outright misrepresentations.

86. Defendants' dereliction of their duties was intentional and done in bad-faith disregard of their duty of loyalty owed to KSV.

87. Defendants' breach allowed Hunsicker to steal approximately $47.4 million from KSV from May to October 2024, along with unnecessary related costs and loss of interest.

88. Additionally, by quietly resigning rather than disclosing Hunsicker's misdeeds, Hennessy allowed Hunsicker to continue her fraudulent conduct by seeking additional funds from KSV and depriving KSV of the opportunity to recover the funds it had invested.

89. Callon, by allowing Hunsicker to remain as CaaStle's CEO, by working with Hunsicker to solicit additional funds from KSV, and then subsequently resigned, further breached his duty of loyalty to KSV.

90. As a result of Defendants' breaches of their fiduciary duties of loyalty and of disclosure, KSV has suffered and will suffer injury and is entitled to an award of damages, including pre- and post-judgment interest and costs, to be determined at trial and according to proof.

WHEREFORE, KSV demands judgment against Hennessy and Callon for damages, pre- and post-judgment interest, costs, and such other relief as the Court deems just and proper.

**COUNT II**

**Aiding and Abetting Hunsicker's Breaches of Fiduciary Duties Under Delaware Law**
**(All Plaintiffs as to Callon)**

91. KSV repeats and re-alleges each and every allegation contained in Paragraphs 1 through 80 of this Complaint as if fully set forth herein.

92. Despite having resigned from the Board in December 2024, Hunsicker, remained as CEO of CaaStle until March 2025. As CEO, Hunsicker owed a fiduciary duty of loyalty to KSV as a shareholder of CaaStle.

93. Between December 2024 and March 2025, Hunsicker breached her fiduciary duty of loyalty to KSV when she violated the law and committed fraud by falsifying financial records to induce KSV and other investors into making additional investments in CaaStle and related entities such that she could then divert KSV's funds into transactions aimed at enriching herself and covering up her years of fraudulent activities at CaaStle.

94. Callon knowingly participated in the breach by assisting Hunsicker in her attempts to "re-structure" CaaStle in such a way to resolve the issues, i.e., her fraud, that she had kept hidden from KSV. He further aided Hunsicker in her efforts by withholding the information regarding her forced resignation as Board chairperson from KSV while she simultaneously was soliciting more funds from KSV.

95. KSV incurred significant costs and fees performing due diligence and other work related to Hunsicker's continued fraud, which Callon knew of and allowed her to further perpetrate.

96. As a result of Callon aiding and abetting Hunsicker's breaches of her fiduciary duty of loyalty and of disclosure, KSV has suffered and will suffer injury and is entitled to an award of damages.

WHEREFORE, KSV demands judgment against Callon for damages, pre- and post-judgment interest, costs, and such other relief as the Court deems just and proper.

**COUNT III**
**Unjust Enrichment**
**(All Plaintiffs as to Callon)**

97. KSV repeats and re-alleges each and every allegation contained in Paragraphs 1 through 80 of this Complaint as if fully set forth herein.

98. Unlike other CaaStle investors, KSV received specific misrepresentations about how its investment funds would be used. Rather than funding company operations, KSV's funds were directly used to confer financial benefits on Callon.

99. Callon, who was on notice as to financial irregularities relating to Hunsicker and who had a duty of loyalty—including the subsidiary duties of good faith, oversight, and disclosure—to KSV received the benefit in the form of a $5.25 million payment using KSV's invested funds to satisfy a personal debt owed by Hunsicker. That $5.25 million payment is directly traceable to funds transferred by KSV to CaaStle for its second and third investments.

WHEREFORE, KSV demands judgment against Callon for damages, pre- and post-judgment interest, costs, and such other relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiffs demand a trial by jury on all issues so triable.

DATED: July 27, 2026

**GREENBERG TRAURIG, LLP**

By: */s/ Benjamin J. Katz*

BENJAMIN J. KATZ
California Bar No. 272219
benjamin.katz@gtlaw.com

Attorney for Plaintiffs KSV CaaStle Holdings LP and KSV CaaStle Holdings II LP